# EXHIBIT B

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2
    LLOYD BELL, individually and   ) CASE NO.  1:17CV111
 3  As executor of the estate of   )
    BETTY WHITLEY BELL, deceased,   )
 4                                  )
              Plaintiffs,           )
 5                                  )
    V.                              )
 6                                  )
    AMERICAN INTERNATIONAL          )
 7  INDUSTRIES, et al.,             )
                                    ) Winston-Salem, North Carolina
 8            Defendants.           ) September 25, 2020
    _____
 9

10       CORRECTED TRANSCRIPT OF THE TELEPHONIC MOTIONS HEARING
                    BEFORE THE HONORABLE JOI E. PEAKE
11                   UNITED STATES MAGISTRATE JUDGE

12

13  APPEARANCES (By telephone):

14  For the Plaintiffs:         WILLIAM M. GRAHAM, ESQ.
                                WALLACE & GRAHAM, P.A.
15                              525 North ▇▇▇ Street
                                Salisbury, North Carolina 28144
16
                                FRANK J. WATHEN, ESQ.
17                              LEAH C. KAGAN, ESQ.
                                SIMON GREENSTONE PANATIER PC
18                              1201 Elm Street, Suite 3400
                                Dallas, Texas 75270
19

20  For the Defendants:
    AII:                        ROBERT E. THACKSTON, ESQ.
21                              KURT W. GREVE, ESQ.
                                SAMUEL GARCIA, ESQ.
22                              LATHROP GPM LLP
                                2101 Cedar Springs Road, Suite 1400
23                              Dallas, Texas 75201

24

25
```

```
 1  APPEARANCES Continued (By telephone ):

 2  For the Defendants:
    Brenntag North America:   TRACY E. TOMLIN, ESQ.
 3  Whittaker Clark           BENJAMIN S. CHESSON, ESQ.
                              NELSON MULLINS RILEY & SCARBOROUGH LLP
 4                            301 South College Street, Suite 2300
                              Charlotte, North Carolina 28202
 5

 6  Colgate-Palmolive:        MATTHEW R. SCHROLL, ESQ.
                              NELSON MULLINS RILEY & SCARBOROUGH LLP
 7                            2 South Biscayne Boulevard, 21st Floor
                              Miami, Florida 33131
 8
    Cyprus Amax:              TIMOTHY PECK, ESQ.
 9                            FOX ROTHSCHILD LLP
                              P.O. Box 21927
10                            Greensboro, North Carolina 27420

11  Neslemur Co.:             JOE CARRUTHERS, ESQ.
                              WALL BABCOCK, LLP
12                            1076 West Fourth Street
                              Winston-Salem,  North Carolina 27101
13

14  Transcriber:              BRIANA L. BELL, RPR
                              United States Court Reporter
15                            P.O. Box 20991
                              Winston-Salem, North Carolina 27120
16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2            THE COURT:  All right.  Good morning.  This is Judge

 3  Peake.

 4            Ms. Kemp, do I have the call?

 5       COURTROOM DEPUTY CLERK:  Yes, Your Honor.

 6            THE COURT:  All right.  Very good.  Good morning to

 7  you.

 8            COURTROOM DEPUTY CLERK:  Good morning, Judge Peake.

 9            THE COURT:  All right.  So what I am going to do is

10  first note we're here in Case 17CV111.  And as is my usual

11  practice, I will start by finding out who is on the call for

12  each of the parties and who is going to be handling the matters

13  today.

14            So let me start first with the Plaintiff.

15       MS. KAGAN:  Good morning, Your Honor.  My name is

16  Leah Kagan from Simon Greenstone Panatier on behalf of the

17  Plaintiff, and I'm joined with my cocounsel, Frank Wathen, from

18  my law firm, and we will together be handling the motions,

19  although I suspect I will be arguing most of them.

20            THE COURT:  All right.  And did we have local counsel

21  as well?

22       MR. GRAHAM:  Your Honor, good morning.  It's Bill

23  Graham at Wallace & Graham for Ms. Bell as well.

24            THE COURT:  All right.  Very good.

25       MR. GRAHAM:  Thank you.
```

1        **THE COURT:**  All right.  As to the Defendants, AII?

2        **MR. THACKSTON:**  Good morning, Your Honor, Robert

3   Thackston for AII.

4        **THE COURT:**  All right.  Very good.  Anybody else here

5   with you, Mr. Thackston?

6        **MR. THACKSTON:**  Yes, Your Honor.  I have a client

7   representative, Brian Dror, and then also counsel with me from

8   my firm are Kurt Greve and Sam Garcia, but I believe I will be

9   doing the talking.

10        **THE COURT:**  Okay.  Very good.

11        As to Colgate-Palmolive?

12        **MR. CHESSON:**  Good morning, Your Honor.  This Ben

13   Chesson from Nelson Mullins down in Charlotte, and Matt Schroll

14   is on the phone as well from Nelson Mullins, and I believe Matt

15   is going to be handling the majority of the speaking from our

16   side.

17        **THE COURT:**  All right.  And let me -- so remind me

18   again, Mr. Chesson, who is with you?

19        **MR. CHESSON:**  Matt Schroll is with me from Nelson

20   Mullins as well.

21        **THE COURT:**  Okay.  Very good.

22        **MR. CHESSON:**  Mr. Schroll is going to handle the

23   majority of the argument for our side.

24        **THE COURT:**  Okay.

25        All right.  For Cyprus?

 1           **MR. PECK:**  Good morning, Your Honor.  It's Tim Peck
 2  from Fox Rothschild.
 3           **THE COURT:**  All right.  Very good.
 4           And for Whittaker Clark & Daniels?
 5           **MR. PECK:**  Good morning.  This is Tracy Tomlin
 6  representing Whittaker Clark & Daniels.
 7           **THE COURT:**  Very good.
 8           And do we have the folks for Neslemur here today as
 9  well?
10           **MR. CARRUTHERS:**  Joe Carruthers, Your Honor.
11           **THE COURT:**  All right.  Very good.
12           All right.  We have multiple motions on today.
13  Again, I appreciate the joint status report.  We've been here
14  several times before.
15           As you know, my usual practice is to allow everyone
16  to be fully heard and then make decisions as we go; but given
17  the number of times we've met before and some concern that
18  there may have been some breakdown in communication here and
19  just trying to get things back on track, what I'm going to do
20  is just give you some general thoughts before we get started,
21  and then I will let you know how I've organized things and my
22  initial thoughts.  And then I will let each of you be heard
23  briefly if there is anything new to add or anything else you
24  want to be heard on those things.
25           So before we begin, I'll let you know I've read

1  everything that you all have filed.  At this point there's

2  3,000 pages sitting here on the bench with me.  I do not find

3  any bad faith or basis for sanctions, and any requests for

4  sanctions or requests for motions back and forth along those

5  lines really I don't find very helpful or persuasive at this

6  point.

7         So I'm just going ahead and letting you know now the

8  only potential sanction that I am looking at is the possibility

9  of whether I need to require local counsel to sit in on all

10 these depositions or to be the ones responsible for filing

11 discovery motions going forward; and I will wait until the end

12 of the hearing and then make some decision if we need to do

13 that or not in this case.

14        My goal right now today is to just resolve whatever

15 disputes remain in place.  I've identified three areas I need

16 to address.  So what I am going to do is just start with

17 letting you know what those issues are and how I've organized

18 them and what my initial thoughts are on that.

19        So, first, as to Nos. 161 and 190 -- this is

20 Plaintiffs' motion to quash as to Lab/Cor and Defendant AII's

21 motion to compel.  On that one, I just want to, as we go

22 through, confirm that all of the records that have been agreed

23 to have now been provided and confirm that all videos have been

24 produced and whether there is any need for an affidavit from

25 Mr. Fitzgerald on that or any other videos for any other

1  experts.

2          As to whether to allow a limited deposition of

3  Mr. Harris, particularly limited just to the facts surrounding

4  his testimony -- or, excuse me, his testing, not any opinions,

5  but just his testing, and that would be a one- or two-hour sort

6  of limited deposition.

7          I want to address the dispute regarding the time

8  limit for what remains for Dr. Fitzgerald.  It looks like

9  additional time might be warranted in light of the late

10  disclosure of the videos, but I also noted in the joint Rule

11  26(f) report you had all stipulated to no limits on expert

12  depositions with respect to the time limits that might

13  otherwise apply.  So if there is a good cause showing to change

14  that, we can address that, but, otherwise, that would be the

15  stipulation that was agreed to and adopted in the scheduling

16  order in this case.

17          There are also local rules with respect to

18  depositions, and I call your attention to those, particularly

19  30.1 in this case.

20          With respect to Document No. 168, Plaintiffs' motion

21  to quash as to Northwell, and 179, the motion for protective

22  order as to Dr. Moline and the related motions to seal, I don't

23  find any bad faith or unreasonable conduct.  ███████████

24  ██████████████████████████████████████████████████████

25  ████████████████████████████████████████████



1　　　　　　　　　　　　　It looks like Plaintiffs' counsel

2　just referred defense counsel to Northwell to obtain that.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22　　　　　　It also seems to me that with respect to the rest of

23　the information requested from Northwell, that could be the

24　subject of party discovery regarding the designated experts;

25　and so it looks to me like we may not need further subpoena

1  from Northwell, but that would be without prejudice to getting

2  that information in expert discovery, if it's appropriate and

3  within the scope of the rules.  So we can talk about that.

4          As to the motions to seal, I think it's appropriate

5  to treat this as confidential information limited to the

6  present suit.  To the extent we would take this up separately

7  when dispositive motions are filed or at trial, then you would

8  have First Amendment protections with respect to the court's

9  public record; and those would definitely require a higher

10  standard to overcome, and that's going to be something the

11  district judge will need to consider in this case.

12          But when we're talking just about discovery motions

13  and filings related to discovery, we don't have those same

14  level of First Amendment protections.  Here, this is related to

15  medical information or expert discovery, and I am going to

16  treat that as confidential and limited to the case for purposes

17  of discovery, but without making any finding with respect to

18  filings on dispositive motions or at trial.

19          And, specifically, that means because Plaintiff is

20  claiming it's confidential, you all would need to file Local

21  Rule 5.4, file motions to seal, and then have that heard and

22  resolved by the district judge, if that is necessary to be

23  filed at some point related to dispositive motions or trial.

24          As to Colgate-Palmolive's motions and scheduling

25  generally, it looks like that that was raised or necessary

1  because of some delays in the dates for Plaintiffs' expert

2  depositions.  So in that sense, I would treat that as a request

3  by Plaintiff to be able to have their experts deposed out of

4  time since their experts were not provided within the deadline

5  of September 21st.  If there is agreement to allow those

6  depositions late, as long as the dispositive motion deadline is

7  extended, I can consider that with some time coming out of both

8  Plaintiffs' response time and Defendant's briefing time on

9  that.

10       And then as to Dr. Attanoos -- it looks like

11  Dr. Geyer, the designated expert for now, it may be necessary

12  for Colgate-Palmolive to request leave to substitute prior to

13  trial, if Dr. Geyer is not available.

14       On the one hand, I don't disagree that some of that

15  can be resolved later closer to trial once you know if

16  Dr. Geyer is going to be available or not, but to the extent

17  it's helpful now, I can tell you that, as to Dr. Attanoos as an

18  alternative, I have not ever tried to supervise tax compliance

19  on a party's expert.  I don't intend to try to do that.  I also

20  don't generally exercise jurisdiction over experts, whether

21  they're outside of North Carolina or the U.S.  I exercise my

22  jurisdiction over the parties to the case.

23       So if there are restrictions we need to put on

24  Colgate with respect to what they might do or ask their expert

25  to do, we can do that subject to all the ordinary spoliation

1  rules that would apply, but, otherwise, I don't see any issue

2  with Dr. Attanoos.  And what I would suggest is going ahead and

3  letting Dr. Attanoos have the information, prepare a report for

4  the alternative, if Dr. Geyer is not available, but then

5  reserving any final determination on a request to substitute

6  and whether that would be ultimately necessary and how that

7  might look for the spring, although, I will tell you, it will

8  need to be resolved by February 15th, I think, to keep you on

9  track, either a deposition of Dr. Geyer by then or a motion to

10  substitute for the trial judge to consider.

11       I have, again, gone through all of that as a

12  preliminary matter, not because I don't want to hear you, but

13  because I think it will help to focus our conversation and keep

14  things on track for what the actual disputes might be that

15  remain and the things that we need to address today.

16       I am going to keep them generally in that order with

17  respect to how we're taking those things up, so for

18  Colgate-Palmolive and the scheduling issues, I'm going to save

19  that for last.

20       I will start first with the AII issues and beginning

21  with the Lab/Cor issue and AII's motion to compel, which are

22  Documents 161 and 190.

23       And, Mr. Thackston, since it's your motion to compel,

24  I am going to hear from you first, and then I will go back to

25  Ms. Kagan on that.

1          **MR. THACKSTON:**  Thank you, Your Honor, Robert

2  Thackston for AII.

3          Your Honor, overlaying all of this is the fact that

4  there's two different kinds of testing:  One is bulk sampling,

5  what's in the powder.  Number two is air sampling, what's in

6  the air that the Plaintiff can allege that Mrs. Bell breathed

7  and contributed to her mesothelioma.

8          So in this case, there is one container of Clubman

9  talc.  There's no allegation that my client made it.  It was --

10  my client bought the brand in 1987.  This is an old metal can

11  of unknown origin.

12          That can -- Mrs. Bell -- the evidence I think is

13  undisputed.  Mrs. Bell -- or her lawyers provided that can to

14  Mr. Fitzgerald in Greensboro.  Mr. Fitzgerald took some of

15  it -- he's a geologist, and he took some portion of it, put it

16  in test tubes, and gave it to Mr. Segrave, who is an expert

17  hired by AII.  This all occurred in the New Jersey case back in

18  2015.

19          So Mr. Fitzgerald gave a report in the New Jersey

20  case, and we were aware that Mr. Fitzgerald had done both the

21  bulk sample test and what he claims is an air releasability

22  test, which we'll talk about, but, basically, he's manipulating

23  that can inside of a glovebox in a manner that he claims is

24  consistent with how Mrs. Bell used it.

25          So skip forward to this case, we see in March of 2020

1  the Plaintiffs filed expert designations, and they did not list

2  Mr. Fitzgerald, and they listed Dr. Compton, who is in Atlanta.

3  When they produced Dr. Compton's reliance materials, it

4  mentioned in the chain of custody for the can -- he had also

5  done tests on the can.  So it mentioned Lab/Cor and John

6  Harris, and this is a lab out in Seattle.

7         And we have Dr. Moline's report.  She says that

8  she -- that it has been confirmed by three different

9  laboratories that there was asbestos in the container, the can,

10 that Mrs. Bell had.

11        And you will recall that the first hearing we had

12 here was our motion to compel production of a can, right,

13 because we want to figure out exactly what has happened with

14 this can and how much of the material has been used.

15        So we're aware of the bulk sample with

16 Mr. Fitzgerald, but we weren't aware that the can then went --

17 well, that Mr. Fitzgerald did destructive testing on the

18 product, right.  And so this is a product liability case and

19 the product is that can, even though it's not an AII product.

20 It's what Plaintiffs claim is relevant physical evidence in

21 this case, that can.

22        So they destroy some portion of that material in

23 doing these air tests.  I don't think -- I got the Plaintiffs'

24 response this morning, and they said no material was destroyed;

25 but Mr. Fitzgerald, who we deposed last week, said, Yeah, I

1 mean, we didn't put -- whatever we used, we didn't put back

2 into the can. And he can't tell us how much he used.

3        So then the material -- we find out this year the can

4 apparently goes to Mr. Harris. We don't know what Mr. Harris

5 did, but he issues a report in 2016 through Plaintiffs'

6 counsel, same Plaintiffs' counsel in this case, and he says he

7 found asbestos in this white can as well, and he apparently did

8 a releasability or air sampling test and destroyed some of it.

9 Again, I'm not aware of any notice to AII's counsel or AII that

10 destructive testing was going to be done by Mr. Fitzgerald or

11 Mr. Harris. Then the product apparently goes to Dr. Compton in

12 Atlanta, who then does a third set of testing.

13        So Mr. Harris and Lab/Cor are in the chain of custody

14 of this can. We don't know exactly when it went to him. We

15 don't know what he did. Plaintiffs say that, well, it doesn't

16 matter because it's all consistent.

17        Well, first of all, it matters because if they're

18 going to try to get into evidence, which they obviously are,

19 these two so-called releasability tests, then we would

20 obviously need to know how much was released and how was it

21 released.

22        That's the whole issue with the videotapes, which I'm

23 not going into right now, but the chain of custody of the

24 physical evidence in the case went from Fitzgerald to Harris to

25 Compton, and what exactly happened at each stage is very

1  important.

2          And Mr. Harris at Lab/Cor apparently found a

3  different kind of asbestos called anthophyllite, but he lost

4  the fiber.  He said he had a microscope malfunction that caused

5  him to lose the anthophyllite fiber, so he's reporting on

6  tremolite.

7          So the Plaintiffs have two experts, Compton and

8  Moline, both specifically saying that they're relying upon the

9  Lab/Cor report.  They now have a can.  They're apparently going

10 to finally let us look at it maybe next week, look at it only;

11 but Mr. Fitzgerald didn't weigh the can.  He couldn't tell us

12 how much he started with.  He couldn't tell us how much he

13 used.  He couldn't tell us how much he ended with.  We went

14 through all the different ways.  You could have just measured

15 the container before your test and measured it after the test,

16 and that might not be the most scientific way, but you could

17 have at least done that.  He didn't do that.

18         So they claimed to have done these tests in a way

19 that replicate the way that Betty Bell would have used the

20 product.  Well, we spent some time with Mr. Fitzgerald talking

21 about all the reasons why that's false; first of all, that it's

22 in a box.

23         But Mr. Harris, apparently, and Lab/Cor, they say

24 that their assistant put the powder all over somebody's arm

25 inside of a box.  And there's no allegation -- Mrs. Bell

1  alleges that she used it on a brush to brush off someone's neck

2  after a haircut.  So why he would do a test pouring it all over

3  someone's arm is a mystery and whether he videotaped that so we

4  could see -- so we could show just how dissimilar it is to what

5  Ms. Bell actually said that she did with the product.

6       So I don't think calling this person a consulting

7  expert fixes the problem when that consulting expert is in the

8  chain of custody as a physical product -- the physical evidence

9  in the case.  I think the consulting expert cases that the

10 Plaintiffs cite, none of them had anything to do with someone

11 who actually handled the product and was in the chain of

12 custody.

13      And the second is this would be a classic case of

14 exceptional circumstances.  Even if he were a consulting expert

15 and his material otherwise protected, these are the exceptional

16 circumstances where there's no way the Defendant can otherwise

17 have access to this kind of information.  It's the physical

18 custody of the product and what he did with it to preserve it

19 when he got it, how much of it he disposed of.

20      And I think the fact that they didn't give notice to

21 the Defendants that they were going to do destructive testing

22 of this product is another factor weighing in favor of allowing

23 the discovery of the information, but we don't know how much he

24 used, we don't know how he used it, and then we don't know what

25 he did with the product after that.

1        So I think those are all circumstances justifying

2   that the full file be produced, and I'm not aware of our having

3   received anything.  Plaintiffs' counsel say that they are

4   trying to get in touch with him, and the fires in California

5   are keeping him from producing this; but this happened over

6   four years ago, and it was specifically requested in written

7   discovery that the Plaintiffs just blew off.  They objected to

8   it, said it would be provided by way of expert testimony -- or

9   expert designations and expert productions, but since they

10  claim that he's a consulting expert, none of it was provided.

11       I really needed it to cross-examine Mr. Fitzgerald.

12  I will need it to cross-examine the rest of their witnesses who

13  claim they rely upon this chain of custody -- I mean, this

14  report, and for Dr. Compton, to talk to him about the chain of

15  custody, since this same can has now been from Greensboro to

16  Seattle to Georgia.

17       **THE COURT:**  All right.  That's good, Mr. Thackston.

18  I think I understand your position on that.

19       I'm going to go through all the different pieces I

20  have as far as -- related to this to make sure we've covered

21  everything before I go to Plaintiff on that.

22       The first note I had was confirming whether the

23  records that have been agreed to have been provided.  It sounds

24  like you don't yet have the records.  There may still be some

25  delays out there on the West Coast, but you don't have those

1  yet; is that right?

2          **MR. THACKSTON:**  That's right, Your Honor.

3          **THE COURT:**  And then with respect to the deposition

4  of Mr. Harris, I have a less concern about the destructive

5  aspect of it because my understanding is that these –– the

6  sample was divided, and Defendant was given their sort of

7  portion of it prior to the Plaintiff testing going forward.

8          I understand in some cases where you've got

9  destructive testing and there's no sample left, then that

10 becomes a basis for exceptional circumstances.  I think here my

11 focus is more the first part of your argument, which is the

12 chain of custody, the way that the testing went, some of –– any

13 details about that that then was put into the report or at

14 least was the basis for the report that was then relied upon by

15 the testifying experts.

16         It does look like there is case law supporting the

17 notion that that would provide exceptional circumstances, but I

18 would want to be careful to make sure we're limiting it there

19 to that aspect and not some issue of determining whether he had

20 some inconsistent opinions or what his opinions might be of the

21 other testifying experts' opinions or things well afield of

22 that, which I think would unnecessarily invade the protection

23 for nontestifying experts.

24         **MR. THACKSTON:**  Your Honor ––

25         **THE COURT:**  I will stop with that and let you all

1  respond to that.

2          **MR. THACKSTON:**  Well, the question of whether giving

3  us a sample fixes the destructive part of the testing, that's

4  fine for bulk sampling.  We can bulk sample what -- the portion

5  they gave us, but for the air release test, those are done with

6  the can.  The can is used, and they shake out a certain amount

7  from the can.  How much you get, how fast you get it, how you

8  shake the can, how long you shake the can, and what you do with

9  it once you get it out, we can't replicate that.  We don't know

10  what they did.  That goes to the issue of the videotapes.  We

11  don't know what they did.  We can't do it.  We've never had

12  possession of the can.  We never will have possession of the

13  can.

14          So the fact that they gave us a small portion for

15  bulk sampling doesn't fix that part of the sampling and our

16  inability to know what they did or to replicate it.

17          **THE COURT:**  Okay.  That's helpful.

18          What about the second part of that in terms of how

19  we -- because I think that's still consistent with limiting it

20  to the information about how he did the testing and what he did

21  as opposed to any opinions of his?

22          **MR. THACKSTON:**  Well, Your Honor, if they're not

23  going to rely on any opinions of his, then that's a fair use of

24  someone as a consulting expert; but if they are going to rely

25  on the opinion and say he found -- he says he found X, then I

1 should be able to get into, well, what makes you think that is

2 X? Because whether something they see under a microscope is

3 actually asbestos is certainly a subjective determination, and

4 it depends on the methodology that they're following and their

5 expertise, and that makes things like standard operating

6 procedures and his training relevant to the inquiry.

7         **THE COURT:** So maybe it's more helpful to be specific

8 and state his opinion as to whether it was asbestos or not or

9 what he saw as opposed to any opinion he might otherwise have

10 regarding what that means or Ms. Bell's case or the other

11 opinions that then other experts may have offered.

12         **MR. THACKSTON:** Yes, Your Honor, that would be fair.

13         **THE COURT:** Okay. All right.

14         The other notes I have related to this No. 190 was

15 the dispute regarding the time limit for Mr. Fitzgerald's

16 remaining deposition.

17         Have you all resolved that yet?

18         **MR. THACKSTON:** No, Your Honor.

19         **THE COURT:** Is it your understanding still that you

20 all had waived the time limits for expert depositions?

21         **MR. THACKSTON:** Yes, Your Honor, that's my

22 understanding, and I specifically tried to raise that in the

23 meet-and-confer, that the rules governing this case do not have

24 a time limit for experts. I tried to say that in the

25 meet-and-confer.

1      **THE COURT:**  All right.  And then I think that may be

2   it with respect to No. 190, but you tell me.  Is there anything

3   else that we would need to address with regard to the motion to

4   quash as to Lab/Cor and the motion to compel that you filed?

5      **MR. THACKSTON:**  As long as we're not rolling up the

6   video for Fitzgerald issue into that, then that would be all of

7   it.

8      **THE COURT:**  Okay.  Well, since that was in 190, I

9   guess, the videos as to Mr. Fitzgerald, my understanding was

10   they had provided those and confirmed that there were not any

11   others.

12      I understand that there was the concern raised

13   earlier that they hadn't been provided, and it wasn't

14   investigated or determined what may have happened until his

15   deposition.  And so I would be inclined to give you additional

16   time with him if you needed that, but if we're not subject to

17   any time limits for expert depositions anyway, then I don't

18   know that there is anything else we would need to address with

19   that, but you tell me.

20      Anything else as to that?

21      **MR. THACKSTON:**  Well, yes, Your Honor, because we

22   don't have a clear answer on whether there really were

23   videotapes.

24      Fitzgerald said -- and this is why you ask it in an

25   interrogatory and a request for production, too, to try to get

1  clear what videotapes exist or any test that you are going to

2  rely upon for Clubman.  We tried to ask that, I think, separate

3  from expert disclosures and discovery, but the Court allowed

4  them to defer that until the time of answering the -- providing

5  the expert materials.

6          So Mr. Fitzgerald's report said in 2016 that he

7  videotaped these releasability studies.  So this is what he

8  does in the glovebox.  He said he videotaped it.  And on page

9  48 of his report from June 29, 2020, he says, again, videotapes

10 of this -- of these tests available upon request.

11         Well, at the time they -- at the time that they send

12 out Fitzgerald's report in June of 2020, we not only asked --

13 in the written discovery from October of last year, we've not

14 only asked about the videotapes, but we've had a motion to

15 compel it.  The Court has specifically brought it to their

16 attention.  There's been a representation that all videos will

17 be produced as part of the expert discovery.  And he says at

18 that point there are videotapes, but these are things that our

19 experts really and fairly should have been able to see to see

20 what they did to get these numbers.

21         So during the deposition, the first position is,

22 well, we gave it to you.  We gave you a link.  And so we spend

23 time going through the link trying to find it, and then,

24 finally, he says, Okay, I didn't give it to you in a link; I

25 will see if my assistant can find it.  And I said, Have you

1  ever been asked before to provide these videotapes?  And he

2  said no.

3  So we have that, and then the report says they exist.

4  So we're looking for the four tests, and so we asked for uncut

5  videos of everything he did with Clubman testing.  What we get

6  instead -- and the report talks about how long the test went

7  on.  What we get instead -- there are four things he did:

8  Application, then he did a second application, then he did a

9  sweeping, then he did a second sweeping.

10  His report says, I get the highest numbers from my

11  sweeping tests, three and four.  And I asked him a number of

12  questions about what he did, and he said every time -- he said

13  many times -- and I can provide the Court with the example --

14  many times:  I don't remember.  I don't remember.  You'd have

15  to look at the video.

16  Okay.  So then he produces two what appear to be cut

17  videos from one and two, putting stuff on the mannequin, but

18  they're cut, I think.  They're not as long as what he did

19  overall, and one of them -- I mean, it's been altered.  One of

20  them has got Clubman video -- Clubman tests superimposed over

21  the thing, so it's obviously not the uncut version.

22  And then I start asking him questions about what he

23  did with the sweeping.  I said, Well, did you sweep it into --

24  Did you sweep it into a pile?  Was the can still inside of the

25  enclosure?  Did you remove it with a dustpan?  The second

1  sweeping, were you just sweeping everything around again or

2  were you sweeping what was left?  He couldn't answer any of

3  those questions.

4         And then ultimately he said -- he said, I don't

5  remember.  I don't remember.  And then he said -- I said, Where

6  are the videos?  Wouldn't the video be a better demonstration?

7  And then he said at one point in his deposition, Well, if you

8  will just look at the video, it will tell you what I did.

9         So then the story evolved from I gave it to you to I

10  can't find it to, well, there aren't any.  So I think we're

11  entitled to an answer in the written discovery from Plaintiffs

12  about whether there -- are there not any because you lost them

13  or you destroyed them or you never videotaped three or four,

14  even though your report in June of 2020 said you did videotape

15  it?

16         This is a really big deal because what they did with

17  the product to get the numbers used to be substantially similar

18  to what happened in the case.  It's their burden to prove that,

19  but shame on us if we don't try to fully discover exactly what

20  they did.

21         So I would say that the only way we're going to get a

22  straight answer that we can hold the Plaintiffs to is if they

23  are required to answer the interrogatory that we asked them

24  that explains are there videotapes of tests of Clubman

25  products?  If so, list them, explain what exists, and then we

1  can make sure we have that, and we can cross-examine their

2  experts, and we can present them to our experts.

3      **THE COURT:**  All right.  So boiling that down, it

4  looks like if you have another opportunity to question

5  Mr. Fitzgerald now that you have the videos, you can follow up

6  with him to the extent you need to get further testimony from

7  him.  And then in addition, given the failure to having

8  previously disclosed those, the remedy may be to request or to

9  get another answer or a specific answer to the interrogatory as

10  to video to make sure exactly what exists as to each of the

11  experts, if anything, and to have that separately listed out.

12      Is that what you're asking for then on that,

13  Mr. Thackston?

14      **MR. THACKSTON:**  Yes, Your Honor.

15      **THE COURT:**  Okay.  Anything else as to Nos. 161 and

16  190?

17      **MR. THACKSTON:**  Not from me, Your Honor.

18      **THE COURT:**  Okay.  And I did note, with respect to

19  161, the motion to quash as to Lab/Cor, that aspect of it would

20  seem to be mute to the extent you're not pursuing this as a

21  subpoena to Lab/Cor as part of expert or party discovery, and

22  we would be handling it as to No 191.

23      Is that accurate, Mr. Thackston?

24      **MR. THACKSTON:**  Yes, Your Honor.  If the Court

25  considers that to be the equivalent, if they prefer to deal

1  with it as discovery to the expert and they're going to provide

2  it by way of expert discovery, then I don't think we need to

3  treat it like a subpoena to Lab/Cor; but at the time we did

4  that, I don't think we knew that they were claiming that Harris

5  was a consulting expert.  It was just someone in the chain of

6  custody.

7          **THE COURT:**  All right.  That's helpful.

8          What I am going to do now is -- before we move on to

9  any other motions, let me come to Ms. Kagan, and then we'll see

10  if there is anybody else who needs to weigh in.

11          Ms. Kagan, as to these issues with respect to Nos.

12  161 and 190, let me let you respond to any of those things and

13  give me your position on the particular disputes that remain.

14          **MS. KAGAN:**  Thank you, Your Honor.

15          I can separate out the two experts and address

16  Mr. Harris first.

17          **THE COURT:**  Okay.

18          **MS. KAGAN:**  As we laid out in our motion to quash the

19  Harris subpoena, Mr. Harris has never been disclosed under Rule

20  26 as an expert.  He has always remained as a consulting

21  expert.

22          The can of Clubman that was provided to him was

23  provided to him, as the Court noted, after counsel for AII had

24  their expert collect aliquots of talc from that can, and

25  anything that Mr. Harris did did not destroy AII's opportunity

1  to collect talc or to conduct any testing.

2        I thought it was interesting that Mr. Thackston

3  claimed that using the can itself in a simulated exposure study

4  somehow destroyed evidence that they don't have access to.  The

5  evidence is the talc itself, right.  That's what's being used,

6  and they were given samples of the talc.  Their expert offered

7  a report and offered opinions on their samples of talc before

8  Mr. Harris was ever involved in consulting on this case, and so

9  the idea that evidence was destroyed is simply not true.

10        The can itself -- to replicate an air test --

11  deposing Mr. Harris or obtain information from Mr. Harris by

12  way of documents does not allow anyone to replicate his test

13  unless you get a can that's the same and then you replicate the

14  test, or you can request the can to do the test.

15        At this point in time, AII has never requested the

16  can so that they could do their own simulated analysis.  In the

17  years that this case has languished, they have never made that

18  request to do their own air simulation, and, in fact, their

19  designated expert, Mr. Segrave, is not qualified to do such a

20  test.  He is no longer employed by any laboratory.  He has

21  nowhere to do such a test.

22        So the idea that we have destroyed evidence and

23  prevented AII from replicating an air test by not disclosing

24  Mr. Harris as an expert is -- I can't make the logical link

25  there, but what we did do is we disclosed the facts in data.

1  We disclosed Mr. Harris' findings, even though we chose not to

2  disclose him as an expert in this case.

3          And the idea, again, that we were evidence shopping

4  and that would somehow create exceptional circumstances that

5  would warrant the deposition of a nontestifying expert under

6  Rules 26 and 30 is, again, inconsistent with what the facts are

7  in this case.  We didn't hide that evidence.  We didn't go to

8  multiple different laboratories looking for good evidence and

9  not disclosing bad evidence.

10          All three laboratories that we sent this can to all

11  found the same thing.  They found amphibole asbestos in the

12  talc samples by bulk testing and by air testing, and they found

13  the same type of asbestos, tremolite asbestos.

14          And so we could disclose Mr. Harris as an expert.

15  There's nothing harmful in his testing.  We disclosed his

16  testing, but we don't intend to rely on it or him, and that's

17  why we didn't disclose him.  We provided his report to the

18  other experts in the case as part of the chain of custody and

19  documentation in the case, but no expert in the case actually

20  relied on any of Mr. Harris' findings.  Mr. Fitzgerald

21  certainly doesn't.  He came up with his opinions before

22  Mr. Harris ever tested.  Dr. Moline issued a report in 2016 in

23  this case before Mr. Harris had ever tested that container.

24          None of our experts actually rely on Mr. Harris'

25  testing; and as a result, this is neither evidence shopping nor

1  attempting to back-door a consulting expert's opinion through

2  testifying experts.  As a result, exceptional circumstances

3  have not been met to warrant any type of deposition of

4  Mr. Harris.

5        **THE COURT:**  Well, Ms. Kagan, I noticed in one of

6  Dr. Moline's reports she does specifically refer to the notion

7  that three different labs have found asbestos, and one of those

8  cite specifically to Lab/Cor.  I think that there is a similar

9  reference as to Compton, but I know I saw it in Dr. Moline's.

10        That does, to me, bring it closer within the idea of

11  where your testifying expert is relying on this report, that

12  they would at least have the ability to find out about the

13  testing and the factual information related to that report that

14  the experts relied on, taking it out of the consulting or

15  nonconsulting expert or otherwise providing exceptional

16  circumstances.

17        I don't see this as evidence shopping, and that's why

18  if I were going to allow the deposition, I wouldn't be inclined

19  to do anything that would include opinions or what Mr. Harris

20  thinks about someone else's opinion or how they've used his

21  report.  It would really just be limited to the factual

22  information related to the testing that then is used for the

23  report that's relied on by the testifying experts, and that's

24  really where I was looking on that.

25        **MS. KAGAN:**  Your Honor, to address that specific

1  point --

2          **THE COURT:**  Sure.

3          **MS. KAGAN:**  -- the factual information is contained

4  in the report that was produced.  The report isn't "I found

5  tremolite in this container and that's it."  It outlines the

6  detailed methodology that was followed by Mr. Harris in

7  collecting the talc from the container and analyzing it and

8  identifying asbestos in the analysis and identifies the

9  methodology specifically and how it was applied.

10          I have already agreed -- although I do think that the

11  information is protected by Rule 26, I have agreed to produce

12  any of the underlying data that may exist at Lab/Cor for this

13  test.  For example, if there were any imaging taken of the

14  actual asbestos fibers identified on the grid or any other

15  records or anything that were tests related to the testing I

16  have already agreed to produce, and I have asked Mr. Harris

17  repeatedly to send that to me.  He told that I would have it

18  yesterday, and I don't have it yet; but I was very clear with

19  counsel that I'm not withholding anything.  I just don't have

20  anything else to turn over.  And as soon as I do, I'll review

21  it and make sure there's nothing in there that would be

22  privileged; and to the extent that it is privileged, I would

23  produce a log.

24          The facts and data of the Harris work will be turned

25  over and has been turned over, and a deposition would merely be

1 him reading his report and reciting what he did. And that's --

2 there's no extraordinary or exceptional circumstances that

3 exist here that AII is unable to obtain that factual

4 information from any other source but a deposition, and they

5 will literally have all of that factual information.

6      **THE COURT:** All right. Anything else as to any of

7 those things with respect to 161 and 190? I interrupted you to

8 ask you that, so let me go ahead and let you finish.

9      **MS. KAGAN:** Sure. That was my argument with respect

10 to Mr. Harris and Lab/Cor and the Lab/Cor subpoena.

11      And we have already -- in our meet-and-confer, as is

12 clear in our joint status report, we have already agreed that

13 we would supplement the discovery request with information on

14 anything that was produced subsequent to us answering that

15 discovery request. That's not an issue.

16      Which then brings me to Mr. Fitzgerald with respect

17 to the videos and then the limit on his deposition. With

18 respect to the videos first, I have requested, pursuant to the

19 deposition notice and subpoena duces tecum to Mr. Fitzgerald,

20 for Mr. Fitzgerald to provide me with his entire file on the

21 Bell case. I asked for absolutely everything, which would

22 include data, and I didn't specifically outline every type of

23 document. I said everything.

24      And his assistant sent me a very, very large Dropbox

25 link of everything that he has on the Bell file and -- or that

1  what was represented to me -- everything on the Bell file and

2  all of the reliance materials.  And the link was so large that

3  as opposed to downloading it and resaving it into the types of

4  links we send and produce in expert materials, I just sent the

5  Defendants the actual Dropbox link directly from Mr. Fitzgerald

6  and gave them direct access to it.  I was not aware that there

7  were videos that were not disclosed, because, again, I asked my

8  experts to give me everything.

9         During the course of the deposition of

10  Mr. Fitzgerald, Mr. Fitzgerald also initially was not aware

11  that he hadn't turned over the videos; and when he realized he

12  hadn't, on a lunch break, he had his assistant find the videos

13  and upload them to a link.  On that lunch break, I sent all

14  counsel that link to the videos.  There were two videos.

15  Mr. Fitzgerald represented that is all that he had.

16         I confirmed again with Mr. Fitzgerald before our

17  meet-and-confer with counsel in this case and before today's

18  hearing that these are the only videos that exist at FAI

19  regarding these talc Clubman simulations.  There is nothing

20  else I can produce, according to my experts.

21         **THE COURT:**  The issue with that, Ms. Kagan, more than

22  anything for me is it looks like the defense counsel was

23  sending sort of notes or letters or emails letting you know

24  that along the way, but they still didn't have the videos and

25  they still didn't have the videos and that that could have been

1  investigated and resolved prior to the deposition.

2           I understand the initial sort of failure where it was

3  a general request; you thought he turned over everything, but

4  what I want to make sure is you all are still communicating

5  well enough with each other so that if counsel comes and tells

6  you, we still don't have the videos, that you can investigate

7  that and find that out before it gets to the point of being in

8  the deposition.

9           What Mr. Thackston has suggested and what seems

10  reasonable to me is they can explore that further with

11  Mr. Fitzgerald, if they need to, at his deposition, and then

12  you could do a specific answer to the interrogatories with

13  respect to the videos just to make sure it explicitly lists all

14  of the videos that exist so that there's not any confusion or

15  misunderstanding about that in the future.

16           Is that something that you would be able to do?

17           **MS. KAGAN:**  Yes.  We had already agreed to do that on

18  the meet-and-confer, that we would supplement the discovery

19  response to identify specifically what was produced during the

20  deposition of the videos and confirm that that is, according to

21  Mr. Fitzgerald, the universe of the videos that exist.

22           **THE COURT:**  And I think it would be helpful as to

23  Mr. Fitzgerald.  And then to the extent there is any other

24  videos of any testing for any of the experts, that you include

25  those as well so that we know that it's covered and taken care

1  of as to all of the experts so that issue doesn't arise again.

2  So I think it would include answering the interrogatory, with

3  respect to videos, to be specific about any videos and making

4  sure that all of those from Mr. Fitzgerald and from any other

5  experts who did testing have been provided, and then that would

6  take care of Mr. Fitzgerald's issue.

7        Other than this issue with respect to the length of

8  time, it looks like you all have stipulated and agreed in the

9  26(f) report, which was adopted as part of the scheduling

10 order, that there would not be any time limits on expert

11 depositions.

12       **MS. KAGAN:**  I actually disagree with that

13 interpretation, Your Honor.  It's not that there would be no

14 time limits; it's that the strict time limits of Rule 26 and

15 Rule 30 would not necessarily apply.  It's not that there would

16 be an unlimited amount of time.

17       And, specifically, Rule 30(d)(3) allows a party to

18 terminate a deposition if the deposition is being taken in bad

19 faith or the conduct becomes harassing, and that's exactly what

20 happened with Mr. Fitzgerald's deposition.  We are six hours

21 and 15 minutes into this deposition.  A very large portion of

22 that deposition involved reading back Mr. Fitzgerald's prior

23 testimony to Mr. Fitzgerald from other cases.

24       Other Defendants have yet to question Mr. Fitzgerald.

25 I don't know if they have questions.  I know that counsel for

1   Whittaker Clark & Daniels said he had about 15 minutes of

2   questions, but there could be other counsel that has questions.

3   I believe counsel for Colgate had questions, and they still

4   haven't had an opportunity to ask anything.

5           This isn't an unknown witness who has never been

6   deposed by Mr. Thackston.

7           **THE COURT:**  Okay.  So, Ms. Kagan, let me interrupt

8   you because -- let me go back to the 26(f) report.  There may

9   be other issues with respect to depositions that would be

10  raised or potentially need to be addressed, but let's start

11  specifically with the 26(f) report that says:  "The time

12  limitation contained in Rule 30(d)(1) of the Federal Rules of

13  Civil Procedure will not apply to depositions of expert

14  witnesses and any deposition noticed or taken as a de bene esse

15  at a for-trial deposition."  That is Document No. 74 and

16  paragraph 2(D)(3).  And, specifically, the reference is to Rule

17  30(d)(1), that the time limit there is a deposition is limited

18  to one day of seven hours, and that's specifically the

19  reference that it would not apply to depositions of expert

20  witnesses.

21          Those are routinely included in expert -- or in Rule

22  26(f) reports in some of these cases, and I am willing to adopt

23  those by agreement.  I don't usually include an unlimited time

24  for deposition unless the parties have stipulated and agreed to

25  that, but that was what was in the 26(f) report, and that was

1  what was adopted as the order of the Court.

2          If there is good cause to revisit that or to adopt

3  some other limitation and provision going forward, then you can

4  make that request; but I can't see any way to interpret this

5  26(f) report other than exactly what it says, which is the time

6  limitation in Rule 30(d)(1) will not apply to deposition of

7  expert witnesses.

8          Is there something else as far as the history of that

9  provision in the 26(f) report that may shed some other light on

10 that, or anything else that you want to be heard on with

11 respect to good cause on changing that?

12          **MS. KAGAN:**  Yes, Your Honor, both actually, too.

13          **THE COURT:**  Okay.

14          **MS. KAGAN:**  Again, stating that the limitations of

15 Rule 30 would not apply does not mean an unlimited deposition,

16 and it was very clear about halfway through this deposition

17 that this was not a deposition that was being conducted under

18 Rule 30 in good faith.  So I believe there is cause to now

19 amend that stipulation and replace it with the traditional Rule

20 30 time limits in light of the conduct; hence, my objections

21 under Rule 30(d)(3) and my admonitions to terminate the

22 deposition if the conduct continued in the way that it was

23 continuing.

24          **THE COURT:**  All right.  So I did not see anything

25 that would warrant that from the parts that I saw that was

1  submitted to me.  And, certainly, that's different now than

2  what the request was, since the request was a limit to the

3  seven hours in 30(d)(1) that wouldn't apply.

4          I will also just, again, note for all of you Local

5  Rule 30.1 with respect to the limits on making any objections

6  or statements, suggesting any answers for either side or for

7  anyone in terms of how the depositions should be conducted

8  under the local rules.  So I'm not going to find any bad faith

9  or any issue there.

10          To the extent that the seven hours was by agreement

11  or stipulation in the 26(f) report waived, I will hear from

12  everybody with respect to whether you all need to request or

13  add some sort of time limit on those things; and I will just

14  take it as Plaintiffs' request now going forward to limit all

15  of the depositions to seven hours and whether I should change

16  the 26(f) scheduling order for that.  I can hear from everyone

17  as we go through this.

18          So as to that, at least right now, it looks like the

19  26(f) report would waive the time limits for expert

20  depositions, but it may be worthwhile to consider whether there

21  is good cause to change that to put some sort of parameters on

22  that.  And so I'll hear from everybody on that.

23          With respect to any of the other matters raised as to

24  161 and 190, including that request, anything else you want to

25  be heard as to any of that, Ms. Kagan?

1      **MS. KAGAN:** No, Your Honor, thank you.

2      **MR WATHEN:** Your Honor, excuse me, this is Frank

3  Wathen, also for the Plaintiff. Just a point of clarification,

4  with regard to supplementing the discovery regarding the

5  videos --

6      **THE COURT:** Right.

7      **MR WATHEN:** -- we are, of course, fine with that, and

8  I would just say that with regard to AII's motion to compel and

9  the conference we had, it's my understanding they just

10 reference requests for productions. I'm not aware of any

11 interrogatories that have been discussed in that context other

12 than here this morning.

13     **THE COURT:** So I think what that may be is just a way

14 to address the concern that there may be videos out there that

15 weren't produced, and so it may be an alternative remedy that

16 we're considering here that you all would provide, whether it's

17 as an answer to an interrogatory or some other affidavit or

18 statement that would specifically list all of the videos for

19 all of the testing that Plaintiff has done with any of their

20 experts just to make sure that there is finite list and that

21 all of that has been provided and accounted for.

22     Is that something you could do, Mr. Wathen?

23     **MR WATHEN:** Yes, Your Honor, I believe we can. I

24 just wanted to clarify that point.

25     **THE COURT:** All right. So I won't treat it as

1  anything other than an alternative or a remedy that we're

2  considering here just to confirm that there aren't any other

3  issues remaining as to that prior dispute.

4      All right.  Before I go back to Mr. Thackston on

5  Nos. 161 and 190, let me hear from the other Defendants,

6  whether they have anything as to any of the matters that have

7  been raised.  And then there's now a request from the Plaintiff

8  to modify the provision of the 26(f) report that waived the

9  time limits of 30(d)(1), and so I will hear from everybody on

10  that as well.

11      Mr. Chesson or Mr. Schroll, let me start with you all

12  from Colgate.

13      **MR. SCHROLL:**  Good afternoon, Your Honor.  This is

14  Matthew Schroll on behalf of Colgate.

15      At this point I think it's premature, and we would

16  oppose a blanket modification of the current order in the case

17  on that limitation.

18      And, you know, I -- specifically, as to

19  Mr. Fitzgerald, Colgate has deposed him before, and I don't

20  have much to ask him; but I don't want to be prejudiced by

21  being put in a position where I have two minutes of a

22  seven-hour time limit to depose him.

23      And I will say that, as for other experts, there are

24  other experts in this case who have been deposed, and there are

25  other experts in this case who are very new, and so we've -- I

1  don't think a blanket time limit is appropriate.

2           **THE COURT:**  All right.  So it may be something

3  that -- right now it's unlimited, and that may create its own

4  issues or problems.  So it may be worth you all, before you get

5  too deeply into the other depositions, determining whether you

6  can reach an agreement; but absent agreement at this point, the

7  default is no limit.  It may be, again, worthwhile for you all

8  to discuss that, whether on an expert-by-expert basis or some

9  sort of overall management of that, but it may be premature to

10  try to add that now.  As you say, it's a blanket, since some of

11  the experts may differ from others in that.

12           Is that an accurate summary there, Mr. Schroll?

13           **MR. SCHROLL:**  Yes, Your Honor.  I would suggest that

14  if there is a request for a limitation, that it be taken on a

15  deposition-by-deposition basis and be supportive of due cause.

16           **THE COURT:**  Okay.  Mr. Peck for Cyprus?

17           **MR. PECK:**  Yes, Your Honor.  I agree with the

18  comments just expressed by Mr. Schroll.  There has been no

19  demonstration of good cause shown literally in the depositions.

20  That's first, obviously.  There's been no concern about that

21  amendment or revision to the Rule 26(f) report from the time it

22  was entered, and no demonstration that it's been abused at this

23  point; no showing of good cause that it's been a problem.  So I

24  would also oppose changing that at this point.

25           **THE COURT:**  All right.  Mr. Tomlin, for Whittaker

1   Clark & Daniels?

2          **MR. TOMLIN:**  Yes, Your Honor, I don't have anything

3   to add other than to say that I can expect that we can work

4   this out going forward, if necessary.  At this point I don't

5   see any need to make any changes.

6          **THE COURT:**  All right.  That's good.  Thank you.

7          And, Mr. Carruthers, anything you want to add for

8   Neslemur?

9          **MR. CARRUTHERS:**  No, ma'am.  We're just here to

10  listen, and we take no position.

11         **THE COURT:**  Okay.

12         All right.  Mr. Thackston, let me come back to you

13  with respect to anything as to 161 and 190 and this additional

14  suggestion for modifying the 26(f) report.

15         **MR. THACKSTON:**  Well, Your Honor, I certainly

16  disagree with modifying the report.

17         What happened in this case is I deposed

18  Mr. Fitzgerald -- I tried to depose him one time in a Clubman

19  talc case, and the deposition was terminated because he refused

20  to answer questions.  But in that one deposition, he said,

21  "I've tested Clubman talc three times.  I never found any

22  asbestos," right.  So I need that testimony in this case.  And

23  it took a while to get it because he did not want to say under

24  oath in this case what he said under oath in another case, that

25  he doesn't disclose those negative reports in his report in

1  this case.  He tests a 30-year-old can.  And I said, Yeah, but

2  you've tested three plastic containers that didn't have any

3  asbestos in them; right?  And to get a straight answer to that

4  took a long time.

5         And we also had the situation of -- when you have a

6  time limit, then if defending counsel is allowed to constantly

7  interrupt and make speaking objections and the witness is in

8  the -- I don't know if you remember the four corners, but is in

9  the stall mode where every question he tells you he has to go

10  check something, you know, they can literally run out the clock

11  without answering questions.  So I think a time limit

12  encourages the filibustering that we were getting in this

13  deposition.  So I don't think we need that.

14         And then with respect to the John Harris deposition,

15  his report is two pages, and it's extremely conclusory.  It

16  says -- for example, on the second page, his says -- it talks

17  about general concepts of ways that you can do something.  It

18  says:

19         "Confirmation of the crystalline nature of each fiber

20  was accomplished using dual tilt diffraction analysis.  This

21  type of analysis was needed to assure that the crystalline

22  structure of the fiber can be confirmed using either rotating

23  tilt and/or double tilt specimen holders.  The fiber is tilted

24  to specific positions in relation to the electron beam

25  order" -- I think that means in order -- "to confirm

1  crystallographic planes.  In such a position, crystallographic

2  information is obtained to confirm the mineral species from

3  other similar mineral species.  Lab/Cor uses a software program

4  that uses both the data obtained from the crystallographic

5  observations and then compares also the chemical composition of

6  the particle from energy dispersive spectroscopy values to

7  further refine the final definitive mineralized confirmation,"

8  period.

9          Okay.  But what did you do?  Did you tilt it?  At

10  what angles did you tilt?  How many times?  He doesn't even

11  name the program that they used to reach these conclusions.  So

12  he uses a real general statement about what you can do, and

13  then he gives you his conclusion, and there is an enormous gap

14  in between about what he actually he did, how much of it

15  involved subjective interpretation.

16          And he did actually find at a different time -- I

17  think Plaintiffs' counsel said they all found amphiboles, and

18  that's just a -- that's just a giant category of materials, and

19  he found anthophyllite and lost the fiber.  We actually need to

20  talk to him about what kind of standard operating procedures he

21  has and how often it is for him to lose the fiber after he

22  finds it.  So I definitely disagree that the questions are

23  answered here.

24          And our subpoena was detailed in specifying exactly

25  the kinds of materials that we would need that should underlie

1 a report like this, and the Plaintiffs' objection for that were

2 stuff like -- were the most form objections imaginable.

3 Everything was vague and uncertain and not proportional to the

4 burden, though I think that the subpoena should be the guide

5 for what it is that they should supply in this case.  It's the

6 kind of data that are supposed to underline -- underlie

7 conclusions like this, the kind of data that other people like

8 their expert Compton would produce for his report.

9        And, finally, Your Honor, on the testing thing, I've

10 done a poor job, I guess, of explaining what's different

11 between the bulk analysis and a can demonstration or simulation

12 inside of a glovebox.

13        Nobody -- I don't think anybody is alleging that they

14 put the powder back into the bottle when they were done, right.

15 It's a twist top shaker, and there are some paragraphs in some

16 of the materials that we produced.  Once you get it out, at

17 least Plaintiffs' experts have said, you can't put it in back

18 in.

19        And so whatever Fitzgerald tested was different than

20 what Hairston tested was different than what Compton tested

21 because the can had been used in a simulation, they say, where

22 they shook some out of the can and did various things with it.

23 How much they shook out of the can we're still trying to figure

24 out.  So I think we need full leeway to explore those alleged

25 simulations tests that took place inside the box.

1           And if I can just say one final thing on the videos,

2    on the discovery response?  If videos have been destroyed or

3    lost or otherwise become unavailable, I think they need to

4    explain that because -- and I'll explore that with

5    Mr. Fitzgerald, but his report says they exist.

6           An awful lot of time was spent in his deposition --

7    you know, a picture is worth a thousand words.  If I had the

8    videotapes before his deposition, I wouldn't have to had go

9    step by step by step to ask, What did you do?  And he didn't

10   even remember -- he claimed to not even remember whether he had

11   the can inside the box to do his testing or whether he had

12   poured some out and just put that amount inside the box to do

13   the testing.  It look a lot of time to try to develop that when

14   if I just had the videos in advance, we could have started way

15   further on.

16          Thank you.

17          **THE COURT:**  All right.  If I were going to allow a

18   limited deposition of Mr. Harris, as I've indicated, by subject

19   matter but also adding a time limit there consistent with that,

20   which I noted in the range of two or three hours, any issue

21   with respect to that sort of limit, given the limited nature of

22   the inquiry that we're talking about here?

23          **MR. THACKSTON:**  Your Honor, just -- assuming

24   cooperation of the witness and not interruptions by the other

25   side, I could take that deposition in three hours, I believe.

1        I would ask -- Your Honor, I would be happy for the

2   Court to review that Fitzgerald testimony and sanction one or

3   the other.  If the Court thinks that I was out of line,

4   sanction me.  If the Court thinks opposing counsel was of out

5   of line, sanction her.  But that's how strongly I feel about --

6   it was conducted properly from my end, and I would ask the

7   Court -- I would be happy for the Court to appoint a discovery

8   master or the Court herself preside over these depositions

9   because I think they would be a lot more efficient if somebody

10  else were present to rule on things like that.

11       **THE COURT:**  Well, I indicated I am not going to

12  impose sanctions.  I didn't see a basis for sanctions.  I have

13  given you my general reference for everyone to the local rules

14  and also my indication that the next round of remedy that I

15  would find is to require local counsel to be there and then to

16  be responsible for any discovery motions filed in relation to

17  anything that may be raised or occur, and that's generally what

18  would be the next round of remedy, although it's very rare that

19  folks can't get along well enough that we have to resort to

20  that.

21       So I understand -- I'm just going to put it back to

22  you all to try to conduct these depositions consistent with the

23  federal rules and the local rules; and if you need to, go ahead

24  and have local counsel responsible for being present, because

25  that's the next round of what I would do before we start

1  talking about appointing a special master.

2         We have lots of asbestos cases in this district, and

3  they are able to make it through discovery without that sort of

4  issue or remedy, and so I'm going to let you all try to do a

5  reset here and see if you can do that in this case.

6         If we have to come back for more hearings, we'll

7  determine whether we can do that still by telephone or whether

8  we at least have local counsel here and do those in person so

9  that we can sort out what may be going wrong here; but at this

10  point, I'm going to express my hope that you all can do the

11  reset yourself and make it through the rest of these

12  depositions here.

13         **MR. THACKSTON:**  Well, Your Honor, I am local counsel,

14  so I'm all for that rule.

15         **THE COURT:**  All right.  Well, that is my general

16  remedy here.  I'll just make sure then you're not -- you're not

17  pro hac?  You're local counsel as well; is that right,

18  Mr. Thackston?

19         **MR. THACKSTON:**  Yes, Your Honor, I'm licensed in

20  North Carolina.  From Winston-Salem and licensed in North

21  Carolina.

22         **THE COURT:**  All right.  So that -- again, that is

23  generally my first round of remedy, but I will, again, leave it

24  with you all with the hope that you can do a reset here.  If we

25  need to all come in and talk about it together, we can do that;

1  but let's see if we can move forward.

2          I'm not going to preside at your depositions, and I'm

3  not going to appoint a special master; but we can have some

4  more hearings here, if we need to do that, but it is not

5  ordinary that that's necessary.  So I hope you all will be able

6  to address that or work that out with the rest of these

7  depositions.

8          **MS. KAGAN:**  Your Honor, if I may be heard briefly --

9  this is Ms. Kagan -- on that topic?

10          **THE COURT:**  Okay.

11          **MS. KAGAN:**  I agree with you, Your Honor; this is not

12  ordinary.  It's extraordinary, but it's not extraordinary when

13  it comes to counsel for AII.  And in California and in New

14  Jersey, when I've had to deal with Mr. Thackston specifically

15  in depositions of our experts, they have, more often than not,

16  resulted in suspensions of depositions and courts limiting

17  Mr. Thackston's ability to continue with harassing our experts.

18          And so the idea that this could be remedied by having

19  local counsel participating, unfortunately, I don't think it's

20  a solution because, as Mr. Thackston indicated, he is his own

21  local counsel here.  And without any limits set to these

22  depositions and the patterns of behavior that Mr. Thackston

23  engages -- either -- maybe I'm special.  Maybe it's just with

24  me.  I don't know, but the other folks who have deposed our

25  experts, this doesn't happen.

 1          So I envision this is not going to just be a reset,

 2    and I think it is going to be an ongoing problem.  And I would

 3    hate to continue to have to file motions.  I would hate to have

 4    to terminate depositions and file motions to limit them or

 5    whatnot.  And so if the solution is really to have a discovery

 6    referee to appear at these depositions with us, I would welcome

 7    that because I would hope then that we would be able to

 8    efficiently get through these depositions without personal

 9    attacks and without repetitive harassment and argument and

10    questions of the witnesses that is endemic to these AII cases

11    regardless of what jurisdiction we are in.

12          **THE COURT:**  Well, Ms. Kagan, I have to tell, though,

13    the clips or the pieces of the depositions I saw, I had as much

14    concern about your piece as any; and so I'm going to, again,

15    direct you to the local rules and ask everybody to do a reset

16    in terms of how these depositions are conducted.

17          I am not going to preside over your depositions, but

18    we'll start getting into the position of precluding experts if

19    there's behavior that you all can't address or correct on your

20    own with respect to these expert depositions.

21          **MR. THACKSTON:**  Your Honor, I mean, speaking of

22    personal attacks, that was a personal attack that I find

23    offensive and very untrue and we have avoided this.  You have a

24    motion before you where you have a statement on the record from

25    Plaintiffs' counsel inviting us to issue a subpoena and then a

1 motion for sanctions for issuing a subpoena with all kinds of

2 personal attacks.

3          It's a litigation tactic to distract the Court from

4 the merits of the case, which probably indicate the weakness of

5 the merits of the case when you're constantly going after by

6 name their lawyer.  And they aren't examples of this ongoing

7 feud.  There's no ongoing feud.  This is just a tactic to make

8 the Court think there is an ongoing feud so that the Court will

9 say everybody play nicely, and I'm not going to look at the

10 merits of the motion as being broad.

11          So I appreciate the Court not taking that invitation,

12 but I disagree, and I'm not engaging in those tactics.  I'm not

13 calling anybody out by name or saying -- other than looking at

14 specific examples in depositions that occurred in this case.

15          **THE COURT:**  So, Mr. Thackston, I understand you

16 wanting to respond, but responding that way actually does not

17 help because we're still back at you all at each other, rather

18 than helping me resolve the particular disputes that we've got.

19          I already indicated I'm not going to impose

20 sanctions, or I have not found any bad faith; and I want to go

21 forward with resolving the disputes.  So I am, again, going to

22 say to both of you to reset and try to move forward with

23 discovery.  I don't find either one of you to be blameless in

24 this, to the extent I have bits and pieces before me, and it

25 certainly continues to be represented in the discussion that

1   we're having here.  So that's the problem that I'm talking
2   about.  That's what I want you both to reset.
3          I would like to go forward now with respect to the
4   rest of the dispute that we have.  On that, we've got first
5   this No. 161 and No. 190.  What I'm going to do on that is as
6   to the motion to quash, No. 161, I'm going to find that motion
7   is denied as moot because the parties have agreed to address
8   that as part of party discovery.
9          As to the motion to compel, No. 190, that motion is
10  going to be granted in part in that Plaintiff must provide the
11  documents as agreed.  I don't have a specific time frame on
12  that given the extenuating circumstances on the West Coast.  I
13  understand that, but I'm going to go ahead and say a week; and
14  if there is a need to extend that further, then I expect
15  Plaintiff to file a motion explaining what they've done and
16  what remains to be done in order for that to be provided.
17         In addition, Plaintiff will provide, either as an
18  answer to an interrogatory or a further affidavit, a statement
19  with regard to all videos that have been or were created of any
20  of the testing, listing any that exist or that have existed for
21  each of their experts, to make sure that we have a finite list
22  on those.
23         With respect to Mr. Harris, I'll require Plaintiff to
24  make Mr. Harris available for a deposition, in which the
25  Defendants are limited to three hours, limited to Mr. Harris'

1  testing and report, but not any other opinions, whether his own

2  or his view of others' opinions.  Particularly, I'm not finding

3  that this was any type of expert shopping or any basis to

4  explore further what his opinions may have been other than just

5  specifically what's set out in his report and, more

6  particularly, the facts that underlie his testing and the

7  information in the report.

8       That would be based on the Court's finding that even

9  though he was not designated as a testifying witness, multiple

10  of the other testifying experts cite his testing as support,

11  and in this limited way, there are exceptional circumstances in

12  which it was impractical for AII to obtain facts on the same

13  subject matter by other means.  Again, though, that would be

14  limited just to the testing, including, for example, chain of

15  custody, contamination preventions, sample creation conditions,

16  and factual information regarding the testing.

17       As to the reconvened deposition of Dr. Fitzgerald,

18  that would not otherwise be limited in light of the stipulation

19  and agreement in the 26(f) report that the time limits of

20  30(d)(1) are waived for experts and de bene esse depositions.

21  And the parties will agree to at least discuss or meet and

22  confer regarding whether it may be appropriate to add any

23  limits on a deposition-by-deposition basis, but, for now, those

24  provisions of the 26(f) report have waived the time limits that

25  would otherwise apply.

1          With respect to those, there was also a motion,

2    No. 194, to add this issue to the hearing today.  To the extent

3    that's not already been done, that should be shown as granted

4    since we have addressed and covered that.

5          Finally, I would, again, just note generally that

6    there's been some breakdown in communication, and I would

7    encourage both counsel for Plaintiff and counsel for AII to

8    reset that for future depositions so that this can proceed with

9    respect to the remaining expert depositions in order to keep

10   the case on for trial and all the experts in the case.

11         I can consider whether to require local counsel to

12   participate and/or other suggestions, but I'm not going to do

13   anything further on that at this time other than just give my

14   general direction for complying with not only the federal rules

15   but the local rules and the general exhortations to cooperate

16   in discovery and particularly in depositions here.

17         I think that covers everything as to 161 and 190 as

18   well as that 194.

19         And then there was also a motion to quash, 151, that

20   the parties agree is moot.  And so I'll ask the clerk to note

21   151 is denied as moot by agreement of the parties.

22         That then takes us to 168 and 179, which is the

23   motion to quash as to Northwell and the motion for protective

24   order as to Dr. Moline and the related motions to seal.  As to

25   both of those -- those are Plaintiffs' motions -- I have given

 1  you some general indication of my thoughts on that with respect

 2  to where we might be as well as the motions to seal and how

 3  that would apply to the discovery stage.

 4          Ms. Kagan, let me hear from you first.  These are

 5  Plaintiffs' motions, so I will let you address those, in light

 6  of the Court's earlier discussion.

 7          **MS. KAGAN:**  Thank you, Your Honor.  And I took some

 8  notes on what Your Honor indicated were (inaudible) are with

 9  respect to these motions, and so I am going to follow that

10  guidance and address the concerns I have that Your Honor

11  raised.

12          **THE COURT:**  Okay.

13          **MS. KAGAN:**  So the first concern that I have is the

14  manner in which the information was obtained.  ███████████

15  ████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ███████████████████████████████████  Dr. Moline has never

18  disclosed the identities of the 33 patients in her paper; ███

19  ████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ███████████████████████████████████████████  None of the

24  33 patients consented to being part of this study.

25          That is why specifically they are anonymized, and

1  that is, I think, the heart of the issue, that human research

2  is fraught with potential privacy and confidentially and

3  ethical challenges.  And as Dr. Moline and Dr. Diette and

4  Dr. Roggli all explained, and we put that in our papers, when

5  you do human research and you publish on it, it has to remain

6  anonymous.

7        And that's actually consistent with the guidelines

8  from the Department of Health and Human Services and the FDA,

9  45 CFR 46.111(a)(7) and 21CFR56.111(a)(7).  There are

10 institutional review boards that are required to assess whether

11 or not a human subject in a published study can be revealed,

12 and that is done, again, to protect those human subjects and to

13 protect the integrity of the research.

14        And Dr. Diette expressed -- and, again, Dr. Diette is

15 a pulmonologist at Johns Hopkins.  He is an expert that

16 defendants in asbestos talc litigation routinely retain, and I

17 deposed him this year on behalf of Johnson & Johnson, and he

18 was very clear about the ethical requirements that somebody

19 would have to go through before revealing the identity of a

20 human patient, and he said that they would have to approach an

21 ethics board.  If there was approval from the ethics board,

22 there would have to be an informed consent process.

23        And what I thought was really interesting -- and this

24 is Exhibit G to our papers -- is that Dr. Diette testified that

25 the informed consent process is, quote, not just signing a

1 consent form, but with a real consent process, ████████

2 ████████

3 ████████████████████

4 ████████████████████

5 ████████████████████████

6 ████████████████████

7 ████████████████████

8 ██████████████████████████

9 ████████████████████████

10 ████████████████████████

11 ████████

12         So because of that, I find that it would be

13 absolutely inappropriate and contrary to the well-established

14 case law and the statute to de-anonymize ████████████

15 ████████████████

16         **THE COURT:**  So, Ms. Kagan, here is the issue here,

17 though.  ████████████████████

18 ████████████████████████

19 ████████████████████

20 ████████████████████████

21 ████████████████████

22 ████████████████████████

23 ████████████████████████

24 ████████████████████

25 ████████████████████████

1 ████████████████████████████████████████████

2 ███████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ██████████████████████████████████████████████

5 ████████████████████████████████████

6      **MS. KAGAN:** If I may respond to that, Your Honor?

7      **THE COURT:** Sure.

8      **MS. KAGAN:** ██████████████████████████

9 ██████████████████████████████████████████████████

10 ██████████████████████████████████████

11 ██████████████████████████████████████████

12 ██████████████████████████████████████████

13 ████████████████████████████████████████

14     ██████████████████████████████████ ██

15 ██████████████████████████████████████████

16 ███████████████████████████████████████████████

17 ███████████████████████████████ it would reveal the

18 confidential information of patients that are part of the human

19 study without an ethics board approval and without informed

20 consent. So we couldn't provide that discovery, and it was

21 obtained -- and the information was obtained in an improper

22 fashion.

23     But the litigation issue I think is really important

24 because Dr. Roggli, who is now a late-disclosed expert by

25 AII -- Dr. Roggli has published on hundreds of his patients

1  that he has seen wholly in litigation, and he's published human

2  studies, offered conclusions, including about whether or not

3  talc causes mesothelioma and asbestos in talc causes

4  mesothelioma.  And they designated him as an expert, and he has

5  published on human studies for decades.  And Dr. Roggli has

6  taken a very strong stance that it doesn't matter if you're

7  testifying on behalf of any of those patients or against any of

8  those patients in litigation; the confidentiality of their

9  identities is paramount.

10       It's also a First Amendment freedom of speech and

11  research issue, that these types of things, the confidentiality

12  of human patients and subjects, if they had to be revealed in

13  every study, there would be no study, unless people volunteered

14  publicly to do this.

15       And the data that is collected in litigation,

16  specifically asbestos litigation, is very precious, for lack of

17  better words, because mesothelioma is such a rare disease, and

18  there isn't a cure.  And so there aren't a lot of studies on

19  human patients with mesothelioma and the various exposures and

20  the various potential causes.

21       Disclosing human patient means, ███████████████████

22  ███████████████████████████████ -- would quash that

23  scientific effort completely.

24       And another part to that, also, Your Honor, is the

25  Defendants rely on epidemiology studies, human studies that are

1  on the Italian miners and millers and the Vermont miners and

2  millers.  And the information in those studies that those

3  authors published –– and the Vermont study was published by

4  some of the defense experts –– are based on employment records

5  and medical records that these individuals provided to their

6  employers.  They didn't consent to being part of a published

7  studies.  Their names are anonymized.

8       Allowing this would open the floodgates to all of

9  these various researchers who rely on workers' compensation

10  records, like the Finkelstein publications about the Archie

11  Vanderbilt line, or medical worker records, like the Italian

12  and Vermont, or Dr. Roggli's publication on human tissue

13  analysis and Dr. Abraham's studies on human tissue analysis ––

14  all to be disclosed because they obtained those records either

15  through litigation or through employment records.

16       **THE COURT:**  Well, again, Ms. Kagan, I think you're

17  talking about something different, though, because I understand

18  the concern if you're saying, well, because they were related

19  to litigation, they are all free and open.  Obviously, that

20  creates some significant concern, ████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████████

23  █████████████████████████████████████████████

24  ██████████████████████

25       It seems to me fundamentally different there.  ██████



1

2

3

4

5

6

7

8     It creates a potential to mislead the fact finder

9 that I think we would need to consider and address here,

10

11

12

13

14

15 .

16     **MS. KAGAN:** Your Honor, I respectfully disagree.

17 She, from just memory, does not know the names of all 33 human

18 subjects that she selected for this publication.

19

20

21

22

23

24

25     And, again, I think the issue is ultimately the

1  candor to the jury and the ability for AII to cross-examine

2  Dr. Moline on these issues, and AII has had that opportunity.

3  They have, in fact -- Mr. Thackston did, in fact, cross-examine

4  Dr. Moline at length earlier this year in New Jersey in a

5  different trial of two consolidated Clubman cases, and that

6  judge did not allow him to identify ████████████████████████

7  ████████████████████████

8      **THE COURT:**  ██████████████    ████████████

9  ████████████████████████████████    █

10 ████████████████████████████████████████

11 ████████████████████████████████████████

12 ████████████████████████████████████

13 ████████████████████████████████████

14 ████████████████████████████

15      **MS. KAGAN:**  ████████████████████

16 ████████████████████  because somehow AII has

17 been deprived of the ability to meaningfully cross-examine, and

18 that's just not true.  They have been able to meaningfully

19 cross-examine things like did Dr. Moline take into account that

20 somebody filed a workers' compensation.  That's an easy

21 cross-examination point ████████████████████

22 ████

23      ██████████████████  Mr. Thackston can

24 cross-examine Dr. Moline specifically:  Did you take into

25 account this specific fact, the idea that hairdryers, some

1  hairdryers at some point in time, contained asbestos?  That is

2  a question that is easily asked of Dr. Moline on

3  cross-examination without identifying any of the individuals

4  that are described as hairdressers.  █████████████████████

5  ████████████████████████████████████████████████

6  ████████████████████████████████████████  ███

7  ███████████████████████████████ good cause

8  hasn't been shown by AII that they would be deprived of the

9  ability to cross-examine Dr. Moline ██████████████████

10  █████████ especially if the goal of the cross-examination is

11  to undermine Dr. Moline's opinion or paper conclusion that

12  these individuals had no concern of asbestos exposure other

13  than the talc.

14       Well, that's an easy question to ask Dr. Moline:  Did

15  you confirm whether or not any of these people filed workers'

16  compensation claims?  Did you confirm with the hairdressers

17  whether or not they used hairdryers?  Mr. Thackston did an

18  excellent cross-examination exactly like that in the *Lashley*

19  and *Johnson* cases in New Jersey, ████████████████████████

20  █████████████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████████

23  █████████████████████████████

24       **THE COURT:** ████████████████████████████

25  ████████████████████████████████████████████

1 ████████████████████████████████████████████

2        Let me ask you one other thing, though, with respect

3 to the remainder of the subpoena to Northwell.  Is that still

4 outstanding as an issue, or where are we with that?

5        **MS. KAGAN:**  It is, Your Honor, with respect to -- as

6 we identified in our motion to quash, these are not the types

7 of information that the custodian of records of Northwell would

8 be providing.  These are specific information about Dr. Moline,

9 so her employment contract with Northwell, her salary, any

10 correspondence she had with her coauthors on this paper.  These

11 are the types of things that Rule 26 discovery is for and not a

12 subpoena to her employer's custodian of records.  So our motion

13 to quash stands with respect to those objections.

14        **THE COURT:**  All right.  And then as to the motions to

15 seal, while I could consider those for discovery purposes, it

16 would be a separate First Amendment standard you would have to

17 meet with respect to dispositive motions and trial.

18        Anything else you wanted to address as to the motions

19 to seal?

20        **MS. KAGAN:**  Yes, Your Honor, if I may?  I understand

21 Your Honor's reasoning -- or position ███████████

22 ██████████████████████████████████████████████

23 ██████████████████████████████████████████████

24 ███████████████████████████████████████████

25 ███████████████████████████████████████████

1 ██████████████████████████████████████████

2        So, for example, that *Johnson-Lashley* trial had to be

3 suspended, and it was ultimately mistried because of the

4 pandemic, and jurors could not remain sworn as jurors

5 indefinitely.

6        So at some point we will be able to come back and try

7 the *Johnson-Lashley* case in New Jersey, and Mr. Thackston

8 certainly, I'm confident, will attempt to use this information

9 in that trial, and that judge has already ruled that's not

10 appropriate, but there's nothing stopping him if the record

11 isn't sealed. If this hearing, this portion of our transcript

12 is not sealed for discovery purposes and the records and

13 filings are not sealed, then ████████████████████████

14 ████████████████████████████████████████████████

15 ████████████

16     **THE COURT:** I think that's fair, and I would want to

17 make sure that we are keeping that ██████████████████

18 confidential and under seal. And then to the extent it may

19 have to be revisited ultimately at trial, then that's something

20 that the district judge can consider further, to the extent

21 that needs to be done; but, certainly, at this point I would

22 not expect or intend these sort of preliminary or

23 discovery-related determinations -- to make that then public

24 for use in other cases.

25        Anything else, Ms. Kagan, before I go to

1  Mr. Thackston?

2          **MS. KAGAN:**  No, thank you, Your Honor.

3          **THE COURT:**  All right.  Mr. Thackston?

4          **MR. THACKSTON:**  Your Honor, I don't have much to say

5  on it other than that these are not protected materials by any

6  stretch of the imagination.

7          I asked Dr. Moline in her deposition –– I think it's

8  clear from the face of the article that I asked her in her

9  deposition:  Everything you've got was from a lawsuit?

10  Everything produced to you was, like, answers to

11  interrogatories?  And she says –– she says on page 12 of her

12  article:  "Exposure histories were reviewed based on sworn

13  testimony by patients and, in some cases, family members with

14  firsthand knowledge."

15          So, I mean, we're talking about deposition

16  transcripts.  I think if there is an actual medical record,

17  they can designate that record and then say there's something

18  about that that's confidential.

19          But here's the other problem, Your Honor.  The fact

20  that this stuff is not HIPAA protected is evidenced by the fact

21  that Dr. Moline openly talked about it in glory detail in her

22  report.  You've got –– you mentioned earlier Dr. Moline's

23  report.  ████████████████████████████████████

24  ████████████████████

25          ████████████████████████████████████

1 ███████████████████████████████████████

2 █████████████████████████  █████████████████

3 ███████████    And if this stuff was HIPAA protected, Dr. Moline

4 would probably be in a world of trouble.  The fact is no one

5 has treated it as being HIPAA protected because it was

6 disclosed in the course of litigation.

7       So to claim now that because Dr. Moline happens to be

8 employed by Northwell -- I guess they let her use her work

9 server to do litigation articles.  Actually, they -- one of the

10 reasons for the employment agreement is that Northwell gets

11 paid when she does it on their clock.  She gets paid when she

12 does it at home.

13       But the burden to show that something should be

14 sealed -- I haven't seen any case or authority for the idea

15 that if it could be used against you in another case, if it

16 could be used against that witness in another case, then it

17 ought to be sealed.  I mean --

18       **THE COURT:**  Well, Mr. Thackston, I think we're

19 getting a little off track here.  There's plenty of authority,

20 including in this court's own development of the local rules,

21 for the idea that we don't use the discovery process or the

22 court's docket to make things public that aren't otherwise

23 public records or information.  It's a different thing if

24 something is a judicial record, which, particularly in the

25 context of dispositive motion or trial, means has First

1 Amendment protections; but documents produced in discovery are

2 not subject to common law disclosure or information, and

3 certainly where there's confidentiality orders or protections

4 in place and a party can claim something is confidential, then

5 we go through the process of sealing under 5.4 for information

6 that's filed on the docket.

7 Here, when it's related to discovery, we follow the

8 more general balancing that applies when the First Amendment

9 doesn't apply, and because we're at the discovery or the

10 preliminary stage, it makes sense to allow those things to be

11 filed for which confidentiality is still claimed.

12 And I do think there are concerns with regard to

13 disclosure of this outside this case. ████████████████

14 ███████████████████████████████████████████████████████

15 ███████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ██████████████████████████████████████████████████████

18 ██████████████████████████████████████████████████████

19 ████████████████████████

20 So, as I said, I think the determination will

21 ultimately be up to the district judge when we get to trial in

22 this case, but at this point we're just talking about discovery

23 materials. There is no right to use discovery materials from

24 one case in another case, particularly where, here, there is

25 some claim of confidentiality that's only being produced

1  subject to that claim and subject to a confidentiality

2  protection in place.

3         So I would caution against a notion of using this or

4  being able to use this in some other case, because if that's

5  where we're headed, then I would be more inclined to put a

6  protective order over all of it and not allow it to be used at

7  all.  If we're talking about using it here just in this case

8  ████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10 ████████████████████████████████ I think a limited disclosure and

11 use of that is not outside the bounds of reasonableness and

12 actually is necessary to avoid potential misleading of the fact

13 finder here.

14        So that's where I am, but I interrupted you because I

15 don't want end up too far down a path where you make me

16 second-guess that determination.

17        **MR. THACKSTON:**  Your Honor, I don't have -- I'm not

18 trying to conduct discovery for any other case. ████████████████

19 ████████████████████████████████████

20        But if the materials we're talking about are -- ██████

21 ████████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████

23 ████████████████████████████████████████ maybe we agree that

24 everything is treated confidential for 14 days, and if they

25 want that to continue to be confidential, then they have to

1  point out why it's confidential and not otherwise available in

2  the case.

3        But, obviously, not only we, but that stuff is

4  shareable and Dr. Moline can be cross-examined on her report in

5  this case and other cases. We certainly -- when they put

6  reports out there, they get put out there for general

7  consumption. At least in the litigation, they get -- they can

8  be sent to the defense expert reports -- defense experts for

9  their response to them.

10       So I'm just trying to think of what kind of

11  information could come from the Northwell files ███████████

12  ████████████████████ and I guess if there is something

13  like that, certainly agree to treat it confidentially until at

14  least we could have a hearing on it.

15      **THE COURT:** So I may have lost, though, your train of

16  thought there. What now are you talking about, because it's

17  different than just the limited piece of information we're

18  talking about here, █████████████████████?

19      **MR. THACKSTON:** Yeah, right. What Dr. Moline said

20  she relied upon was discovery materials in the case. She

21  didn't do the pathology part of this case. She says she relied

22  on discovery materials, like deposition transcripts. For us to

23  have to treat deposition transcripts ███████████████

24  ███████████████████████████████████, as

25  those are confidential information just seems not an

1 appropriate use of the rule for sealing materials.

2         **THE COURT:** So I think we're talking about different

3 things. The sealing is only for what's filed on the docket,

4 and it's only where there's been a claim of confidentiality.

5 Now, that can be pursuant to a stipulated protective order

6 that's been entered in the case and the parties agree to

7 designate things as confidential and file them under seal with

8 a motion to seal under Rule 5.4, or it can be a particular

9 piece of information that the party requests confidential

10 treatment or designation of; and then as to that, it's limited

11 however the Court may decide, if it's not already subject to a

12 confidentiality agreement in the case. So we may be talking

13 about different things here.

14         With respect to the motions to seal, those are

15 specifically just as to the documents filed on the docket, and

16 I would grant that.

17         With respect to the request for a protective order,

18 to the extent that may be a broader request, my inclination

19 would be to deny the request to the extent it requires

20 destruction of the material ███████████████████████████

21 ████████████████████████████████████████████████

22 ██████ and any future determination about whether it needs to be

23 made public as part of the trial or dispositive motion will be

24 for the district judge; but until then, it should be treated as

25 confidential under 5.4, which requires a motion to seal if

1 anybody is going to file it on the docket.

2      That's just as to that particular piece of

3 information.  And I don't know that you all have had any

4 practice in this case of otherwise designating information as

5 confidential; but if it hasn't been designated as confidential

6 pursuant to a stipulated protective order or pursuant to an

7 order I've just entered here, ████████████████████

8 ██████████████████████████ then there wouldn't be a reason why

9 it had to be sealed or with a motion to seal, unless it's

10 something that you're requesting to seal.  Again, that's just

11 all covered by 5.4, and that's with respect to documents that

12 are filed.

13      So I'm a little bit confused, I think, Mr. Thackston,

14 about exactly what it is we're focused on now or what the issue

15 may be, just to make sure I'm understanding.

16      **MR. THACKSTON:**  Well, Your Honor, I go back to the

17 idea that you can take litigation materials that the witness

18 says are available to defense counsel in the case.  She admits

19 these are materials that the defense counsel have; I have been

20 cross-examined in these cases.  And then apparently without --

21 if she did it without permission, and, apparently, she didn't

22 think permission was necessary, these definitely are not

23 subject -- human study subjects within the meaning of either --

24 any of the cases that the Plaintiff cited.  They cited a case

25 involving a blood donor who had HIV, and they wouldn't disclose

1   who that was, wouldn't require the blood service to disclose

2   who that was or an actual medical study where there is a

3   physician-patient relationship.

4          The context of litigation makes it different, and the

5   witness obviously didn't think -- or Dr. Moline didn't think it

6   was necessary to get any kind of permission to share the

7   litigation information, but by putting it in an article, now

8   she can't be questioned about those cases unless she discloses

9   what they are.

10         **THE COURT:**  Mr. Thackston, let me interrupt you again

11  because I'm still confused. ████████████████████

12  ███████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████

14  ██

15         **MR. THACKSTON:** ████████████████████████████

16  ████████████████  ████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ███████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████

20  ██████████████████████████████████████  ████████████

21  ███████████████████████████████████  ████████████████

22  █████████████████████

23      ███████████████████████████████████████████████████

24  ██████████████████████████████████████████████████

25  ██████████████████████████████████████████████████

1 ████████████████████.

2     **THE COURT:**  Okay.  So I think I understand,

3 Mr. Thackston.  Your argument is now related to the ████

4 ████████  ████████████████████████

5 ██████████████████████████████████

6 ██████████████████  ██████████████████████

7 ████████████  ████████████████████████

8 ██████████████████████████████

9 ████████████████████████████

10     And so I think, along the same lines as what happened

11 up in New Jersey ████████████████████

12 ████████████████  I would have the same sort of concerns if

13 you had to try to get the identification of the ██████

14 individuals here.  There are important confidentiality and even

15 larger structural concerns with regard to how these

16 publications are presented and constructed and protected, and

17 so I don't see a basis for requiring disclosure, and I don't

18 see any case law that would support that as far as other

19 individuals who may have been included in the study.

20     ████████████████████████████

21 ██████████████████████████████

22 ██████████████  it's subject to a confidentiality claim and

23 protection to the extent that it's not disclosed outside of

24 this case, unless or until the district judge makes a

25 determination on that as part of dispositive motions or trial.

1 ████████████████████████████████████████

2 ███████████ everything would need to be redacted on that and a

3 motion to seal would be filed, as the Plaintiffs did consistent

4 with Local Rule 5.4.  And if the Defendants were filing that

5 information, they would need to file the motion to seal.

6       I will say that just as a purely technical matter,

7 the Plaintiffs did that technically correct, and I would

8 commend them for that and ask you all to do the same thing,

9 which is specifically you file the full document as a sealed

10 document, all of the provisions, and then you file the redacted

11 document as a public document as a complete filing so that all

12 of the ECF numbers, for instance, match up, the attachment

13 numbers all match up, and they are essentially mirrors of each

14 other.  There's just a redacted one and a sealed one.

15       The only piece I would add for Plaintiffs and for

16 Defendants going forward is if the sealed version can also

17 include highlighting over the parts that are sealed, then what

18 that lets the Court do is use the sealed version as the working

19 copy that I have or that the district judge will have, but then

20 the highlighting on it lets the Court know easily this part is

21 the part for which sealing is claimed; and so if it's going to

22 be used in an order or addressed as part of the substance, then

23 there's going to need to be a determination made with regard to

24 whether it should be filed under seal or not.

25       That is an aside, but it looks like there may be

1  issues where things get to be filed under seal in this case

2  and, if so, then follow Rule 5.4, but as a technical matter,

3  refile the whole document the way the Plaintiffs did and just

4  add the highlighting on the sealed parts.  That's my aside on a

5  technical issue that will help the Court a lot, whether it's me

6  or the district judge who is handling it later.

7        Before I finalize or make my determination, anything

8  else, Ms. Kagan -- I was with you -- as to 168?

9        **MR. THACKSTON:**  Your Honor -- I'm sorry, Your Honor.

10 Could I just offer one additional suggestion?

11       **THE COURT:**  I will come back to you, Mr. Thackston,

12 but I was with Ms. Kagan.  So let me finish with her.

13       **MR. THACKSTON:**  I'm sorry.

14       **THE COURT:**  Ms. Kagan?

15       **MS. KAGAN:**  Yes, Your Honor.  I think, again -- and I

16 think Your Honor actually said this in response to

17 Mr. Thackston, but there is no case law that says that the

18 context of litigation makes -- or destroys human study

19 confidentiality across the board, the identity of these ▆▆

20 ▆▆▆▆▆individuals in this study.  There aren't releases from

21 these patients for this information because they were never

22 approached to release this information.  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

23 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆, and there certainly was no informed

24 consent given by the ▆▆▆▆▆▆ human subjects of this study,

25 identities which no one knows other than Dr. Moline; and so the

1  idea that HIPAAs can start being collected for medical records

2  and submitted to Northwell for release of these names is highly

3  inappropriate.

4          And the other piece of it -- and I just -- I

5  appreciate Your Honor's distinction and clarification that you

6  would grant the protective order -- or you're inclined to grant

7  the protective order in part, ██████████████████████████

8  ████████████████████████████████████████████████ and

9  that it cannot be used outside of this case for discovery

10  purposes, and a final determination obviously of that would be

11  made by the district judge, either by dispositive motion or at

12  trial.

13          I didn't hear Mr. Thackston agreeing we wouldn't do

14  that, and we are going to talk about deposition and

15  interrogatories and other materials in Dr. Moline's report.  I

16  just want to be very clear on this record ████████████████

17  ████████████████████████████████████████████████████

18  ██████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ██████████████  That's part of the protective order until we

21  get to the point where the district judge either agrees or

22  disagrees.

23          Is that fair?

24          **THE COURT:**  I think that was what I had indicated.

25  And I'll note that the district judge would be making that

1  determination under a different standard.  So it wouldn't just

2  be agreeing or disagreeing.  It would also be having to take

3  into account the greater public access or rights to judicial

4  records that would apply at dispositive motions and at trial.

5  So while the district judge might agree with me as to discovery

6  materials, we all might end up coming to a different conclusion

7  if it's something that is presented at trial.

8         So I'm not making any indication one way or the other

9  how or what that might be or what that might look like, but

10 that would be part of the determination here for the current

11 filings and the treatment of that information before or until

12 any other determination is made by the district judge in

13 whatever context it might be presented there.

14        Does that clarify, Ms. Kagan, the piece that you were

15 looking at?

16        **MS. KAGAN:**  Yes, and that would include the

17 transcript of today's hearing as well?

18        **THE COURT:**  And I will tell you as to that, under the

19 ordinary rules, if someone requests a transcript, then it will

20 be prepared and filed, and it's automatically sealed, I think,

21 for 15 days.  And during that time period, if you file a motion

22 to seal and set out the basis for that request and specifically

23 designate exactly what parts need to be sealed as narrowly as

24 possible, then it will stay under seal until the Court rules on

25 that and makes that determination.

1    **MS. KAGAN:**  Thank you.

2    **MR. GREVE:**  Your Honor, this is Kurt Greve with AII.

3  Just one quick question just to make sure I understand.  The

4  limitation that you provided ████████████████████████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████ and

7  that is the motion that is currently pending before the Court;

8  correct?

9    **THE COURT:**  Well, is there some other identification

10  or information I should know about?

11    **MR. GREVE:**  Yes.

12    (Cross-talking.)

13    **THE COURT:**  Wait.  I need you all to wait and let me

14  designate who's next, or else we're going to end up with too

15  many folks talking over each other.

16    So, Ms. Kagan, let me let you finish.  I think

17  Mr. Greve had jumped in, but let me let you finish, Ms. Kagan,

18  and then I am going to go to Mr. Thackston and he can bring in

19  Mr. Greve if he needs to.

20    So, Ms. Kagan?

21    **MS. KAGAN:**  Thank you, Your Honor.

22    The identification that I thought you and I -- that

23  we had been discussing during this hearing ████████████████

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████

1 ██████████████████ ███████████████████████

2 ████████████████████████████████████████

3 ███████████████████████████████████████

4 ██████████████████████████████████████████

5 ████████████████████████████████████████

6 ███████████████████████████████████████

7 █████████████████████████ that would remain confidential

8 until the district judge makes a determination on that final

9 issue.

10        **THE COURT:**  So, Ms. Kagan, let me just finish as

11 well.  The motion to quash as to Northwell, it's not that you

12 are necessarily opposed to providing whatever information may

13 be appropriate as part of the expert disclosures; your issue

14 there is whether it should come from Northwell.  Is that

15 correct?

16        **MS. KAGAN:**  That's correct.  The information

17 requested is information that would be in the custody and

18 control of Dr. Moline and properly requested through a duces

19 tecum pursuant to a notice of deposition.

20        **THE COURT:**  All right.  So if we need to address any

21 of that further, we can, but I'll assume that you're going to

22 make the information within the scope of expert discovery

23 available to them directly from Dr. Moline; is that right?

24        **MS. KAGAN:**  Everything that is unobjectionable, yes,

25 Your Honor.

1    **THE COURT:**  So I guess what I think I'll let you do

2  is work those particulars out, but I am only -- or would only

3  be quashing that as to Northwell based on the premise that

4  you're providing anything that's appropriate for expert

5  discovery as part of the disclosures and discovery of

6  Dr. Moline.  I don't want to get into another round of

7  withholding information that needs to be provided if she's

8  going to be presented as an expert.

9        Is there anything in particular that we need to

10  address on that?

11    **MS. KAGAN:**  I know from conversations with Dr. Moline

12  one of the items that she had an objection to and that is not

13  discoverable is her employment contract with Northwell.  It has

14  nothing to do with her bias or credibility.  It has nothing to

15  do with the amount she has billed us for her time in this case,

16  and unless there is case law that says that her employment

17  contract as the head of the Occupational Medicine Department at

18  Northwell and as a professor at Hofstra Medical School is

19  somehow discoverable, that would not -- that would be an

20  example of something that she personally objected to and also

21  is not part of the scope of normal expert discovery under Rule

22  26 and Rule 30.

23    **THE COURT:**  All right.  That may be something that I

24  will let you all address and work out, and I'll hear from

25  Mr. Thackston on that as well, but it may be worth you all

1  determining -- particularly whether it's something that could

2  be provided on an attorneys-eyes-only basis, just to make a

3  determination of whether that is something that would have a

4  sufficient basis for discovery or disclosure here, but I think

5  as to that particular, I will let you all do a further

6  meet-and-confer on that before we address that, but I will hear

7  from Mr. Thackston first on that.

8           Anything else, Ms. Kagan?

9           **MS. KAGAN:** No, Your Honor, thank you.

10          **THE COURT:** All right. So, Mr. Thackston, let me

11  come back to you then with respect to the motion to quash,

12  motion for protective order, and motions to seal, and then if

13  there is something that Mr. Greve had to raise in addition,

14  then I'll let you indicate that or defer to him on that.

15          **MR. THACKSTON:** Okay. Yes, Your Honor. I think what

16  I heard the request to be was that the Court enter a

17  restraining order against defense counsel ████████████████

18  ████████████████████████████████████████████████████████

19  ████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████    ██████████████████████████████████

22  ████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████

25          So I don't think that the Court intends its order

1 about confidentiality of anything we might get from Northwell

2 to include some type of prohibition on talking about materials

3 that we have from other sources, particularly something that's

4 probably in the congressional record.  I just want to make

5 sure --

6            **THE COURT:**  Here's the issue with that,

7 Mr. Thackston, because you had that information, ██████████████

8 ████████████████████████████████████████████████████████████

9 ████████████████████████████  ████████████████████████████

10 ████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████

12 ██████████████████████████████████

13            And so that would be part of the concern.  If you

14 want --

15            **MR. THACKSTON:**  I --

16            **THE COURT:**  Mr. Thackston, let me finish.

17            **MR. THACKSTON:**  I'm sorry.

18            **THE COURT:**  ████████████████████████████████████

19 ████████████████████████████████████████████████████

20 ████████████████████  ████████████████████████████████

21 ████████████████████████████████████████████████████████████

22 ████████████████████████████████  ████████████████████

23 ████████████████████████████████████████████████████████████

24 ██████████████████████████████████████████████████████

25 ██████████

1     **MR. THACKSTON:** Well, Your Honor, I don't want to

2 undue what we've done. I guarantee you we will not violate the

3 Court's order with respect to any information we get from

4 Northwell until we have a chance to have a hearing on that.

5     ████████████████████████████████████

6 ████████████ we could submit a list of the cases for which we

7 have a -- for which we have a release and -- because -- I mean,

8 to say something is confidential is not the same thing as to

9 say it's not discoverable.

10     Dr. Moline said in her deposition it would be

11 possible to redact materials to take out any personal health

12 information -- any personal identifying materials, and if one

13 of -- I would just ask a yes or no -- if we submit a list of

14 the cases for which we have a medical authorization, can we get

15 a yes or no from Northwell that can't be used, and then -- and

16 then at least take up the possibility of redacting materials so

17 that we could say, look, Case No. 6, you said they had no other

18 possible exposure, but the deposition of the Plaintiff says

19 they worked in a textile mill. So we would have some ability

20 to question her about her methodologies without disclosing

21 all -- who we're talking to -- about. It doesn't really matter

22 who it is, but it is a scientifically valid methodology to have

23 an expert in a case evaluate -- subjectively evaluate discovery

24 materials.

25     **THE COURT:** So --

1      **MR. THACKSTON:**  I just ask --

2      **THE COURT:**  -- I understand the request, again,

3  there, Mr. Thackston, 

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22      **MR. THACKSTON:**  Okay.

23      **THE COURT:**  Let me pause a minute.  It looks like --

24  we are recording this, but there was some feedback there, and

25  so I don't know if that's coming on my end -- we might need to

1  restart -- or whether that's someone who is on the line, that

2  we can clean that up a little bit.

3      **MR. SCHROLL:**  Your Honor?

4      **THE COURT:**  Yes.

5      **MR. SCHROLL:**  This is Matthew Schroll on behalf of

6  Colgate.  May I be heard on this issue?

7      **THE COURT:**  Sure.  Actually, let me make sure that

8  we're recording okay, and then I will go through the other

9  Defendants as well before -- okay.  It sounds like we've gotten

10  it cleaned up.

11      So with respect to that then, I think, Mr. Thackston,

12  as to the motion to quash, what I would intend to do is allow

13  that just as to any remaining requests without prejudice to

14  making those requests as part of expert discovery.

15      Is there something else we need to address on that?

16      **MR. THACKSTON:**  I don't think so, Your Honor,

17  unless -- I would like to speak to the employment contract

18  briefly.

19      **THE COURT:**  Okay.

20      **MR. THACKSTON:**  The only thing -- and perhaps they

21  can tender it in camera or whatever, but the only thing I'm

22  looking for is that Dr. Moline says that she gets paid directly

23  for her personal time that she spends on cases, and then when

24  she spends case -- when she spends company time on cases, the

25  company gets paid.  In other cases, I have seen situations

1  where there is also a bonus provision based on the amount that
2  someone brings in.
3           So I'm just trying to figure out whether there's
4  something in her contract that says:  And part of the money
5  that Northwell gets she also gets.  I'm happy for them to
6  redact every other word in the employment agreement other than
7  any provision that relates to any amount of bonus that she
8  might get for the money that she brings in through her expert
9  consulting work.
10          **THE COURT:**  So what may make sense on that, since
11 that's sort of a contingent-type request, is to clarify that in
12 the deposition; and then if there is some sufficient link there
13 or basis to provide or -- to get that information, that she can
14 then provide that with the redactions as part of that.  It may
15 be more efficient to let that be clarified rather than for me
16 to try to make some determination that's based on a lot of
17 contingencies or things that we are not aware of or clear of.
18          **MR. THACKSTON:**  Okay.
19          **THE COURT:**  So let me go to the other Defendants now
20 because I do want to make sure that I've heard from everybody.
21          Mr. Schroll, you wanted to be heard for Colgate?
22          **MR. SCHROLL:**  Yes, Your Honor, thank you.
23          Just two things, I think, on this issue is I
24 understand the Court's order, and just for purposes of the
25 record, I just wanted to put Colgate's objection on the record

1  as to the confidentiality order.  We weren't –– it obviously

2  wasn't our subpoena, and we weren't a party to the motions

3  practice, but I just –– for purposes of the record, I just

4  wanted to put in an objection that we would respectfully

5  disagree and adopt AII's position on that, and I need not add

6  anything else to that.

7  **THE COURT:**  Okay.  Well, it's helpful to me, though,

8  to understand exactly what that is.  Is the issue that you want

9  to be able to use that in other cases, or what's the issue?

10  **MR. SCHROLL:**  Well, Your Honor, if I understand your

11  order, it's still open for the judge's discretion at trial.

12  And I understand the difference between trial and discovery,

13  and, you know, I would suggest that the information that is

14  contained ████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████

16  █████████████████████████████████████████████████████

17  ███████████████████████████████.  It will come from Dr. Moline

18  testifying at trial.  Any local news reporter, anyone off the

19  street will be able to sit at trial and hear that information

20  because ████████████████████████████████████████████████

21  ████████████████████████████████████████, and they will put

22  it into evidence at trial and ask a jury to award them millions

23  and millions of dollars against –– from the Defendants.

24  So, you know, I understand that this is going to be

25  left open for the trial judge, and that's why I said we accept

1  the order, but we just put our objection on this so we can

2  preserve it for the record for −− if it gets revisited at

3  trial.  And so I would say that that's sort of −− I'm looking

4  ahead, Your Honor, that even though this wasn't my subpoena or

5  my motion, I want to be on record that Colgate reserves the

6  right to litigate this at the appropriate date, as Your Honor

7  indicated.

8          **THE COURT:**  All right.  And just to make sure I'm

9  being clear, I am not making any sort of finding that it would

10  be confidential if it is ultimately presented at trial or what

11  pieces or parts may be confidential if it's ultimately

12  presented at trial.

13          My determination here is solely for discovery

14  purposes and proceedings now before the Court, that the fact

15  that this was disclosed in discovery is still treated as

16  confidential information the way any information would that's

17  produced in discovery and designated confidential in a consent

18  confidentiality agreement in the type that are ubiquitous in

19  these cases and in other cases before the Court.

20          So just because something is designated as

21  confidential or protected as confidential in discovery does not

22  mean that that's going to control ultimately when it's

23  presented as dispositive motions or, more importantly, at

24  trial, and that would be subject to a separate determination

25  under the federal rules and the local rules.

1        So I want to make sure that I'm clear, too, that

2   I'm -- it would not be necessary to revisit anything.  It would

3   be a whole new determination that would be made once or if

4   something is presented at trial or on dispositive motions.

5        Does that help, Mr. Chesson -- or, excuse me,

6   Mr. Schroll?  I'm sorry.  That was my mistake.

7        **MR. SCHROLL:**  Yes, Your Honor.  Like I said, I just

8   wanted to put on the record that we adopt AII's position with

9   all this, because I don't want to be in a situation where

10  perhaps AII is not at trial, Colgate is at trial, and

11  Plaintiffs take a position that we -- this was not our

12  argument, this was not our subpoena, and so on.  So I just want

13  it to be on the record that we adopt AII's position and any

14  objections that they have made.

15       And then I have -- the other point, Your Honor, I

16  raise is that with respect to identifying information ███████

17  ██████████████████████  I -- I don't know if that's -- I would

18  suggest that that -- that the Court not enter an order on that

19  at this time.  That is the subject of a discovery dispute that

20  recently finished the meet-and-confer process with Plaintiffs,

21  between Plaintiffs and Colgate, and that the Court has not had

22  the opportunity of full briefing on that issue.

23       I will note that we're in a little bit different

24  position than Clubman because Colgate was a defendant in about

25  half the cases that are part of the 33 cases that Dr. Moline

1    has, and I would just ask that -- you know, I understand what

2    the Court's sort of initial reaction is in talking with

3    Mr. Thackston, but I would just ask that the Court defer on

4    that without -- until the Court has the benefit of full

5    briefing on that issue.

6            **THE COURT:**  All right.  So I wasn't aware of that,

7    and I thought that was raised -- or what was before me as part

8    of the motion for protective order, at least as it relates to

9    Dr. Moline and Northwell.

10           Is there still something else as to those folks?

11           **MR. SCHROLL:**  Yes, Your Honor.  We're going -- I

12   believe that Colgate will move to compel the underlying data as

13   to identities for the individuals of Dr. Moline's article and

14   Dr. Emory's article, which currently isn't a subject of this

15   dispute, but I don't believe that there's -- the real focus

16   that I perceive from these motions and from the arguments that

17   have been presented here has been the focus on the disclosure

18   that was made by Northwell ███████████████████████████

19   and that Northwell has not filed its own motion to quash and

20   that the identities ██████████████████████ -- the Court would

21   benefit from a different perspective because Colgate has been a

22   defendant in many, many more of the cases than AII was, and so

23   we -- we're in a different position than AII on that.  And the

24   meet-and-confer wrapped up last week.  So that's why it wasn't

25   part of this here, and we haven't filed a motion yet, but we

1  believe that now it's ripe, and it will be about Dr. Moline's

2  article and also Dr. Emory's article, who -- just -- the

3  Court's indulgence, Dr. Emory is another expert who had a

4  similar article using data from exclusively cases that she

5  received in litigation, the same position, and so we think that

6  that is a little bit different perspective from Colgate on that

7  issue, and I would ask that the Court reserve on that until

8  Colgate has had the benefit of briefing that and arguing that

9  before Your Honor.

10       **THE COURT:**  All right.  Well, I'm trying to balance

11  that with the need to go ahead and resolve the ones that are

12  before me, at least as to AII.  And I think you've heard my

13  thoughts on that and generally how it seems to me; but then

14  since Colgate hasn't briefed that, if there are additional

15  arguments that you want to raise, then I can certainly consider

16  those, but what I'm inclined to do is go ahead and address them

17  to the extent they have been raised with respect to AII, but

18  with leave for Colgate to raise that further if there is

19  something else that you want the Court to consider further.

20       **MR. SCHROLL:**  Yeah, and, Your Honor, just to be

21  clear, my understanding was that -- central to this dispute was

22  that it was a subpoena to Northwell.  Earlier in this case,

23  Plaintiffs made clear that their position was that they viewed

24  these types of subpoenas as improper.  After that was made

25  clear to Colgate, Colgate then propounded requests for

1 production. Plaintiff responded. We had our meet-and-confer,
2 and now that's all teed up. So we would be moving to compel on
3 the basis of discovery requests, which is different than the
4 issue with the Northwell subpoena. And so, Your Honor, I would
5 just suggest that, you know, we be afforded the benefit of
6 being heard on that as it relates to Colgate.

7         **THE COURT:** All right. Well, I think that's what I
8 indicated, Mr. Schroll, just in the sense that I would grant
9 the motion for protective order just to -- in the limited sense
10 that I've set out as well as granting the motion to quash as
11 moot to the extent that that would be then pursued as part of
12 party discovery.

13         I'm not intending to hear from AII again on this
14 because I think they've briefed the issue and I've considered
15 it, but I can reserve the ability to consider further as to
16 Colgate since you have not yet briefed that, and I want to give
17 you the opportunity to do that.

18         So I think that's consistent with generally your
19 suggestion there, other than maybe just the fact that I am
20 making the determination to the extent it's been presented as
21 to AII with respect to both the motion to quash and the motion
22 for protective order; but I understand if you've gone about it
23 through party discovery, as may have been otherwise called for,
24 and need additional opportunity to need to be able to bring
25 that before the Court.

1            Again, I've indicated I've got concerns about that,

2    but I will let you present whatever you may want to present, if

3    it's separate for Colgate, so that you can brief that and I can

4    consider whatever you may want to present there.

5            **MR. SCHROLL:**  Thank you, Your Honor.

6            **THE COURT:**  All right.  Mr. Peck, anything for

7    Cyprus?

8            **MR. PECK:**  No, Your Honor.  Based on the position of

9    Cyprus in this case, we don't have anything to add on this

10   dispute.

11           **THE COURT:**  Okay.  Mr. Tomlin, for Whittaker Clark &

12   Daniels?

13           **MR. TOMLIN:**  Nothing further, Your Honor.

14           **THE COURT:**  All right.  So let me come back around.

15   There's still the last matter of Colgate's motions and

16   scheduling that I would like to take up and that we need to do

17   quickly.  So I don't want to do any more extended discussion on

18   this, but, Ms. Kagan, just with respect to the present motions,

19   anything else that you needed to be heard on?

20           **MS. KAGAN:**  No, Your Honor.

21           **THE COURT:**  And, Mr. Thackston, anything else?

22           **MR. THACKSTON:**  No, Your Honor.

23           **THE COURT:**  All right.  So as to those, what I'm

24   going to do will be as to the motion to quash, No. 168, I am

25   going to grant that as (audio glitch) as to any remaining

1  requests -- we're getting some feedback again.

2        So we're getting a lot of feedback, folks.  We think

3  it may be from one of the parties.  It's making it difficult to

4  make a recording.

5        All right.  Now, we're back.  So I don't know who it

6  was that may have just joined or muted, but whatever that may

7  have been, it prevents us from getting a good recording.  So

8  hopefully we've got that now.

9        All right.  So as to the motion to quash, No. 168,

10  that would be granted as to any remaining requests, without

11  prejudice to making appropriate requests as part of the expert

12  discovery process, as we've discussed.  As part of that, as

13  I've initially indicated, I did not find any bad faith or

14  unreasonable conduct with respect to that and the particular

15  circumstances that were presented here; but for any remaining

16  requests, the parties will address those as part of expert

17  discovery rather than by subpoena to Northwell.  So that will

18  be the -- 168 would be granted to any remaining requests.

19        As to the motion for protective order, which is

20  No. 179, I will deny the request that ███████████████████████

21  ███████████████████████████████████, but I will allow Plaintiff

22  to designate that information as confidential and limited

23  solely to this case, and the motion for a protective order

24  would be granted to that extent.

25        Again, that is just as to a claim for confidentiality

1 during discovery, which means that any filing of that

2 information would need to be accompanied by a motion to seal

3 pursuant to Local Rule 5.4.  However, the Court is not making

4 any ultimate determination as to whether that information

5 should be sealed if it is presented and considered as part of

6 dispositive motions or at trial since that would be subject to

7 different standards that would apply.

8          In that respect, the motions to seal, No. 180 and

9 No. 200, will be granted with respect to the present filings

10 related to discovery disputes, as those are not subject to

11 First Amendment protections that would apply to filings on

12 dispositive motions and at trial.  Again, whether those should

13 remain under seal ultimately would be a matter for the trial

14 judge in this case, and so those things would need to be filed

15 with a motion to seal consistent with Rule 5.4 until that issue

16 is ultimately determined by the trial judge.

17          With respect to the motion for a protective order as

18 to discovery or inquiry into the identity of ████ human study

19 subjects, that will be granted with respect to Plaintiffs'

20 Motion 179 as to AII and the subpoena to Northwell, and I will

21 find that based on the discussion ███████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 ███████████████  and that was part of our extensive earlier

1  discussion.  I won't repeat all of that here, but I will also

2  note that to the extent Colgate has indicated some requests to

3  be able to address and brief that, I will consider that, and I

4  will allow the parties to fully brief that before I make any

5  determination on the request that Colgate may raise.

6          So as to the present motion for a protective order,

7  it would be essentially granted, except that denied with

8  respect to the documents ███████████████████████████,

9  and those can be included as part of the discovery in this

10 case, but that information is confidential and limited solely

11 to this case, and that is specifically ████████████████

12 ███████████████████.  If there is any reason to revisit that

13 further and as well if there is any reason to address a further

14 motion that may be filed, including by Colgate, then those are

15 matters that the Court can take up once they are briefed and

16 presented.

17         So I think that takes care of, again, 168, 179, 180,

18 and 200.  For the clerk, 168 would be granted as to any

19 remaining requests without prejudice to making requests as part

20 of expert discovery.  179 will be denied in part and granted in

21 part, as set out during the hearing.  And motions to seal, 180

22 and 200, will be granted with respect to the discovery

23 disputes.

24         And, Ms. Kemp, I will indicate specifically to you,

25 as to 179, just note it's denied in part and granted in part on

1   the docket entry as further set out in the hearing, because

2   parts of that may be subject to claims of confidentiality, and

3   we'll let the parties address that once the transcript is

4   ordered and docketed.  So we can just -- the docket entry can

5   just show granted in part and denied in part, and the details

6   will be as set out in the transcript.

7         All right.  The last piece we have is the scheduling

8   and Colgate-Palmolive's motion -- we're getting the feedback

9   again.

10         **COURTROOM DEPUTY CLERK:**  Judge Peake, I'm not sure

11   what's going on with the line.  I never had these difficulties

12   before.  Usually, it's clear.

13         **THE COURT:**  I'm concerned about the ability to make a

14   transcript because the level of interference that we're getting

15   is increasing.  If we still have this conference line, what we

16   could do is take a five-minute break, and then see if we come

17   back and get a cleaner line.  It does seem to come and go, so

18   it's possible we're getting feedback from -- see, it's clear

19   again.  It's possible we're getting feedback from other folks

20   on the line.

21         **COURTROOM DEPUTY CLERK:**  Maybe we can take a recess,

22   Your Honor, and try to call back in.  Maybe that would help.

23         **THE COURT:**  Why don't we do that.  Let's take a

24   five-minute recess.  Everybody disconnect and then call back

25   in, and we'll see -- and I'll ask our IT folks to come down and

1  get us straightened out and see if we can get that cleaned up,

2  and then we'll take up these last matters.

3            **COURTROOM DEPUTY CLERK:**  Yes, Your Honor.

4            **THE COURT:**  All right.

5            (Pause in the proceedings.)

6            **THE COURT:**  All right.  I apologize to the extent we

7  may have had some technical difficulties on this end.

8  Hopefully, we've got that cleared up now, and hopefully the

9  transcript is clear enough.  There were a few places where

10  there may have been some feedback.  It may make it difficult

11  for the court reporter, and if there is anything that I need to

12  do by written order to clarify further, certainly, I can do

13  that; but, hopefully, we should be able to get a recording of

14  this, if we need it.

15            So I think we were ready for Colgate-Palmolive's

16  motions, and that involves just general scheduling as well.

17  With respect to that, there was -- No. 185 is the motion for a

18  telephone hearing, and that's granted based on this hearing

19  that we're having today.  There's the motion for leave to

20  designate Dr. Attanoos as an alternative expert, and the motion

21  to extend dispositive motions deadline.

22            What I think I'll do is let's take up Dr. Attanoos,

23  and you can correct my pronunciation on that, Mr. Chesson or

24  Mr. Schroll.  Let's consider that one first.

25            Consistent with how I operated earlier, I think I

1  gave you my general indication that we could reserve the

2  ultimate determination with respect to whether there is a need

3  to substitute Dr. Geyer, if he's ultimately not available, and

4  reserve that question, but, in the meantime, let you go ahead

5  and proceed with Dr. Attanoos in order to reduce any potential

6  prejudice to the Plaintiff so that that's well in advance and

7  that you all get that resolved either by a deposition of

8  Dr. Geyer or a motion to substitute by February 15th so that

9  you're sufficiently in advance of trial, but Mr. Chesson or

10  Mr. Schroll, I will hear from you with respect to that motion

11  and how you would propose to proceed on that.

12         **MR. SCHROLL:**  Thank you, Your Honor, Matthew Schroll

13  on behalf of Colgate.

14         In the interest of time, I think that your overview

15  is essentially what we've asked for in our motion, which is

16  that we hope for the best that Dr. Geyer makes a full recovery,

17  but we prepared for the worst.  And, Your Honor, it is our

18  position that waiting until February or March to make that

19  determination would possibly result in prejudice to Colgate

20  because it does take time to ship pathology materials and for

21  Dr. Attanoos to review them and generate his report and sit for

22  deposition.

23         And Colgate is being proactive on this.  We're not

24  waiting until the last minute because, you know, I think that

25  if we did, Plaintiff would correctly accuse us of a delay

1    tactic and say that we're trying to deny Plaintiff his day in

2    court, and we're trying our best to avoid that and be proactive

3    and up front with the Court about the situation.

4         You know, I think it was in our joint status report,

5    Your Honor, it wasn't in our motion, but the latest news that

6    we had and I shared with counsel was that Dr. Geyer suffered a

7    heart attack and that he's likely to be recovering for the rest

8    of the year.  So, you know, I think that Your Honor's

9    suggestion that we proceed with Dr. Attanoos and then revisit

10   to see what Mr. Geyer's condition is the most appropriate

11   action at this time.

12        **THE COURT:**  What I would assume then, Mr. Schroll, is

13   that Dr. Geyer is still the designated expert at this point,

14   and for dispositive motions, you're going with that and nothing

15   about Dr. Attanoos would affect that, and that just as a

16   contingency option or alternative, you can proceed with

17   providing the materials and getting the expert report with the

18   understanding that that would only be in the eventuality

19   Dr. Geyer is unavailable and still subject to or requiring a

20   motion to substitute so everything can get fully heard at that

21   point.  I think by doing it that way, you reduce any concern as

22   to the potential prejudice to Plaintiff for doing it too late

23   or before trial.

24        Is that consistent with your understanding?

25        **MR. SCHROLL:**  Yes, Your Honor.  As pointed out by

1   Plaintiff, Dr. Geyer is here in the United States, and, you
2   know, I would like to have all my experts appear live at trial.
3   That would be my preference.  So, you know, we don't know what
4   the world is going to be like in April, but, you know, I think
5   your summary is where we stand.
6          **THE COURT:**  All right.  Let me go to Ms. Kagan with
7   respect to that.  Anything else we would need to address on
8   that?
9          **MS. KAGAN:**  I think Your Honor has given her
10  tentative on this, and we do still raise a strong objection to
11  Ms. Bell's original pathology materials leaving the United
12  States and traveling to the United Kingdom, because if
13  Dr. Attanoos decides to not return them, we do not have any
14  recourse.  Certainly, we could file a motion to compel against
15  Colgate, but Colgate can't go get them back from the United
16  Kingdom, and there is nothing we can do to compel them.
17          That aside, we also have very strong concerns -- and
18  I'm very sensitive to the fact that Dr. Geyer is not well, and
19  I told this to Mr. Schroll; and if Mr. Schroll chose an expert
20  who is legally allowed to be employed in the United States and
21  who pays taxes in the United States on that income, I would
22  certainly have no objections at all whatsoever; but at this
23  point, because Dr. Attanoos is not legally allowed to travel to
24  the United States for employment and yet he intends to do that
25  and make income from the United States that he doesn't pay

1  taxes on, we have a strong objection to being party to

2  continuing to support his ability to do that.  And if he

3  doesn't intend to travel to the United States to testify at

4  trial, that creates substantial prejudice to Plaintiffs.

5         With all of that said, what I had proposed to counsel

6  for Colgate and what I think the Court is saying is consistent,

7  that we can wait and see how Dr. Geyer is.  He is the

8  designated expert, and then come February 15th, we can reassess

9  what the situation is and the availability of Dr. Geyer.

10        I do still have very strong objections to Mrs. Bell's

11 actual pathology materials, her actual tissue, leaving the

12 United States and going anywhere out of this country.

13        **THE COURT:**  Is there anything else you need to do

14 with those tissues?

15        **MS. KAGAN:**  There is nothing that we need to do, but

16 it is evidence, and so if that evidence is destroyed or not

17 returned to us, then there is no way that we would be able to

18 meet the best evidence rule to show that, in fact, these slides

19 demonstrate and these tissue demonstrate that she has this

20 bilateral pleural plaque, which every expert agrees is a

21 signature of asbestos exposure, undisputed.

22        **THE COURT:**  So wouldn't that just be subject to all

23 the ordinary spoliation rules?  I mean, we could send it to an

24 expert in Greensboro and have it end up destroyed in some act

25 of God that no one anticipated or by negligence of the expert

1  in how they handled the material.  In whatever the scenario

2  might be, the federal rules give us a lot of guidance.  Those

3  are not the sort of first times those things may have happened

4  in terms of spoliation and how we hold those against the

5  parties in the case and protect the plaintiff from any

6  prejudice on that.

7         It seems like we could address that the same way --

8  Colgate is going to be responsible for it.  If they choose to

9  send it overseas, it's their responsibility under the

10  spoliation rules, the same way even if someone here in

11  Greensboro had a fire in their lab and lost the whole thing or

12  negligently sort of dropped it or left it somewhere.

13         I mean, it seems to me that we can address those

14  things.  It's a risk no matter what the expert may be -- or who

15  the expert may be, but we'll put that burden on Colgate,

16  depending how much they trust this expert and the risk that

17  that might assume if there's any problem with getting any

18  materials back.

19         Any reason why it wouldn't just be subject to those

20  same ordinary principles?

21         **MS. KAGAN:**  Your Honor is correct; it would be

22  subject to those principles, including an adverse inference

23  charge and spoliation, but the risk is increased when these

24  materials are being sent, not to Duke here locally or even New

25  York, but they are being sent overseas.  But it's not necessary

1  because we don't actually know that Dr. Geyer will not be

2  available to testify in April.  And I had offered counsel for

3  Colgate to hold off on his deposition, because we have deposed

4  him many times before.  He doesn't contest the diagnosis, and

5  we can wait for his causation opinions sometime in 2021.

6  That's not something that I need to oppose dispositive motions

7  and they have indicated they don't need for their dispositive

8  motions.

9          **THE COURT:**  Well.

10         **MS. KAGAN:**  Just the fact --

11         **THE COURT:**  I'm sorry.  Go ahead, Ms. Kagan.

12         **MS. KAGAN:**  It's simply that the risk is so much

13  higher by these materials going overseas when the need is not

14  really clear at this point in time.

15         **THE COURT:**  So the alternative, though, Ms. Kagan,

16  would be then I treat that as a waiver of any prejudice with

17  respect to it being too late or too close to trial; and so if

18  we wait until closer to trial to send this information to

19  Dr. Attanoos to provide a report, you may not get a report

20  until the day of trial or trial has already commenced.  I would

21  assume you would have wanted that information sooner rather

22  than later.

23         **MS. KAGAN:**  Under normal circumstances, I would agree

24  with Your Honor, but as I wrote in our briefing, Dr. Attanoos'

25  reports are identical.  His opinions in every case in these

1  talc cases are identical.  It's never the asbestos that causes

2  the mesothelioma.  It's always the person's age, there's some

3  genetic mutation, so forth and so on.  So I am less concerned

4  about an opinion from Dr. Attanoos that I've never seen before.

5  I'm much more concerned about him not actually showing up for

6  trial and me not being able to fully and fairly cross-examine

7  him in front of a jury.

8        **THE COURT:**  All right.  Well, that's a different

9  issue; right?  Whether he can appear or not would be a separate

10 issue and whether you can address that by a video deposition in

11 advance of trial and be prepared for trial, but I just want to

12 make sure that I'm correctly understanding how you're balancing

13 all of these things.

14        If we treat Dr. Attanoos as being sort of disclosed

15 as a potential alternative at this point and Plaintiff agreeing

16 that even if his report is not provided until trial begins,

17 that there wouldn't be prejudice there that would preclude

18 substituting him for Dr. Geyer, I can note that and take it

19 into account if that's at this point what you would sort of

20 represent.

21        **MS. KAGAN:**  I think based on the amount of time that

22 we still have and the uncertainty with Dr. Geyer's recovery

23 period -- you know, we're still in September.  I think it

24 probably would be most prudent, as I had suggested at our

25 meet-and-confer, to reconnect in January on this issue and

1 determine whether or not Dr. Geyer is well enough to sit for

2 deposition, whether he intends or will be able to come to

3 trial, and have that meet-and-confer conversation.  And if at

4 that point it's clear that his recovery has not gone well or

5 he's no longer going to be testifying, even though apparently

6 Defendants continue to disclose him and swear under oath that

7 he will be available to testify as recently as two weeks ago --

8          **THE COURT:**  Well, Ms. Kagan, that's the sort of thing

9 that doesn't help, though.  It really doesn't.  We understand

10 that they have disclosed him.  He is their expert right now, to

11 the extent he's available.  We all understand the concern with

12 respect to which he might not be available.

13          I have some concerns about putting it off until

14 January if the response then is going to be that it's too late

15 or there's not enough time to get the sample to him or for him

16 to be able to provide a report or it's somehow going to

17 prejudice Plaintiff at that point, which is why I'm inclined to

18 allow them to go ahead and get the reports prepared, if they

19 are so inclined, still with the caveat that Dr. Geyer is the

20 expert.  He's the one who is intended and expected, but there

21 may be a need to substitute based on the health concerns and

22 that as much notice as possible generally helps reduce the

23 prejudice on all sides.

24          It's sounds like really the only reason to wait is so

25 that the sample doesn't get sent overseas until later; is that

1  right?

2           **MS. KAGAN:**  That's correct, Your Honor, until

3  absolutely necessary.

4           **THE COURT:**  All right.  So let me go back to

5  Mr. Schroll with respect to that.  Are you intending to send

6  the sample to Dr. Attanoos, or how would that work?

7           **MR. SCHROLL:**  Yes, we are, Your Honor.

8           And I just want to note here that they've raised this

9  as a potential issue, but I don't see anything in their brief

10 about this happening before or that there's any unusual risk as

11 to Dr. Attanoos other -- any different than the risk that Your

12 Honor raised about sending it to Dr. Geyer in Pittsburgh or

13 anywhere else.  It travels in some cases by plane via FedEx or

14 UPS, or however it's sent.

15          I'm not really seeing a factual record here that

16 would preclude Dr. Attanoos from physically handling the

17 pathology material.  I will note he does it routinely all the

18 time, as Plaintiffs' brief shows you.  They say, you know, he

19 makes all this money from testifying in all these cases.

20 That's exactly what he does in all these other cases.  So, you

21 know, I don't see a risk here, and I agree that Colgate would

22 be subject to spoliation sanctions, just as we would if

23 Dr. Geyer lost the materials.

24          And I would add, Your Honor, that all this

25 uncertainty about what's going to happen in February, whether

1   Dr. Attanoos can travel to the United States -- and, you know,

2   I'll also add that Dr. Attanoos has a day job.  He just didn't

3   sit here and look at pathology materials for litigation at the

4   drop of a hat.  So, you know, I think all of this uncertainty

5   is exactly the reason why we would suggest that that review by

6   Dr. Attanoos happen now and proceed based on -- and reassess

7   about Dr. Geyer's condition after the New Year and see, and we

8   are then able to decide what's going to happen.

9           **THE COURT:**  All right.  So what I'm going to do as to

10  No. 169, which is Colgate's motion for leave to designate an

11  additional expert, I'm going to grant that in part to the

12  extent that Colgate can choose to designate an additional

13  expert as a potential alternative and subject to filing a

14  motion to substitute by February 15th if Dr. Geyer is

15  unavailable, and that as part of that, they can undertake

16  whatever ordinary testing they may choose to do, subject to the

17  ordinary spoliation rules.

18          I'm not going to supervise or try to manage the tax

19  compliance on the party's expert.  I'm also not going to give

20  any particular orders to an expert or tell Colgate who they can

21  choose as an expert on that, but I will leave on Colgate the

22  risk with respect to any spoliation or any other similar

23  concerns regarding the materials and the samples.

24          To make sure that's clear then, at this point it

25  would be leave to go ahead and undertake that expert report and

1  review, but subject to further motion to designate or

2  substitute Dr. Attanoos if Dr. Geyer is not available, and it

3  would be limited in scope not to go beyond Dr. Geyer in the

4  sense that it would not provide an additional late expert on

5  matters that weren't already addressed or covered.  And it

6  would be then by February 15th either a deposition of Dr. Geyer

7  or a motion to use Dr. Attanoos at trial in lieu of Dr. Geyer,

8  if that's necessary at that point.

9         So let's see.  Mr. Schroll, is that clear enough that

10  I'm not making it a final determination that Dr. Attanoos is

11  now an expert or a testifying expert in this case?  That would

12  need to still be subject to a motion and only if Dr. Geyer is

13  not available, but you can go ahead and undertake that if you

14  choose to do that in the meantime so that you have that as an

15  option to offer to the Court for further consideration and

16  determination at that point.

17         **MR. SCHROLL:**  Thank you, Your Honor.

18         **THE COURT:**  All right.  So, Ms. Kemp, No. 169 can

19  show granted in part, as set out at the hearing, subject to

20  further motion, if necessary, by February 15th.

21         **COURTROOM DEPUTY CLERK:**  Yes, ma'am.

22         **THE COURT:**  All right.  Thank you.

23         And then we have No. 183, which is the motion to

24  extend dispositive motions deadline.  It looks like that may

25  have been necessitated by some delay on the expert depositions;

1  and while I don't have a motion to extend as to those expert

2  depositions, if that's otherwise happening by agreement, I

3  could allow that, but it would seem appropriate to adjust the

4  response and reply times for everybody in order to adjust and

5  accommodate that.

6         But, Mr. Schroll, let me start with you as to that so

7  we can get a sense of where we are on that.

8         **MR. SCHROLL:**  Yes, Your Honor.  And I think, you

9  know, as a starting point, in our motion, you know, we raised a

10 reference to a few depositions that were postponed to after the

11 September 21st deadline.  My last count, keeping track of

12 everything, is that we currently have 20 depositions scheduled

13 between now and November 3rd and, you know, after the Court's

14 September 21st order.

15        Colgate contends that a few of those have

16 case-specific opinions that bear on summary judgment.  Those

17 depositions were scheduled to occur before the deadline, and

18 everything was amazingly going to work out, given the time

19 frame that we had.  Unfortunately, some of those depositions

20 were postponed.  Some -- as we laid out in the motion, one

21 expert had health issues, for example.

22        So, you know, through no fault of the diligence of

23 the parties, you know, these depositions just had to be

24 rescheduled; but we're in a position now where, with summary

25 judgment due Monday, as it comes to Colgate -- and I don't know

1  how the other Defendants feel, but as it comes to Colgate, we

2  don't have those depositions completed.  So, you know, we would

3  not be in a position to file our dispositive motion.

4      And so, you know, I really filed this motion looking

5  for guidance from the Court because we understand from the

6  Court at the last hearing you set a deadline for summary

7  judgment -- or altered the discovery deadline I think with

8  summary judgment in mind and advised that, you know, this might

9  cause issues for other markers in the case.

10     So, you know, we didn't ask for a fixed date as an

11  extension to file our summary judgment motion because, you

12  know, we're sort of in this position where we have one expert

13  who has not been offered yet, and that was Dr. Moline, because,

14  obviously, you just resolved some motions with respect to her

15  deposition, and I understand that Plaintiffs' counsel will now

16  offer her for a date.  So we don't even have that deposition

17  scheduled yet.

18     So, you know, we're really looking for guidance from

19  the Court of when the Court would want us to file summary

20  judgments in light of the fact that we have so many depositions

21  going on in October past the current discovery deadline.

22     **THE COURT:**  So which ones do you need in order to be

23  able to file your dispositive motions?

24     **MR. SCHROLL:**  There's two -- there's Dr. Emory on

25  October 1st; Dr. Longo on October 8th.  Those two were set in

1 the motion.  Since then, Dr. Compton has been rescheduled to

2 October 23rd, I believe.

3          **THE COURT:**  Oh.

4          **MR. SCHROLL:**  And then we don't have a date for

5 Dr. Moline.  And, you know, I don't know -- I don't expect

6 Ms. Kagan to have a date here right now, obviously, but I

7 assume that she could probably check and get one next week.

8          **THE COURT:**  All right.  If you're talking about

9 October 23rd, there's not going to be a way to keep you on the

10 April trial calendar.  Let me go to Ms. Kagan and see where

11 Plaintiff is.  As far as these depositions, those were all ones

12 that needed to be done by September 21st if we were going to

13 keep this schedule.

14          Ms. Kagan, where are we on that?

15          **MS. KAGAN:**  The only issue actually is really

16 Dr. Compton, the October 23rd deposition.  His deposition was

17 actually scheduled for today.  All of the depositions that are

18 set for after the September 21st cutoff have been agreed to by

19 the parties and stipulations filed on the docket.

20          This week, when the Court set today's hearing for

21 today, counsel for AII requested a new date for Dr. Compton so

22 that they could appear here, all three of them, as well as a

23 deposition of Dr. Compton at a later point.  I had explained

24 that Dr. Compton has an incredibly tight schedule and that the

25 date will not be soon, and then the soonest date Dr. Compton

1  was able to give me was October 23rd, which I offered to

2  Defendants, again noting that it's quite far out, and perhaps

3  we could split up; somebody covering the depo and somebody

4  covering the hearing for today.  And the Defendants chose to

5  appear here today and move the deposition to the 23rd.  So I

6  would urge the Court not to penalize the Plaintiffs and move

7  the trial date because this deposition had to be moved so far

8  out.

9          I'm confident I can get a date for Dr. Moline sooner

10 than the 23rd, and we have Dr. Emory, as counsel for Colgate

11 said, set for the 1st, and Longo set for the 8th.

12         **THE COURT:**  So any of those, though -- my notion was

13 by agreement after September 21st only if it wasn't going to

14 affect the dispositive motions schedule.  I think all of these

15 affect the dispositive motions schedule potentially, and I do

16 not want to have to move it off of April, but everything has to

17 be fully briefed by November 11th, which is when it's currently

18 set to be fully briefed, and, if not, then you're going to be

19 too close to the trial date to be able to have your dispositive

20 motions considered before trial, and that's the concern we've

21 got by packing all of these in so tightly.

22         I don't know -- Ms. Kagan, do you have a suggestion

23 for how we brief dispositive motions and get everything briefed

24 by November 11th, replies included?

25         **MS. KAGAN:**  I guess I can begin by saying that at our

1 last conference, no Defendant had indicated what specific

2 depositions they needed for dispositive motions.  And so I did

3 tell counsel for Colgate that I am a little bit surprised that

4 we have so many depositions that are necessary for their

5 dispositive motions since this isn't our first case together.

6 We've been trying these cases for years against each other

7 across the country, and they -- these are all known quantities.

8 None of these are their new experts, and there's volumes of

9 deposition testimony from them.  So I am a little surprised

10 about the urgent need of these specific depositions in order to

11 file a dispositive motion.

12          That aside, again, I understand the issue with the

13 calendar and the motion schedule, but I also feel that the

14 prejudice to Plaintiff to moving the trial date from April

15 because a deposition was moved to October 23rd, because a

16 hearing was set and the Defendants asked for the deposition to

17 be moved, is really unfair to the Plaintiff.

18          And, certainly, with respect to Dr. Compton, he has

19 no new opinions in this case with respect to Colgate-Palmolive.

20 They have deposed him numerous times.  They have cross-examined

21 him at trial.  He has done no new work on Cashmere Bouquet and

22 has offered no new opinions in this case, and so I would hope

23 that Colgate could rely on the prior transcripts of his

24 testimony in the same exact accord that they have seen many,

25 many times before to be able to address him in a dispositive

1  motion.

2        And then that would leave us with Dr. Longo on the

3  8th, and I'm hopeful I can get Dr. Moline in before then, and

4  then we have a little bit more wiggle room on our motions

5  schedule.

6        **THE COURT:**  So what that would look then is if we set

7  aside Dr. Compton, if you get Dr. Moline -- and I think a

8  condition of this would be you had Dr. Moline in before

9  October 8th.  Then motions would be due October 12th.  Your

10  responses to motions would be 21 days later, which would be

11  November 2nd, and then they would have a week and a half for

12  replies, which would take until November 11th.

13        **MS. KAGAN:**  That is pretty consistent -- it's

14  actually more time than we would specifically get in

15  California.  I accept that schedule, Your Honor.  I obviously

16  can't speak for the Defendants.

17        **THE COURT:**  So that is contingent on you offering

18  Dr. Moline before -- on or before October 8th.

19        **MS. KAGAN:**  Yes, I will endeavor to do that.

20        **THE COURT:**  And if it's after October 8th, then I

21  think there's not going to be a way to get this briefed in time

22  for the schedule that you're on for dispositive motions.

23        I will tell you that that has already extended past

24  what the clerk's office ordinarily would allow for briefing of

25  dispositive motions prior to trial.  You're already closer to

1  trial with that than you should be.  So I extended it as far as

2  I possibly can.

3          And, again, we've talked about this before.  Whether

4  there are trials in April and what that looks like and what the

5  district judge would decide to do would be separate questions.

6  And so the district judge may still conclude that based on

7  either the COVID-related restrictions and/or the volume and

8  timing of the dispositive motions that it's necessary to

9  continue it; but if we go any further, I am going to have to

10 continue it.  I won't be able to keep it on the April calendar,

11 even subject to whatever further developments there may be,

12 again with no promises as to what things may look like then or

13 what the district judge may ultimately decide that they want to

14 do.

15          All right.  That is a possible schedule, at least.

16 I'm going to hear from all of the Defendants, but, Mr. Schroll,

17 let me go back to you first.

18          **MR. SCHROLL:**  Your Honor, I'm sympathetic to

19 Ms. Kagan's statement about prejudice to the Plaintiff here,

20 you know, and Colgate and all the parties really worked hard to

21 schedule those experts before the MSJ deadline, and through

22 unfortunate events, those depositions were postponed, through

23 no fault of Colgate as to those depositions.

24          So, you know, Your Honor, I would suggest that

25 prejudice swings both ways here and that really it's not really

1  anyone's fault.  This is just the -- what happens in this

2  litigation when you have a five-party case with 23 experts,

3  trying to schedule them all within a few weeks.  And we were on

4  track to get it done, and, unfortunately, we just couldn't.

5        With respect to the Compton issue, Your Honor, I

6  don't have his report in front of me right now, as I sit here

7  for this hearing, but my understanding, the last time I looked

8  at it, was that it is true, as Ms. Kagan suggested, that we

9  have deposed him before, and he has performed testing as it

10 relates to Colgate's product.  That has not changed, but my

11 understanding is that in this report he has issued what we call

12 a case-specific opinion about Ms. Bell's specific exposure in

13 this case, which is something that we would not have had the

14 opportunity to discuss with him in prior litigation.

15        As I said, I don't have the report in front of me

16 right now, but that was my recollection of why we considered

17 that deposition one that we wanted done in September before the

18 deadline, but like I said, Your Honor, I would have to review

19 the report to be absolutely certain, but that was my best

20 recollection.

21        **THE COURT:**  All right.

22        **MS. KAGAN:**  If I may be heard on that, Your Honor?

23        **THE COURT:**  Is that Ms. Kagan?

24        **MS. KAGAN:**  Yes.  Just on that limited issue about

25 Dr. Compton and his potential specific opinion.

1          **THE COURT:**  Okay.

2          **MS. KAGAN:**  There is no specific Bell opinion.  There

3  is a sentence in a declaration from Dr. Compton that adopts all

4  of the reports.  Colgate already has the standard testing

5  reports, and he notes that an individual like Mrs. Bell would

6  be exposed to asbestos above background from use of these

7  products, and that is a general statement that he applied to

8  any individual who uses these products as intended, based on

9  his exposure studies.  He has not reviewed or done exposure

10  studies based on Mrs. Bell's deposition testimony or the way

11  she specifically described using the product.  He did a general

12  study based on reviews of deposition transcripts from other

13  cases from years ago.  So there is no specific causation

14  opinion with respect to Mrs. Bell.  It's more of a

15  hypothetical.

16          **THE COURT:**  All right.  Mr. Schroll, does that help

17  as to Mr. Compton?

18          **MR. SCHROLL:**  I think that's what I said, Your Honor.

19  It sounds like he is going to relate an opinion specific to

20  Ms. Bell, not -- as opposed to just coming in and saying, I

21  found asbestos in Colgate's talc.  So I think that's exactly

22  what I said, and I think that -- again, I don't have the report

23  in front of me that I can quote from specifically, but, you

24  know, that was my understanding was that he was going to relate

25  his prior work as -- and give a specific opinion about

1  Ms. Bell.

2          **THE COURT:**  I don't know if that's Ms. Kagan said.

3  It sounded like she said that he was going to give a general

4  opinion about basic exposure or levels of exposure, but that he

5  hadn't reviewed anything specific as to Ms. Bell and wasn't

6  offering any opinions specific as to her.  Maybe I

7  misunderstood.

8          Is that what you were saying, Ms. Kagan?

9          **MS. KAGAN:**  That's exactly what I said, Your Honor.

10  It's the things that the testimony can give in a vast majority

11  of cases.  He's done an exposure study.  He's taken

12  measurements.  He offered the opinion that any individual who

13  would use this product in a manner that it was intended to be

14  used would be exposed to these basic levels of asbestos from

15  use of that product and has not offered a specific opinion

16  about the quality or quantity or duration of Ms. Bell's use,

17  and any questions about Ms. Bell would be purely in the form of

18  a hypothetical.

19          **THE COURT:**  All right.  And, Mr. Schroll, maybe you

20  can help me.  Is that different than what you were contending,

21  or what's the distinction you're making?

22          **MR. SCHROLL:**  Your Honor, maybe perhaps you can have

23  the other Defendants weigh in while I frantically try to pull

24  up the report here.

25          **THE COURT:**  All right.  That's fair enough.

1          So let me go through just with regard to scheduling

2    and how we deal with this.

3          Mr. Thackston, what's AII's position?

4          **MR. GREVE:**  Your Honor, this is Kurt Greve for AII.

5    We're comfortable with the dates that have been proposed by the

6    Court.

7          **THE COURT:**  All right.  So it would be dispositive

8    motions due October 12th, responses November 2nd, and replies

9    November 11th, understanding that's a tight turnaround, but it

10   at least gives you extra time to get the Plaintiff expert

11   depositions, to the extent you might want to have had those.

12         Does that work for AII?

13         **MR. GREVE:**  Yes, Your Honor.

14         **THE COURT:**  All right.  Mr. Peck, for Cyprus?

15         **MR. PECK:**  The same, Your Honor, those dates are fine

16   with Cyprus Amax.

17         **THE COURT:**  And, Mr. Tomlin, for Whittaker Clark?

18         **MR. TOMLIN:**  Sorry, Judge.  I couldn't hit the mute

19   button.

20         **THE COURT:**  That's all right.

21         **MR. TOMLIN:**  Yes, we will strive to get those done.

22         **THE COURT:**  All right.  And so for all of you -- and,

23   Mr. Carruthers, I know you're just listening for Neslemur, but

24   anything you needed to add on that?

25         **MR. CARRUTHERS:**  No, Your Honor.

1      **THE COURT:**  All right.

2      **MR. GREVE:**  Your Honor, just one quick clarification.

3   If we were able to file our motion sooner than the October 12th

4   deadline, would we still have the same response deadlines and

5   replies that are consistent with the rules, as opposed to

6   what's set forth in the schedule of October 12th, November 2nd,

7   and November 11th?

8      **THE COURT:**  Right.  So I think that's a fair

9   question.  Mr. Greve, what would your proposal be?

10     **MR. GREVE:**  Well, I mean, I think it's a situation

11  where we've been working hard to comply with the current

12  deadline.

13     **THE COURT:**  Right.

14     **MR. GREVE:**  You know, obviously, it never hurts to

15  have a couple of extra days, but if we had this on file, you

16  know, sometime next week, we just would hope that we'd be able

17  to keep the same time frames in terms of the response deadline

18  and the reply briefs.

19     **THE COURT:**  Right.  So I think the way it would work

20  is, ordinarily, if we're not following this abbreviated

21  schedule, they would have 30 days to respond.  So I could

22  say -- I mean, if you file it early enough, they've got 30 days

23  to respond, but it still has to be no later than November 2nd.

24  So it would be whichever of those came first, and then your

25  reply would be 14 days, or November 11th, whichever of those

1  came first.

2        Is that what you're asking, I guess?

3        **MR. GREVE:**  Yes, Your Honor.

4        **THE COURT:**  All right.  And I think that's the way I

5  would anticipate interpreting that, but let me go through and

6  make sure with everyone, and I'll start with you, Mr. Greve,

7  for AII.  You could file it early.  Their response is due 30

8  days, or November 2nd, whichever comes first.  Your reply is

9  due 14 days thereafter, or November 11th, whichever comes

10 first.  I don't think anything else is going to come first

11 because that's the date I'm using to -- that's the current date

12 on which everything would be fully briefed under the ordinary

13 deadlines.  So that should, either way, get everything fully

14 briefed by November 11th.

15        And then as far as the other experts that are

16 otherwise designated during October, and I guess even for

17 Hannah in November, early November, none of those would affect

18 AII with respect to being able to stay on the schedule we've

19 proposed; is that right, Mr. Greve?

20        **MR. GREVE:**  That's correct, Your Honor.

21        **THE COURT:**  Okay.  Good.  Thank you.

22        And then, Mr. Peck, none of those other dates for

23 depositions would affect that for you all either, would they?

24        **MR. PECK:**  That's correct, Your Honor.

25        **THE COURT:**  All right.  And Mr. Tomlin?

1          **MR. TOMLIN:**  Correct.

2          **THE COURT:**  All right.  And before I go back to

3    Mr. Schroll and Ms. Kagan, then you understand if I adopt this,

4    it would be contingent on Dr. Moline being deposed on or before

5    October 8th, and it would require you to file a response no

6    later than November 2nd to any of the dispositive motions, but

7    if any of the Defendants file them early, then they're due

8    within 30 days, and then, again, November 2nd at the latest,

9    and then replies would be by November 11th at the latest.

10          Is that workable for you, Ms. Kagan?

11          **MS. KAGAN:**  It is.  My law motions department might

12   murder me, but it is.

13          **THE COURT:**  Okay.  All right.  So then there's only

14   the issue as to Mr. Compton.  Mr. Schroll?

15          **MR. SCHROLL:**  Yes, Your Honor.  I confess; I was not

16   the attorney who was slated to depose Dr. Compton today.  So it

17   has been some time since I looked at this.  It's,

18   unfortunately, not OCR'd and not searchable by the search

19   function here.  I have been trying to read it.  It seems,

20   though, that with the other Defendants agreeing to that

21   deadline that would be the default deadline for us; and to the

22   extent I find something that is not consistent with what

23   Ms. Kagan said, I will raise it with her.

24          **THE COURT:**  All right.  You can do that either by

25   finding an earlier date for Mr. Compton, or if it's something

1  where it looks like there's -- it won't necessarily affect the

2  dispositive motions, but that changes after you actually do the

3  deposition, then you can raise it, if you need, in the reply,

4  and we can determine whether that's something that warrants

5  anything further as far as consideration.

6          But it sounds like, at least from what everyone else

7  understands and what Ms. Kagan has said, that there's not going

8  to be anything different here from Mr. Compton than there has

9  been in any of the other cases where he's been an expert.

10         Ms. Kagan, is that fair?

11         **MS. KAGAN:**  That's correct.

12         I can draw Mr. Schroll's attention to paragraph 26.

13 It's the last paragraph of the declaration.  That is the

14 summary of Dr. Compton's opinions.  Ms. Bell isn't specifically

15 mentioned.  These are his standard opinions with respect to

16 Cashmere Bouquet based on the testing -- the product testing,

17 both bulk and air, that he has done on these products and the

18 sources.

19         **THE COURT:**  All right.  So that's helpful.  Thank

20 you.

21         Mr. Schroll, anything else with that?

22         **MR. SCHROLL:**  No, Your Honor.  Just to clarify -- I'm

23 sorry.  I was trying to handle this report.  Is it

24 October 12th?

25         **THE COURT:**  Right.  October 12th is going to be your

1  dispositive motion deadline.  Defendants can file before then,

2  and responses will be due 30 days out, per the local rules,

3  except that the outside deadline would be November 2nd.  So in

4  any event, responses have to be filed by November 2nd for any

5  dispositive motion filed on or before October 12th.

6       I am trying to say that in ways that help clarify

7  rather than muddy it, but, essentially, the Defendants have up

8  until October 12th.  The Plaintiffs have within 30 days, but if

9  30 days takes them past November 2nd, then by November 2nd, and

10 then the replies are due November 11th.  And that is based on

11 the schedule we have now with Emory, October 1st; Longo,

12 October 8th; and Moline on or before October 8th; and Compton

13 on October 23rd, with the understanding that he's not offering

14 any case-specific opinion and would just be consistent with his

15 testimony in other cases.

16      If any of those things change, then that may

17 require -- or will require changing the dispositive motions

18 schedule, which would almost certainly require moving the trial

19 date.

20      And, again, just to make sure I'm clear, the piece

21 that I control is leaving you on that trial calendar to at

22 least potentially be heard in April, but right now, of course,

23 having an extended civil jury trial would be difficult, if not

24 impossible, and so there are many that are being continued as a

25 result.  And so as part of managing all of those and managing

1  the dispositive motions in this case, the district judge who

2  ultimately has the case may end up moving it to another trial

3  calendar or setting it for a special session, and that's going

4  to be up to them; but for at least our planning purposes for

5  now, if you meet this dispositive motion schedule, then it at

6  least can stay on the April trial calendar for further

7  determination of that issue.

8              Is that clear enough for everybody?  Ms. Kagan?

9         **MS. KAGAN:**  Yes, Your Honor, thank you.

10        **THE COURT:**  All right.  Mr. Schroll?

11        **MR. SCHROLL:**  Yes, Your Honor.

12        **THE COURT:**  All right.  So I think that takes care of

13 183, which is the motion to extend the dispositive motion

14 deadline.  That's going to be granted, and, specifically, as

15 I've indicated, the dispositive motion deadline for Defendants

16 will be October 12th, the response no later than November 2nd,

17 and the reply November 11th; but if there are earlier filings,

18 that would be as we've discussed.

19             And then I believe there was a -- maybe one more

20 motion for a telephone hearing, 186.  That would be granted by

21 this hearing, and that's both 158 and 186.

22             And now I am going to go to Ms. Kemp, and ask you if

23 I have addressed all of the matters that had a pending motion

24 today?

25        **COURTROOM DEPUTY CLERK:**  Yes, Judge Peake, everything

1 has been moved on.  Let me just double-check.

2          **THE COURT:**  Sure.  Take your time.

3          **COURTROOM DEPUTY CLERK:**  Yes, Your Honor, everything

4 has been accounted for.

5          **THE COURT:**  Thank you, Ms. Kemp.

6          All right.  Let me just do a final pass-through.

7 Have we covered everything and resolved everything that you

8 have for today, Ms. Kagan?

9          **MS. KAGAN:**  Yes, Your Honor.  Thank you for your

10 patience with me.

11          **THE COURT:**  All right.  Thank you.

12          Mr. Greve, for AII, have we covered everything?

13          **MR. GREVE:**  Yes, Your Honor.

14          **THE COURT:**  Mr. Schroll, for Colgate, have we covered

15 everything?

16          **MR. SCHROLL:**  Yes, Your Honor.

17          **THE COURT:**  Mr. Peck?

18          **MR. PECK:**  Yes, Your Honor, I believe we have.

19          **THE COURT:**  All right.  Thank you.

20          Mr. Tomlin?

21          **MR. TOMLIN:**  Yes, Your Honor.

22          **THE COURT:**  All right.  Very good.  So I appreciate

23 everyone's time.  We'll go ahead and adjourn.  I'm not going to

24 do a separate order.  The transcript of this will be available

25 in case anyone needs to have that for the details, but,

1    otherwise, it will be based on what I announced here.

2            Thanks very much.

3        (END OF PROCEEDINGS.)

4

5                              * * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I,  Briana L. Bell, Official United States Court

7  Reporter, certify that the foregoing transcript is a true and

8  correct transcript of the proceedings produced to the best of

9  my ability from an audio recording of the telephone conference

10  in the above-entitled matter.

11

12          Dated this 30th day of September 2020.

13

14

15                              _Briana L. Bell_

16                              Briana L. Bell, RPR
                                Official Court Reporter

17

18

19

20

21

22

23

24

25