**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| Lloyd Bell, individually and as Executor of the Estate of Betty Whitley Bell, Deceased, | § § § § | |
| Plaintiff, | § § § | |
| v. | § § | Case No. 1:17-cv-111-WO-JEP |
| American International Industries, Inc., et al., | § § § | |
| Defendants. | § § | |
| _____ | § § | |
| American International Industries, Inc., | § § | |
| Third-Party Plaintiff, | § § § | |
| v. | § § | |
| Neslemur Company f/k/a The Nestle-Lemur Company, | § § § | |
| Third-Party Defendant. | § § | |
| _____ | § | |

**DEFENDANT AMERICAN INTERNATIONAL INDUSTRIES' BRIEF IN**
**OPPOSITION TO NORTHWELL HEALTH, INC.'S**
**MOTION TO INTERVENE AND EXTEND PROTECTIVE ORDER**

Northwell Health, Incorporated's ("Northwell") Motion to Intervene and Extend the

Protective Order should be denied for several reasons:

*First,* Northwell's Motion to Intervene is moot. On December 8, 2020, the Court

ordered "plaintiff must either make Dr. Moline available for deposition on or before

1

January 7, 2021, or withdraw her as an expert witness." (ECF No. 252, at 2.) American International Industries ("AII") requested dates for Dr. Moline's deposition, but Plaintiff never responded. January 7 has passed without Plaintiff making Dr. Moline available for deposition, or seeking relief from the Court's clear deadline. Since Plaintiff cannot proceed with Dr. Moline as an expert, Northwell's Motion is moot.

*Second*, even if the Court finds that Northwell's Motion to Intervene is not moot, it should be denied because it is untimely. Northwell has known AII was seeking to discover whether Ms. Bell was one of the 33 subjects included in Dr. Moline's study since August of last year when AII served Northwell with a subpoena. In fact, in response to that subpoena, Northwell produced documentation proving that Ms. Bell was one of the 33 study subjects. Filing a Motion on December 23, just prior to the deadline for Dr. Moline's deposition, Northwell reverses its stance, arguing that it is obligated to protect the very information it already disclosed. If Northwell wanted to intervene it should have done so months ago, when this issue was before the Court. Allowing Northwell to intervene now would rehash the same issues the court has already decided and cause further delay.

*Third*, Northwell's interests are and were adequately represented by Plaintiff—in fact, every argument Northwell makes in its Motion to Intervene was previously made by the Plaintiff. The Court rejected those arguments and ruled that AII was entitled to discover if Ms. Bell was among the 33 patients in Dr. Moline's study and to question Dr. Moline about that fact.

2

*Lastly,* Northwell's claim that the information about whether Ms. Bell was among the 33 study subjects is privileged and irrelevant is simply both factually and legally wrong. The 33 subjects of Dr. Moline's study were never patients of the doctor. Rather, they were plaintiffs in talc litigation in which plaintiffs' lawyers hired Dr. Moline as an expert. As an expert witness in those cases, Dr. Moline received only information also available to defense counsel. And she relied primarily, if not exclusively, on deposition testimony for her conclusions about alleged exposures to asbestos. Moreover, the central claim in Dr. Moline's paper is that none of the 33 plaintiff / subjects had any possible source of asbestos exposure other than alleged trace-level contamination of cosmetic talc. The reason Plaintiff's counsel, and now Northwell, so vigorously oppose disclosure that Ms. Bell was one of the plaintiff / subjects Dr. Moline reviewed is that the facts of Ms. Bell's case contradict the central findings of Dr. Moline's paper, as Ms. Bell or her Personal Representative has asserted occupational exposures to asbestos in two separate worker's compensation claims, specifically claiming exposure to commercial asbestos on the job. One of those worker's compensation cases remains pending today.

## ARGUMENT

I. **Northwell's Motion Is Moot Because the Court Gave Plaintiff Until January 7 to Produce Dr. Moline for Deposition or Withdraw Her as an Expert Witness, and Plaintiff Failed to Produce Her for Deposition.**

This entire dispute began in January 2020, when AII deposed Dr. Moline in another case. At that deposition, Dr. Moline refused to answer questions about the medico-legal cases she relied on in her published paper titled "Mesothelioma Associated With the Use

3

of Cosmetic Talc." (Moline Paper at 11, attached as **Exhibit A**) ("The [33] cases were referred to author J.M. for medicolegal evaluation as part of tort litigation.") During the deposition in that other case, counsel for the plaintiffs, Leah Kagan, objected to AII's questioning of Dr. Moline.[1] Ms. Kagan said if AII wanted the information it needed to subpoena Northwell.

> I can actually shortcut this for you…**The position that Dr. Moline has taken, as well as Northwell, is that <u>if this is information that you seek, then you're going to have to subpoena it from the hospital</u>** and the hospital's lawyers are going to deal with it. It's not something that – that we, Simon Greenstone, or any other individual plaintiff's law firm is taking a position on. It's proprietary information that the hospital and the hospital's lawyers will respond to.

(Moline Dep. in *Johnson* (1/15/20) at 32:7-33:1, attached as **Exhibit B.**)(Emphasis added.) That is exactly what AII did.

On August 20, 2020, AII filed its notice of intent to serve a subpoena duces tecum on Northwell. The subpoena was served on August 24. (Service Return Aff., attached as **Exhibit C**.)[2] About two weeks after service of the subpoena, on September 1, 2020, Robert Thackston, on behalf of AII, spoke with counsel for Northwell, Rosaleen McCrory, about the scope of the subpoena. (Email chain between AII and Northwell's counsel, attached as **Exhibit D**.) Conversations continued for the next several days. On September 11, 2020, Mr. Kroczynski (for Northwell) asked if AII had an authorization for the release of medical information about Ms. Bell. AII did, and AII forwarded it to Northwell's counsel. (*Id*.) In

---

[1] Ms. Kagan is also counsel of record for Plaintiff in this case.

[2] This was in keeping with the original expert discovery cutoff date of September 21, 2020.

response to that email, Northwell's attorneys produced a spreadsheet showing that Ms. Bell was one of the 33 subjects in Dr. Moline's study. Information about all other plaintiff / subjects was redacted. Hence, not only has Northwell been on notice since August 2020 that AII was seeking information on the 33 study subjects, including Ms. Bell, Northwell produced the very information that confirmed Ms. Bell's inclusion in the study!

While these conversations were occurring, on September 3, 2020, Plaintiff filed a motion to quash the subpoena to Northwell. This filing set off a flurry of briefing and other activity that is summarized below:

- 9/15/20 (ECF No. 179) – Plaintiff's Emergency Motion for Protective Order and Sanctions.

- 9/18/20 (ECF No. 188) – AII's Opposition to Plaintiff's Motion to Quash

- 9/23/20 (ECF No. 197) – AII's Opposition to Plaintiff's Emergency Motion for Protective Order and Sanctions

- 9/23/20 (ECF No. 199) – Plaintiff's Reply ISO of his Motion to Quash

- 9/25/20 – Telephone Hearing on pending motions.

- 9/25/20 – Plaintiff offers Dr. Moline for deposition on October 5, 2020. (Email from Amy Rendon, attached as **Exhibit E**.)

- 10/4/20 – Plaintiff pulls down Dr. Moline's deposition (scheduled for the next day) because Dr. Moline is hiring her own counsel. (Email from Leah Kagan, attached as **Exhibit F**.)

- 12/4/20 (ECF No. 248) – Plaintiff and co-defendants Colgate Palmolive and Whittaker Clark & Daniels' Joint Motion to Extend the Dispositive Motions Deadline and Request for Status Conference.

- 12/8/20 – In ruling upon the 12/4/20 Joint Motion (ECF No. 248), the Court ordered that plaintiff must either make Dr. Moline available for deposition on or before January 7, 2021, or withdraw her as an expert witness. (ECF No. 252.)

- 12/23/20 (ECF No. 258, 259) – Northwell moves to intervene and extend the Court's protective order.

On September 25, 2020, the Court held a hearing to resolve the dispute. Although Northwell did not attend the hearing, it was on notice of the dispute and briefing by the parties. (Julia Gowin email to Rosaleen McCrory and Thomas Kroczynski on September 18, 2020, attached as **Exhibit G**.) At no point did Northwell try to intervene in the case. After hearing arguments, the Court ruled that AII was entitled to discovery into Ms. Bell's inclusion in Dr. Moline's study. (Hearing Tr. (9/25/20) at 95:25-96:6, attached as **Exhibit H**.) (denying the protective order with respect to "documents identifying Ms. Bell as the subject, and those can be included as part of the discovery in this case, but that information is confidential and limited solely to this case, and that is specifically as to her identity as one of the 33 subjects.")

After the hearing on September 25, Plaintiff offered Dr. Moline for deposition on October 5. (Email from Amy Rendon, attached as **Exhibit E**.) The day before the deposition, Plaintiff pulled down the deposition because Dr. Moline was allegedly hiring her own counsel. This again delayed Dr. Moline's deposition. (Email from Leah Kagan, attached as **Exhibit F**.)

On December 8, 2020, the Court ruled on the 12/4/20 Joint Motion, ordering that Plaintiff was required to make Dr. Moline available for deposition on or before January 7, 2021 or withdraw her as an expert witness. (ECF No. 252, at 2.) AII subsequently requested

dates for Dr. Moline's deposition, but Plaintiff never provided a date. (Email from Kurt Greve on October 20, 2020, attached as **Exhibit I**.) (requesting dates for Dr. Moline's deposition.) Plaintiff is therefore in violation of the Court's order to produce Dr. Moline for deposition and she is effectively withdrawn as an expert. Dr. Moline's withdrawal as an expert witness renders Northwell's Motion moot, and the Court should, therefore, deny the Motion to Intervene and Extend the Protective Order for this reason.

## II. Northwell's Motion to Intervene Should Also be Denied Because (1) it is Untimely, and (2) Northwell's Interests Are and Were Adequately Represented by Plaintiff—In Fact, Plaintiff Already Made Identical Arguments and the Court Rejected Them.

Even if the Court finds Northwell's Motion is not mooted by Plaintiff's failure to produce Dr. Moline for deposition, Northwell's Motion fails for the additional reasons that its Motion to Intervene is (1) untimely and (2) its interests were and are adequately represented by Plaintiff and have been properly considered by the Court.

Northwell fails to identify under which subpart of Federal Rule of Civil Procedure 24 it seeks to intervene (i.e., permissive intervention or intervention as of right). Nevertheless, Northwell's Motion should be denied because it fails to meet the requirements under either theory.

To intervene under FRCP 24(a)(2) the would-be intervenor must meet the following requirements: (1) the Motion is timely, (2) the intervenor possess a "direct and substantial interest" in the subject matter of the litigation; (3) "the denial of intervention would significantly impair or impede their ability to protect their interests; and (4) their interests are not adequately protected by the existing parties." *Arista Records, LLC v. Doe No. 1*,

7

254 F.R.D. 480, 481 (E.D.N.C. 2008) (citing *Richman v. First Woman's Bank,* 104 F.3d 654, 658-659 (4th Cir.1997); *Scardelletti v. Debarr,* 265 F.3d 195, 202 (4th Cir. 2001). The would-be intervenor bears the burden of proving the right to intervene, including all necessary elements. *Arista Records,* 254 F.R.D. at 481 (quotations and citations omitted). Northwell cannot meet the first and last requirements.

To the extent Northwell moves for permissive intervention, its Motion should be denied for the same reasons. Federal Rule of Civil Procedure 24(b) provides that "[o]n timely motion, the court may permit anyone to intervene who…(B) has a claim or defense that shares with the main action a common question of law or fact."[3] One factor courts consider in evaluating permissive intervention is whether "the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. Proc. 24(b)(3). *See also Students for Fair Admissions Inc. v. U. of N. Carolina*, 319 F.R.D. 490, 494 (M.D.N.C. 2017). However, "findings on those factors are not determinative of or sufficient to decide permissive intervention motion." *Id*. (citations omitted). The determination as to whether to permit permissive intervention is purely discretionary—the Court may allow or deny permissive intervention regardless of what it determines about delay or prejudice. *Id*.

---

[3] Rule 24(b) also permits intervention if the intervenor "is given a conditional right to intervene by a federal statute." Northwell never suggests that it has a conditional right to intervene given by statute. Hence, AII does not address this subpart.

### A.    Northwell's Motion to Intervene is Untimely.

AII has been trying to depose Dr. Moline for months. Northwell's attempted intervention will only serve to further delay key discovery in this case. As described above, this entire dispute began in January of 2020, when AII deposed Dr. Moline in another case. At that deposition, Dr. Moline refused to answer questions about the medico-legal cases she used in her published paper and counsel for the plaintiffs stated that if AII wanted the information it needed to subpoena Northwell. (Moline Dep. in *Johnson* (1/15/20) at 32:7-33:1, attached as **Exhibit B.**)(Emphasis added.) So AII served a subpoena upon Northwell. (Service Return Aff., attached as **Exhibit C**.)

About two weeks after service of the subpoena, on September 1, 2020, Robert Thackston (for AII) spoke with counsel for Northwell, Rosaleen McCrory, about the scope of the subpoena. (Email chain between AII and Northwell's counsel, attached as **Exhibit D**.) The conversations continued for the next several days. Northwell's counsel ultimately asked AII for an authorization on behalf of Ms. Bell, which AII provided. (*Id*.) In response to that email, Northwell's attorneys produced a spreadsheet that showed Ms. Bell was one of the 33 study subjects. Hence, not only has *Northwell been on notice* that AII was seeking information on the 33 study subjects, including Ms. Bell, since August 2020, *Northwell also produced the very information that confirmed Ms. Bell's inclusion in the study*.

While these conversations were occurring, on September 3, 2020, the parties were extensively briefing the issue to the Court. (*See* ECF Nos. 168, 180, 182, 188, 197, & 202.) This culminated with a hearing before the Court on September 25, 2020. Although

Northwell did not attend the hearing, it was on notice of the dispute and the briefing. (Julia Gowin email to Rosaleen McCrory and Thomas Kroczynski on September 18, 2020, attached as **Exhibit G**.) After hearing arguments, the Court ruled that AII was entitled to discovery into Ms. Bell's inclusion in Dr. Moline's study. (Hearing Tr. (9/25/20) at 95:25-96:6, attached as **Exhibit H.**)

Throughout this entire time (August, September, October, November, and most of December) Northwell never tried to intervene. Then, on December 23, 2020, about four months after it was first put on notice—and after the Court had already ruled on the issue—Northwell filed its Motion to Intervene and Extend the Protective Order. (ECF No. 258.) There is no justification for this delay. Northwell could have intervened months ago, when the issue was being litigated before the Court. And, until recently, Northwell's position was that AII was entitled to the information if it had an authorization for release of Ms. Bell's medical records, which it did. Why Northwell now seeks to take the complete opposite position is inexplicable. Nevertheless, allowing Northwell to intervene at this point will prejudice AII by causing further delay and disruption of the discovery schedule. For this reason, the Court should deny Northwell's Motion to Intervene.

**B.** **Northwell's interests have been and are adequately represented by Plaintiff who made the exact same arguments previously.**

In addition to being untimely, Northwell's Motion should be denied because its interests are and were adequately represented by Plaintiff. In its Motion, Northwell advances several arguments for why AII should be precluded from asking Dr. Moline about Ms. Bell's inclusion in the study. These arguments were previously made by Plaintiff and

10

rejected by the Court. Below is a table comparing the arguments Northwell makes with the

arguments Plaintiff previously made.

| Northwell's Arguments | Plaintiff's Same Prior Arguments |
|---|---|
| "The Federal Policy for the Protection of Human Subjects, **45 C.F.R. Part 46**, Subpart A"<br><br>(ECF No. 259 at 2.)<br><br>"Accordingly, to conform to The Common Rule policies, Northwell's IRB required Dr. Moline to submit a research proposal demonstrating, among other requirements, that there were adequate protections in place to protect the privacy of the research subjects and to maintain the confidentiality of the patient's health data. **45 C.F.R. § 46.111**."<br><br>(ECF No. 259 at 8.) | "And as Dr. Moline and Dr. Diette and Dr. Roggli all explained, and we put that in our papers, when you do human research and you publish on it, it has to remain anonymous.<br>    And that's actually consistent with the guidelines from the Department of Health and Human Services and the FDA, **45 CFR 46.111(a)(7) and 21 CFR 56.111(a)(7)** [*sic,* USC?]."<br><br>(Hearing Tr. (9/25/20) at 55:5-11, attached as **Exhibit H.**) (Leah Kagan)<br><br>"Both agencies require that an institutional review board determine whether there are 'adequate provisions to protect the privacy of subjects and to maintain the confidentiality of data. **45 CFR 46.111(a)(7) and 21 CFR 56.111(a)(7**).'"<br><br>(ECF No. 182 at 6.) |
| "2. Bedrock **Institutional Review Board ("IRB") standards of privacy and confidentiality** covering research subjects; [and] 3. The specific IRB approvals that Dr. Moline secured in advance of writing and publishing the Article"<br><br>(ECF No. 259 at 2.)<br><br>"Dr. Moline's Article was researched and published consistent with **Northwell's** | "There are **institutional review boards** that are required to assess whether or not a human subject in a published study can be revealed, and that is done, again, to protect those human subjects and to protect the integrity of the research."<br><br>(Hearing Tr. (9/25/20) at 55:5-11, attached as **Exhibit H.**) (Leah Kagan) |

| | |
|---|---|
| **IRB processes**, as directed by The Common Rule. The Common Rule is well-established federal policy aimed at protecting the safety, privacy, and confidentiality of research subjects… See 45 C.F.R. § 46.101." <br><br> (ECF No. 259 at 7.) | |
| "Well-established standards and universally accepted norms in the medical research community related **to research subjects** and **anonymity**; and**…[r]elevant case law affirming privacy and confidentiality** requirements for **research subjects**." | "As discussed in Plaintiff's Motion for Protective Order, the **identity of human subjects of scientific studies is confidential, protected information**…The case law instead indicates that **such information is confidential** and should be protected." <br><br> (ECF No.. 202 at 4)(Emphasis added.) (*See also id*. at 4-7)(citing some of the same cases as Northwell). <br><br> "Good cause exists for such a protective order **prohibiting the disclosure of the identity of Dr. Moline's study subjects, including Ms. Bell.** The identity of **human subjects** of medical research and studies is protected, **confidential information**." <br> *See also* Plt's Emer. Motion for Pro. Order and Sanctions (ECF No. 182 at 6.)(*See also id*. at 5-9)(citing some of the same cases as Northwell). |
| "**First Amendment** considerations justify protecting academics engaged in scholarly research so as to prevent a chilling effect on the ability of researchers to gather and disseminate information" <br><br> (ECF No. 259 at 9.) | "**It's also a First Amendment freedom of speech and research issue**, that these types of things, the confidentiality of human patients and subjects, if they had to be revealed in every study, there would be no study, unless people volunteered publicly to do this." |

12

| | (Hearing Tr. (9/25/20) at 58:8-12, attached as **Exhibit H.**) (Leah Kagan) |
|---|---|

After hearing these arguments on September 25, 2020, the Court ruled that AII was entitled to discovery into Ms. Bell's inclusion in Dr. Moline's study:

> So as to the present motion for a protective order, it would be essentially granted, except that denied with respect to the documents identifying Ms. Bell as the subject, and those can be included as part of the discovery in this case, but that information is confidential and limited solely to this case, and that is specifically as to her identity as one of the 33 subjects.

(Hearing Tr. (9/25/20) at 95:25-96:6, attached as **Exhibit H.**)

In sum, Northwell's interests have been adequately represented by Plaintiff because Plaintiff already made the exact same arguments to the Court. The Court rejected these arguments and ruled that AII is entitled to discovery on Mrs. Bell's inclusion as a case subject in Dr. Moline's study. Because the arguments made by Northwell have already been heard and denied, Northwell's interests have been adequately presented and addressed by the Court. The Court should deny Northwell's Motion to Intervene and Extend the Protective Order for this additional reason.

## III. Further, Northwell's Motion to Extend the Protective Order Should Be Denied Because Ms. Bell's Identity as a "Subject" in Dr. Moline's Study Is Not Privileged and it is Highly Relevant to AII's Defense.

Northwell's Motion to Extend the Protective Order to preclude AII from questioning Dr. Moline about the identity of Ms. Bell's inclusion in Dr. Moline's study (ECF 259, at 2) is based on a fundamental misunderstanding of the law and facts of this case. Not only

is the information not privileged, it is highly relevant. And precluding inquiry into Ms. Bell's inclusion in the study will significantly prejudice AII.

###     A.    There is no privilege that protects Ms. Bell's identity as a subject in Dr. Moline's study when that information is sought in Ms. Bell's own lawsuit.[4]

This is not a case where a physician used medical records from her employer to conduct research and publish a paper in a scientific journal. Dr. Moline obtained the records for all 33 subjects in her study from lawyers representing plaintiffs in talc litigation. (Moline Paper at 11, attached as **Exhibit A.)** ("The [33] cases were referred to author J.M. for medicolegal evaluation as part of tort litigation.") These were not patients with whom Dr. Moline had a physician-patient relationship or who were seen by any doctor at Northwell. Based on this litigation-derived information, Dr. Moline published a "study" of 33 people with mesothelioma whom she alleges had no possible exposure to asbestos other than what must have been asbestos contamination of cosmetic talcum powder.

None of this information is confidential. Plaintiffs in personal injury litigation execute a release for medical information relating to their claims, and they waive the patient-physician relationship as it relates to the medical conditions that are at issue in the case. Hence, there is no privilege that applies. And there is certainly no privilege as it relates to questioning Dr. Moline about Ms. Bell's inclusion in the study in this case—this is Ms. Bell's own lawsuit and Dr. Moline is her expert. (Hearing Tr. (9/25/20) at 68:4-10,

---

[4] AII believes there is no privilege with respect to any of the study subjects since Dr. Moline obtained their information in her capacity as an expert witness for all of them in litigation. (Moline Paper at 11, attached as **Exhibit A.)** ("The [33] cases were referred to author J.M. for medicolegal evaluation as part of tort litigation.") Nevertheless, AII confines its argument to Ms. Bell's identity because the Court has already ruled on this issue.

attached as **Exhibit H**.)(The Court noting that there is no privilege as it relates to questioning Dr. Moline about Ms. Bell's inclusion in the study since this is Ms. Bell's lawsuit).

None of the authorities cited by Northwell support the proposition that information obtained by an expert through litigation somehow gains confidential protection when that same expert uses that litigation information to publish a paper that supports her litigation activities. *See, e.g., Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714 (1st Cir. 1998) ("Whether the creator of the materials is a member of the media or of the academy, the courts will make a measure of protection available to him as long as he intended 'at the inception of the newsgathering process' to use the fruits of his research 'to disseminate information to the public.'")(citing *von Bulow v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987). It can hardly be said that Dr. Moline intended "at the inception" of her research to use the information on Ms. Bell and others to disseminate it to the public for the betterment of society. On the contrary, at the inception she obtained that information in her capacity as an expert witness for the purpose of her work as an expert witness.

The remaining cases are no better. Northwell cites to one case that was vacated and remanded by the Seventh Circuit. Northwell omits this information even though it automatically populates if you "Copy with Reference" the district court opinion from Westlaw. *See Andrews v. Eli Lilly & Co., Inc.*, 97 F.R.D. 494 (N.D. Ill. 1983), *vacated sub nom. Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556 (7th Cir. 1984) (finding the lower court abused its discretion in denying Squibb discovery into a third-party

researcher's registry on patients with clear cell adenocarcinoma). *See also In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*, 249 F.R.D. 8, 11 (D. Mass. 2008) (this involved a subpoena to the New England Journal of Medicine (a third-party with no relationship to the underlying litigation) for all documents regarding any studies submitted to the Journal involving Celebrex or Bextra untethered to whether that information was obtained in litigation). *See also Lampshire v. Procter & Gamble Co.*, 94 F.R.D. 58, 59 (N.D. Ga. 1982) (granting discovery into the CDC's study on tampons and toxic shock but requiring names be redacted when the underlying patients had no connection to the litigation).

There is no privilege that attaches to materials produced by plaintiffs in litigation when they are received by a retained expert who happens to be a physician. Indeed, Plaintiff concedes as much when he retained Dr. Moline to write a 20-page expert report with intimate details about Betty Bell's medical conditions without any redaction or request to seal.[5] (Declaration of Dr. Moline, attached as **Exhibit J**.) Personal health information about Betty Bell contained in Dr. Moline's report include an extensive recitation of her cancer treatment, her mental health, and details of treatments she received while hospitalized:

- "Ms. Bell went to see Dr. Frank Dunphy II, a medical oncologist, on August 11, 2015. She was no longer short of breath. Ms. Bell's tumor was staged as T1bNOMO.

---

[5] Northwell tries to argue that the approval of the study by the IRB at Northwell somehow confers a privilege or confidentiality to the information. This is false. Dr. Moline received the information in her capacity as an expert witness in litigation. Hence, the information was no longer privileged at the time she allegedly used it to write her "study." That an IRB later approved her use of the information for a study does not confer any privilege to material where the underlying physician-patient privilege was already waived by filing a lawsuit and turning the information over to an expert witness.

He planned three courses of chemotherapy with Pemetrexed and Cisplatin, followed by…" (*Id.* at ¶18.)

- "Dr. McCollough saw Ms. Bell on March 31, 2016. She was on surveillance. Dr. McCollough increased her anti-depressant medication, since she was now also anxious and depressed due to her husband's recent diagnosis of non-Hodgkin's lymphoma." (*Id.* at ¶27.)

- "She was admitted to the hospital on May 30, 2017 with low blood pressure and a very low temperature. She was treated for sepsis and given fluids and antibiotics. A CT scan of the abdomen showed extensive peritoneal carcinomatosis with significant interval increase in the volume of ascites…" (*Id.* at ¶31.)

These are just a few examples. Dr. Moline's Report contains approximately seven single-spaced pages summarizing Betty Bell's personal and medical history. (*See, e.g., id.* at ¶¶11-42.)

In the end, both Plaintiff and now Northwell attempt to misuse confidentiality and privilege claims intended to protect patients in medical studies in a context wholly unlike Dr. Moline's use of depositions and litigation materials to write an article that supports her expert witness work. Northwell cites no law that says funneling litigation materials through a retained medical expert gives those litigation materials confidentiality protections intended for real subjects of human studies sharing their confidential medical information with medical researchers.

**B.** **That Ms. Bell was included among the 33 subjects in Dr. Moline's "study" is highly relevant to the claims in this case and its exclusion would significantly prejudice AII's defense.**

Northwell argues that extending the protective order to cover "all" patients in the study (including Ms. Bell) "will not prejudice AII." (ECF No. 259 at 10.) This is plainly false. The only reason that Plaintiff, Dr. Moline, and now Northwell, want to extend the

protective order to prevent AII from questioning Dr. Moline about Ms. Bell's participation in her "study" is because it destroys Dr. Moline's credibility and the central claim in her paper. The central premise of her paper is that cosmetic talc must have caused mesothelioma in all 33 study subjects (i.e., plaintiffs) because those study subjects had no other exposure to asbestos. (Moline Paper at 11, **Exhibit A**.) ("For all 33 cases, other potential exposures to asbestos were considered, with no identified source apart from the talcum powder.") To the contrary, Ms. Bell filed two worker's compensation claims alleging exposure to asbestos during her work at Fiber Industries in the 1970s. The first worker's compensation claim was signed by Ms. Bell. (See Form 18B, signed by Betty Bell, attached as **Exhibit K**.) The second was signed by her husband, Plaintiff Lloyd Bell. (See Form 18B, signed by Lloyd Bell, attached as **Exhibit L**.) Both worker's compensation claims were made under oath and subject to criminal penalty. (*Id*.) Ms. Bell's admission, under oath, that she was occupationally exposed to asbestos directly contradicts the central claim in Dr. Moline's paper.[6] Plaintiff and Northwell ask this court to aid them in misleading the medical community, judges and jurors into believing that this study shows a link between cosmetic talc and mesothelioma, when the underlying facts show this to be false. Because the information about Ms. Bell's inclusion in Dr. Moline's study is critical to AII's defense, a protective order preventing AII from questioning Dr. Moline about it would significantly prejudice AII. For this reason, and those discussed above, the Court

---

[6] AII has information to confirm the identity of only one of the 33 patients in Dr. Moline's study (i.e., Ms. Bell). AII fully believes that if discovery were permitted as to the identity of the remaining 32 patients, it would confirm that several more of the plaintiffs had alternative exposures to asbestos.

should deny Northwell's Motion to Intervene and its Motion to Extend the Protective Order.

<strong><u>CONCLUSION</u></strong>

For these reasons the Court should deny Northwell's Motion to Intervene and Extend the Protective Order and allow AII to question Dr. Moline and other experts about Ms. Bell's inclusion in her "study."

This 13th day of January, 2021.

**LATHROP GPM LLP**

*/s/ Robert E. Thackston*
Robert E. Thackston (NC Bar No. 36330)
Kurt W. Greve (TX Bar No. 24007275)
Samuel Garcia (TX Bar No. 24080067)
2101 Cedar Springs Rd., Suite 1400
Dallas, TX 75201-2134
Telephone: (469) 983-6030
Facsimile: (469) 983-6101
E-mail: robert.thackston@lathropgpm.com
kurt.greve@lathropgpm.com
sam.garcia@lathropgpm.com

*/s/ Timothy Peck*
Timothy Peck (NC Bar No. 9991)
Richard A. Coughlin (NC Bar No. 19894)
FOX ROTHSCHILD LLP
230 North Elm Street, Suite 1200
Greensboro, NC 27401
Telephone: (336) 378-5307
Fax: (336) 378-5400
E-mail: tpeck@foxrothschild.com
rcoughlin@foxrothschild.com

*Counsel for American International Industries*

## Certificate of Word Count

The undersigned hereby certifies that the foregoing brief complies with Local Rule

7.3(d) in that it contains fewer than 6,250 words as reported by word processing software.

This 13th day of January, 2021.

/s/ *Robert E. Thackston*
Robert E. Thackston (NC Bar No. 36330)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that I electronically filed the foregoing document with the Clerk of the United States District Court for the Middle District of North Carolina using the CM/ECF system, which will send notification of this filing and an electronic copy of same to all counsel of record registered with the CM/ECF system, and I hereby certify that I have thereby electronically served the document upon all counsel in this action registered with the CM/ECF system.

This 13th day of January, 2021.

 /s/ Timothy Peck                         
Timothy Peck (NC Bar No. 9991)
FOX ROTHSCHILD LLP