UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | | |
|---|---|---|
| Lloyd Bell, Individually and as Executor of the Estate of Betty Whitley Bell, Deceased | : | |
| | : | |
| Plaintiffs, | : | File No.: 1:17-cv-00111 |
| | : | |
| vs. | : | |
| | : | |
| American International Industries Inc., et al. | : | |
| | : | |
| Defendants. | | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO AMERICAN INTERNATIONAL INDUSTRIES' MOTION FOR SUMMARY JUDGMENT**

Plaintiff respectfully files this Brief in Opposition to Defendant American International Industries' ("AII") Motion for Summary Judgment, and asks that the motion be denied.

**STATEMENT OF FACTS**

AII is a California partnership. (Dkt. 294-3, Loveless Decl. at ¶ 4.) It manufactures approximately 45 different beauty product lines, most of which were purchased from other companies.[1] Prior to purchasing a product line, AII "tr[ies] to learn as much about how the company runs, what their market is, [and] customers" as part of its due diligence.[2] AII

_____

[1] Exhibit 1, Deposition of Charles Loveless in *Colpitts v. AII*, June 28, 2016, at 49:2-50:2.
[2] *Id.*, at 95:16-96:3.

1

specifically inquires into the hazards (if any) that a product may pose to human health.[3]  In addition, AII typically keeps the name, customer lists, trademarks, and formulae of the products it plans to manufacture.[4]

### A.  In 1987, AII Purchased Substantially All of Neslemur's Assets, including the Clubman Brand.

In 1987, AII purchased the exclusive rights to the Clubman brand group of products, including Clubman talcum powder ("Clubman") from The Neslemur Company ("Neslemur").[5] (Dkt. 294-3, Loveless Decl. at Exhibit 3, Purchase Agreement, pp. 15-89.) One of AII's goals in structuring the purchase of the Clubman brand was "to ensure that as far as the customer is concerned, there's a seamless transition, from ownership from Neslemur to AII."[6]

Neslemur sold substantially all of its assets to American International Industries in the 1987 purchase and sale transaction.[7] (Dkt. 294-3, at Exhibit 3, pp. 15-89.) The agreement itself is titled "Acquisition of Substantially All the Assets of the Neslemur Company by American International Industries, Closing Date: August 13, 1987" (hereinafter "Purchase Agreement").[8] (*Id.*) AII purchased nearly everything Neslemur

---

[3] Exhibit 2, Deposition of Zvigmond Ryzman, taken August 10, 2016 in *Colpitts v. AII*, at 66:12-18.

[4] Exhibit 1, Loveless Dep., June 28, 2016, at 50:3-54:3.

[5] *See also* Exhibit 3, Deposition of Charlie Loveless, taken on August 12, 2016 in *Depoian v. AII*, at 172:4-174:11.

[6] Exhibit 1, Loveless Dep., June 28, 2016, at 108:9-18.

[7] Exhibit 3, Loveless Depo., August 12, 2016, at 172:14-173:22.

[8] Kleer-Vu was Neslemur's sole shareholder and a party to the Purchase Agreement. (Dkt. 294-3, at Exhibit 3, pp. 15-89.) In 2002, Kleer-Vu's name was changed to Calypso Wireless, Inc. (Dkt. 294-14, at pp. 2-3.). A receiver was appointed to dissolve Calypso

2

owned, including nearly all inventories, intellectual property, patents, trademarks, service marks, logos, trade secrets, technology, customer records, know-how, machinery, equipment, going-concern, and telephone number. (*Id.*, at Article I, pp. 17-20) The only assets AII did not purchase were an unspecified amount of "Halloween Inventory" and six trademarks.[9] (*Id.* at Article I, 1.1(a), p.18.) The total purchase price was $11.991 million, which included the assumption of approximately $5.091 million in liabilities owed.[10] (*Id.* at Article II, pp. 21-23.)

From 1987, after purchasing substantially all of Neslemur's assets, AII continued to manufacture, brand, market and sell Clubman in the same way Neslemur did prior to the asset purchase agreement.[11] AII used the same color packaging, and the same "Clubman" name and logo its predecessor did.[12] AII advertised its Clubman as "World Famous since 1810."[13] (Dkt. 294-3, Loveless Decl. ¶¶ 20,22,26 and Exhibits 5 and 8).

Daniel Dror, Chairman of Neslemur and signatory to the Purchase Agreement, confirmed that Neslemur ceased operations on the date of the asset purchase agreement

---

Wireless in 2012. *Williams v. Calypso Wireless, Inc.*, No. 7140-VCL, 2012 Del. Ch. LEXIS 34, at *1 (Ch. Feb. 8, 2012).

[9] Exhibit 2, Ryzman Depo., August 10, 2016, at 54:3-55:20 [excludes Halloween Inventory and six circled trademarks on Exhibit C to the Purchase Agreement].

[10] Dkt. 294-3, at Exhibit 3, Article II, § 2.1 [amount owed is $6.9 plus assumption of liabilities in § 2.3]; § 2.2 [discussion of two promissory notes, $2.6 and $3.1 million] and § 2.3 [assumption of liabilities, $1.391 million for accounts payable at Exhibit G, and $3.7 to Bank of Nashville owed by Neslemur and Kleer-Vu].

[11] Exhibit 4, Deposition of Charles Loveless, taken on 11/20/2014 in *Cairo v. AII*, at 13:20-14:3, 18:12-20:22, 44:8-15, 50:12-17, 51:3-11.

[12] Exhibit 1 at 17:15-23, 44:8-15, 50:12-17, 51:3-11.

[13] Green tin containers sold by AII looked identical to containers sold by Neslemur. (Dkt. 294-3, Loveless Decl. ¶¶ 20,22,26 and Exhibits 5 and 8).

and received no additional income from that point forward.[14] All of the money received for Neslemur's assets went towards satisfying other debts of the company, and nothing was left over.[15] Neslemur "discontinued operations in 1987." and was discharged in bankruptcy in July 1991.[16] Consistent with its cessation of operations, Neslemur last filed an annual report with its home state of Delaware in 1988.[17] Neslemur's corporate status was changed to "Void" in 1991 for failing to pay taxes and file annual reports. (*Ibid.*) According to Neslemur's former chairman, Mr. Dror, "[a]s a result of the sale of substantially all of Neslemur's assets to AII, Neslemur was unable to answer for any judgment against it."[18]

As litigation claims regarding asbestos in Clubman were filed against it, AII sought to obtain benefits under the Neslemur policies directly from the carrier, Resolute Management Inc. AII's requests for coverage were denied.[19]

In August 2017, AII filed a Verified Petition in a Delaware Court of Chancery, seeking the appointment of a receiver for "dissolved" Neslemur to determine what assets are available for creditors.[20] AII claimed it is entitled to coverage under Neslemur's insurance policies because underlying tort plaintiffs have found AII liable as a corporate

---

[14] Exhibit 5, Declaration of Daniel Dror, at ¶ 6.
[15] *Id.* at ¶ 5.
[16] Exhibit 6, Excerpts of Kleer-Vu Industries, Inc. 1995 Form 10-K Annual Report filed with the U.S. Securities and Exchange Commission, at 52
[17] Exhibit 7, The Neslemur Company's "Entity Details" obtained from the Delaware, Department of State, Division of Corporations on August 16, 2016.
[18] Exhibit 5, Dror Decl., at ¶ 7.
[19] Exhibit 8, Affidavit of John Fitzgerald and Exhibits (four letters) attached thereto, filed in the Delaware Chancery Court .
[20] Exhibit 9, American International's Verified Petition.

successor to Neslemur.[21] AII also claims Neslemur owes AII indemnity under the 1987 Purchase Agreement.  (*Ibid*.)

In response, intervenor-defendant Lamorak Insurance Company filed a motion for judgment on the pleadings. In its opposition filed January 19, 2018, AII concedes that it is "impossible" to obtain proceeds from the Neslemur policies because there is no one left for service of process.[22] The impossibility of obtaining proceeds from the insurance policies is further evidenced in Lamorak's Reply, in which Lamorak highlights plaintiffs' unsuccessful efforts to even *serve* the insurance company, let alone put the Neslemur insurance policies at issue and tender the claims.[23]

The impossibility of recovery from Neslemur was underscored at the May 17, 2018 hearing on Lamorak's motion.[24] Neslemur did not follow the appropriate steps to dissolve itself and instead "Neslemur just walked away and they left for 27 years a hole."[25]  While Neslemur was technically "void," the result was that "[t]his company is effectively dissolved" because "there's nobody to stand up for Neslemur. There's nobody to come to court and say 'No, we didn't do this'; 'Yes, we did'; or 'Let me marshal whatever assets

---

[21] *Id.*, at pp. 2, 5.
[22] Exhibit 10, AII's Response to Intervenor-Defendant's Motion for Judgment on the Pleadings, at ¶ 7.
[23] Exhibit 11, Lamorak Insurance Company's Reply, at ¶¶ 27-31 and underlying pleadings filed in the *Cairo* case, attached thereto as Exhibits 3, 4 and 5.
[24] Exhibit 12, May 17, 2018 Hearing Transcript in Delaware Chancery Court, Lamorack's Motion for Judgment on the Pleadings, at 14:6-17:1.
[25] Exhibit 12, May 17, 2018 Hearing Transcript, at 14:6-17:1.

exist.'"[26] The Delaware Chancery Court ultimately denied the motion and stayed the action requiring that the parties report back in a year.[27] The court estimated that the process of pursuing the insurance coverage could take "a couple years."[28]

Neslemur was revived under Delaware law in April 2020 after having been out of business and void for 33 years.[29] The newly-revived Neslemur has no employees and its only director and officer's "last dealings with Neslemur as an active company took place 33 years ago." (Dkt. 225, at 9.) Neslemur's sole asset is insurance policies, though it is unclear if such policies would cover Plaintiff's claims. In fact, Neslemur's insurer has already indicated that Plaintiff's claims may not be covered by its policies.[30]

### B.    Betty Bell Regularly, Routinely and Repetitively Used Clubman.

Betty Bell began using Clubman in approximately 1974 when attending Central State Beauty College to become a hair dresser.[31] While at beauty school, Mrs. Bell used Clubman when doing men's haircuts or really short haircuts.[32]

---

[26] *Id.*, at 14:6-17:1. *See also id.*, at 22:13-20 ["…I don't know in terms of service issues, if there turned out to be problems, I just don't know how that all plays out, because, effectively, there's no defendant… "] and 26:10-27:15.

[27] *Id.*, at 36:8-40:22 [Court's Order]; *see also id.*, at 27:16-28:16 [discussion regarding Court's tentative decision]; Exhibit 13, May 23, 2018 Order of the Delaware Chancery Court.

[28] Exhibit 12, May 17, 2018 Hearing Transcript, at 29:7-21.

[29] Exhibit 14, Opening Brief in Support of Neselmur's Motion to Dismiss, filed in *AII v. Neslemur*, on June 8, 2020, at p.13.

[30] Exhibit 45, Fitzgerald Affidavit, at ¶ 10, and attached March 29, 2017 Letter at p. 4 ["Any Liability Nestle-Le Mur Assumed by Contract Is Not Covered by the Policies"].

[31] Exhibit 15, Deposition of Betty Bell, Vol. 1, 11/20/2015, at 106:18-25.

[32] *Id*. at 113:10-17.

6

Conditions in the air were "dusty" when Mrs. Bell applied Clubman talc.[33] She applied Clubman talc with "a brush" to "the neck area" and "around the ears." "Sometimes you would put it in your hand and you'd take the brush and – and put it in your hand, you know, and then brush it on, or you can take it, you know, with the container and sprinkle it on and then brush it with the brush."[34]

After completing beauty school and becoming licensed, Mrs. Bell worked full-time at a salon called LaMarick "for approximately two years."[35] While at LaMarick, Mrs. Bell used Clubman talc.[36] Mrs. Bell estimated that her clientele was "50/50" male and female.[37]

After LaMarick, Mrs. Bell started operating her home-based salon, Country Curls.[38] She worked "every day basically at some point" and had on average four to six clients each day.[39] Mrs. Bell used Clubman talc on men, boys, and ladies with short haircuts, doing "a bigger percentage of the shorter cuts than [she] did the longer cuts."[40] When Mrs. Bell applied Clubman, "it would make a puff of smoke."[41] "The dust would fly when you applied it with the brush."[42] After operating Country Curls for some 23 years, Mrs. Bell retired and closed her shop in 2009.[43]

---

[33] Exhibit 16, Deposition of Betty Bell, Vol. 2, 11/23/2015, at 416:16-417:5.
[34] Exhibit 15, Bell Dep., Vol. 1, at 114:10-115:8.
[35] Exhibit 15, Bell Dep., Vol. 1, at 146:14-147:22.
[36] *Id.* at 157:10-17; Exhibit 16, Bell Dep., Vol. 2, at 383:16-384:15.
[37] Exhibit 15, Bell Dep., Vol. 1, at 153:25-154:3.
[38] *Id.* at 164:4-5.
[39] *Id.* at 198:20-199:24, 224:9-19.
[40] Exhibit 16, Bell Dep., Vol. 2, at 397:23-398:22.
[41] *Id.* at 397:23-398:9.
[42] Exhibit 15, Bell Dep., Vol. 1, at 226:6-14, Exhibit 16, Bell Dep., Vol. 2, at 416:16-417:5.
[43] Exhibit 15, Bell Dep., Vol. 1, at 124:6-18, 200:3-12, 222:17-25.

Betty Bell was diagnosed with mesothelioma in June 2016.[44] She originally filed suit against AII (and others) in New Jersey on November 5, 2015, but refiled the present action on February 8, 2017.[45] (Dkt. 1.) Mrs. Bell passed away as a result of her mesothelioma on June 3, 2017. (Dkt. 39-2.) Plaintiff was substituted and an amended complaint asserting a wrongful death was filed on October 23, 2017. (Dkt. 44.)

Though Mrs. Bell testified that she used Clubman from 1974 until she retired in 2009, she was unable to recall any change in the packaging to the Clubman containers that she used. Because her description of the containers she used—and the container that she found stored in her salon—match the description of containers manufactured by Neslemur prior to AII's acquisition, Plaintiff limits his claims against AII to successor liability claims for products manufactured by Neslemur prior to the 1987 acquisition.

## C. Betty Bell's Exposure to Asbestos in Clubman Talc Was Significant Factor in Causing Her Mesothelioma and Death

Testing of Clubman samples, including a container used by Betty Bell, revealed the presence of asbestos.[46] In addition, the Italian and Montana source ores used in Clubman contain asbestos. [47] Fiber release studies of talc and talcum powder products found that the

---

[44] Exhibit 16, Bell Dep., Vol. 2, at 304:9-22.

[45] Exhibit 17, Plaintiff's Original Complaint filed in New Jersey.

[46] Exhibit 19, Compton Decl., at ¶¶ 9-16 and Exhibits E and F; Exhibit 18, Fitzgerald Decl., at pp. 41-45.

[47] Exhibit 18, Declaration of Sean Fitzgerald, at pp. 21-29, 33-36, 40-41, 51. *See also* Exhibit 19, Declaration of Steven Compton, at ¶¶ 2-8 and Exhibits B, C and D. Neslemur formula sheets indicate that it used Italian talc in Clubman. Exhibit 20, Clubman Formula Sheets. WCD sales records indicate supply of Italian talc in the 1970s and 1980s, including Talc 1615 (Italian), Talc 4609 (Italian/Montana blend), and Talc 4628 (Italian/Montana blend). Exhibit 21, WCD Sales Report for Neslemur; Exhibit 22, WCD Response to

Clubman samples, as well as samples from its source ores (Italy and Montana) and other talcum powder products made from the same Italian source ore (i.e., Cashmere Bouquet) have documented elevated concentrations, well above reported ambient levels, of airborne asbestos fibers during use of those products.[48]

Plaintiff's materials science and microscopy expert, Dr. Steven Compton, opines that because the Italian samples are reported to be representative of a homogenous talc horizon, products containing talc produced from these regions in Italy, including Clubman, would contain asbestos to a reasonable degree of scientific certainty.[49] He further opines that aerosolization of Clubman would result in elevated concentrations of airborne asbestos fibers.[50]

Sean Fitzgerald, Plaintiff's expert geologist and mineralogist, opines, to a reasonable degree of scientific certainty, that Ms. Bell was repeatedly exposed to significant airborne asbestos, hundreds if not thousands of times greater than background or ambient levels, by use of Clubman talcum powder products.[51]

Plaintiff's expert pathologist, Dr. Theresa Emory, opined that Ms. Bell's exposure to asbestos dust and fibers from her use Clubman talcum powder was repetitive, routine, and regular, and that, to a reasonable degree of medical certainty, Ms. Bell's mesothelioma

---

Plaintiff's Interrogatories and Requests for Production of Documents, at Interrogatory No. 4.
[48] Exhibit 18, Fitzgerald Decl., at pp. 45-49. *See also* Exhibit. 19, Compton Decl., at ¶¶ 17-23.
[49] Exhibit 19, Compton Decl., at ¶ 26, p13.
[50] *Id*. at ¶¶ 17-23; Exhibit 18, Fitzgerald Decl., at pp. 45-49.
[51] Exhibit 18, Fitzgerald Decl. at pp. 51-52

was caused by the cumulative effect of all of the asbestos exposures from talcum powder that she received as a cosmetologist.[52] Dr. Emory testified that Mrs. Bell's exposure to asbestos in Clubman talc was significant and lead to her development of mesothelioma.[53]

## **ARGUMENT**

AII presents three arguments in support of summary judgment: (1) that Plaintiff failed to establish causation because Plaintiff cannot establish that Mrs. Bell applied Clubman Talc made or sold by AII; (2) that AII cannot be held liable as a successor to Neslemur; and (3) that imposing punitive damages against AII for the acts or omissions of another company violates AII's due process rights. Notably, AII does *not* dispute that Mrs. Bell's exposure to asbestos in pre-1987 Clubman Talc was a substantial factor in causing her mesothelioma and subsequent death.

## **Summary Judgment Standard**

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "informing the district court of the basis for its motion" and "demonstrating the absence of a genuine issue of material fact." *Young v. Prince George's Cty.*, 355 F.3d 751, 754-55 (4th Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party discharges its burden by showing

---

[52] Exhibit 23, Expert Report of Dr. Theresa Emory, at pp. 49-50.
[53] Exhibit 24, Deposition of Dr. Theresa Emory, Vol. 1, 10/1/2020 (excerpt), at 246:15-248:2. Copies of her entire deposition to date are at Dkt. Nos. 282-4, 282-10, and 282-11.

that there is an absence of evidence to support the nonmovant's case, the nonmovant must come forward with specific facts showing that there is a genuine issue for trial. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The court considers the facts in the light most favorable to the nonmoving party. *McLean v. Patten Cmtys., Inc.*, 332 F.3d 714, 718-19 (4th Cir. 2003). "The court therefore cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015). "In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

AII has the burden to inform the Court of the basis for its motion. AII does *not* dispute that Mrs. Bell's exposure to asbestos in Clubman as a substantial factor in causing her mesothelioma and subsequent death. Specifically, AII does not dispute that Clubman manufactured by Neslemur contained asbestos. Nor does AII dispute that Mrs. Bell was exposed to asbestos through her use of Neslemur-manufactured Clubman, or that her exposure was a substantial factor in causing her mesothelioma and death. Rather, AII's motion focuses solely on the issue of successor liability, asserting that it is not liable for the torts of its predecessor, Neslemur.

Case 1:17-cv-00111-WO-JEP   Document 313   Filed 03/08/21   Page 11 of 24

## II. AII IS LIABLE TO PLAINTIFF AS A SUCCESSOR TO NESLEMUR UNDER THE PRODUCT LINE EXCEPTION

### A. California Law Applies to Plaintiff's Claim of Successor Liability.

Because the Court is exercising diversity jurisdiction, it must apply the choice of law rules of the forum, North Carolina. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The applicable law must be determined for each of Plaintiff's claims. *Stetser v. TAP Pharm. Prods. Inc.*, 165 N.C. App. 1, 16, 598 S.E.2d 570, 581 (2004) (applying different choice of law tests depending on nature of claim). AII did not do a choice of law analysis, but applied North Carolina law in its arguments as to all issues. However, Plaintiff asserts California law applies because AII is organized under the laws of California.

North Carolina courts base their choice of law determination on the nature of the claim. *Crawford v. Patrick Hosp. Inv'rs, LLC* (*In re PCH Operations, LLC*), Nos. 09-50697, 10-05067, 11-05023, 2016 Bankr. LEXIS 4163, at *24 (Bankr. W.D.N.C. 2016). Claims for successor liability have elements of corporate, tort and contract law. *Id.*, at *30-31. While North Carolina courts traditionally apply the rule of *lex loci delicti* to tort claims, Plaintiff's successor liability claim is based on AII's continuation of the Clubman product line, not the underlying tort, so the rule of *lex loci delicti* does not apply. *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1174 (C.D. Cal. 2011) ("a court should look to the transaction giving rise to potential successor liability, not the underlying tortious act"). In addition, North Carolina typically applies the law of the place where the contract was made to interpretation of a contract, though North Carolina courts give effect to contractual choice of law provisions. *Cable Tel Servs. v. Overland Contr.*, 574 S.E.2d 31,

Case 1:17-cv-00111-WO-JEP   Document 313   Filed 03/08/21   Page 12 of 24

33-35 (Ct. App. 2002). The Purchase Agreement between AII and Neslemur, with its choice of law provision, is not at issue because Plaintiff's claim of successor liability under the products line exception to successor liability is not governed by the parties' obligations under the contract. *Dassault Falcon Jet Corp. v. Oberflex, Inc.*, 909 F. Supp. 345, 348-49 (M.D.N.C. 1995).

Instead, the internal affairs doctrine applies to Plaintiff's product line successor liability claims. The doctrine, recognized by North Carolina courts, is a conflict of laws principle which recognizes that only one state should have the authority to regulate a corporation's internal affairs because otherwise a corporation could be faced with conflicting demands. *Bluebird Corp. v. Aubin*, 188 N.C. App. 671, 680, 657 S.E.2d 55, 63 (2008) (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)). *See also Landress v. Sparkman*, No. 5:19-cv-150-BO, 2020 U.S. Dist. LEXIS 20707, at *5-8 (E.D.N.C. 2020); *Dassault Falcon Jet Corp. v. Oberflex, Inc.*, 909 F. Supp. 345, 349 (M.D.N.C. 1995); *Beckworth v. Bizier*, No. 3:12-CV-512-MOC-DSC, 2012 U.S. Dist. LEXIS 183061, at *9 (W.D.N.C. 2012); *Greensboro Prof'l Baseball Club, Inc. v. S. League of Prof'l Baseball Clubs, Inc.*, 681 F. Supp. 1104, 1106 (M.D.N.C. 1988). [54] "Under the internal affairs doctrine, issues involving the rights and liabilities of a corporation are generally governed

---

[54] Based upon *Copley Triangle Associates v. Apparel America, Inc.*, 96 N.C. App. 263, 385 S.E.2d 201 (1989), some lower courts have applied North Carolina law to claims to pierce the corporate veil of a foreign corporation. *See, e.g.*, *Loray Master Tenant, LLC v. Foss N.C. Mill Credit 2014 Fund I, LLC,* 2021 NCBC LEXIS 15, *25, 2021 NCBC 12. However, the *Copley* court did not discuss choice of law, or explain why it used North Carolina law. *Copley*, 96 N.C. App. at 264, 385 S.E.2d at 204.

by the law of the state of incorporation, based on the rationale that corporations are creatures of the state and are intentionally incorporated in a particular place in order to organize their liabilities." *Energy Intelligence Grp., Inc. v. Cowen & Co., LLC*, 2016 U.S. Dist. LEXIS 92185, at *33-34 (S.D.N.Y. 2016). Most jurisdictions have adopted the internal affairs doctrine because it provides consistency, predictability and uniformity of result. *Dassault*, 909 F.Supp. at 349; *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1172 (C.D. Cal. 2011). The internal affairs doctrine applies with equal force in the context of a general partnership. *Total Holdings USA, Inc. v. Curran Composites, Inc.*, 999 A.2d 873, 884-85 (Del. Ch. 2009).

The internal affairs doctrine applies to questions of successor liability. The issue of whether an asset transfer triggers the product line exception is peculiar to business entities. *In re GM LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2017 U.S. Dist. LEXIS 123740, at *366-67 (S.D.N.Y. 2017); *Energy Intelligence Grp., Inc. v. Cowen & Co., LLC*, 2016 U.S. Dist. LEXIS 92185, at *33-34 (S.D.N.Y. 2016); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1172-74 (C.D. Cal. 2011). As a result, the laws of the state that governs the organization and affairs of the successor should govern.

Because AII is a California partnership, California law should be applied to Plaintiff's claim for successor liability.

### B. AII is Liable to Plaintiffs Pursuant to the Product Line Exception for Exposures to Clubman Between 1972 and 1987

Under both North Carolina and California laws, a corporation purchasing the assets of another corporation does not ordinarily assume the other's liabilities unless "(1) there is

an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Ray v. Alad Corp.*, 560 P.2d 3, 7 (Cal. 1977); *Budd Tire Corp. v. Pierce Tire Co., Inc.*, 370 S.E.2d 267, 269 (N.C. Ct. App. 1988). However, California has recognized a fifth exception, commonly referred to as the product line exception. *Ray,* 560 P.2d 3. California's product line exception applies to Plaintiff's claim of successor liability.

Because AII improperly applied North Carolina law, it does not address the product line exception to successor liability, much less demonstrate the absence of a genuine issue of material fact. As a result, AII has failed to meet its burden, and summary judgment should be denied. *Young v. Prince George's Cty.*, 355 F.3d at 754-55. Nevertheless, Plaintiff's evidence raises triable issues relating to whether or not AII can be held liable for the tortious conduct of its predecessor under the product-line exception.

Under the product-line exception, successor liability for damages resulting from defective products is imposed "when a party acquires a manufacturing business and continues the output of its line of products with no outward indication of a change in ownership and the selling company has gone out of business." *Petrini v. Mohasco Corp.*, 61 Cal. App. 4th 1091, 1095 (1998). The seminal case adopting the product line exception, *Ray v. Alad*, emphasizes that whoever obtains the benefit of a corporation's goodwill and

Case 1:17-cv-00111-WO-JEP   Document 313   Filed 03/08/21   Page 15 of 24

business   history   should   bear   the   burden   of   its product liability suits,   if the successor continues in the same enterprise. *Ray,* 560 P.2d at 10-11.

Under   the   product   line   exception,   tort   liability can   be   imposed   on a successor  where: (1) "there is a virtual destruction of the injured plaintiff's remedies against the original manufacturer that was caused by the successor's acquisition of the business;" (2) "the successor has the ability to assume the original manufacturer's risk-spreading role;" and (3) "it is fair to require the successor to assume a responsibility for defective products as a burden necessarily attached to the original manufacturer's good will that is being enjoyed by the successor in the continued operation of the business." *Phillips v. Cooper Labs.*, 215 Cal. App. 3d 1648, 1651 (1989); *Ray*, 560 P.2d at 8-9. California courts have stressed that "[*Ray v.*] *Alad* should not be construed so narrowly as to create an exclusive exception to the general rule for successor liability permitting a similar result only in an *Alad* clone." *Kaminski v. W. MacArthur Co.*, 175 Cal. App. 3d 445, 457 (1985) (quoting *Rawlings v. D. M. Oliver, Inc.*, 97 Cal. App. 3d 890, 900 (1979)).

Two California courts addressing the same issue have held that application of California's product line exception leads to the inevitable conclusion that AII is a successor to Neslemur and can be held liable for the tortious conduct of its predecessor which occurred prior to AII's acquisition of the Clubman product line in 1987.[55] A New Jersey

---

[55] Exhibit 25, Los Angeles Superior Court Minute Order dated September 29, 2016 and Tentative Statement of Decision in *Depoian v. AII*; Exhibit 26, Announcement of Intended Decision in Phase I of the Trial by Plaintiffs Against Defendant American International, Inc. in *Colpitts v. AII*, at p. 9.

Case 1:17-cv-00111-WO-JEP    Document 313    Filed 03/08/21    Page 16 of 24

court applying a similar law has also held that "AII is the product line successor to Neslemur as a matter of law."[56] At the very least there is a question of fact in that regard which warrants the denial of AII's motion.

### 1. Virtual Destruction of Plaintiff's Remedies Against Neslemur

To establish the first element in *Ray*, Plaintiff must show that the successor's acquisition of assets has "some causal connection" to Plaintiff's lack of remedies against Neslemur. *Stewart v. Telex Commc'ns, Inc.*, 1 Cal. App. 4th 190, 198-99 (1991) This causation requirement is not strict, as "[t]he successor need only have played *some role*" in curtailing the remedy. *Kaminski*, 175 Cal.App. at 458. Plaintiff must show that the asset sale "at least contributed to the plaintiff's inability to recover against the predecessor." *In re Related Asbestos Cases*, 578 F. Supp. 91, 93 (N.D. Cal. 1983).[57] Evidence supports that Plaintiff is unable to recover against Neslemur as a result of the Purchase Agreement.

In August 2016, Daniel Dror, Chairman of Neslemur and signatory to the Purchase Agreement, signed a sworn declaration, in which he confirmed that Neslemur ceased operations on the date of the Purchase Agreement.[58] Per the terms of the Purchase Agreement, AII acquired "the business of [Neslemur] as a going concern" (Dkt. 294-3, at

---

[56] Exhibit 27, Order Denying AII's Motion, dated March 3, 2020, in the consolidated *Johnson/Lashley* case. *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332 (1981), the seminal case adopting the product-line exception in New Jersey, is consistent with the California Supreme Court's decision in *Ray*, 560 P.2d 3.

[57] The possibility that Neslemur may have failed and gone into bankruptcy had AII not purchased its assets is not relevant. AII did step in, take the assets and goodwill of Neslemur, and use them to continue the product line, and in the process extinguished the Plaintiff's remedies against Neslemur. *Kaminski*, 175 Cal. App. 3d at 458-59.

[58] Exhibit 5, Dror Declaration, at ¶ 6.

p.19, §1.1(e)) and Neslemur transferred the names "The Neslemur Company" and "Ed. Pinaud" to AII and "thereafter cease[d] to use such names other than in connection with the liquidation and winding up of its business." (Dkt. 294-3, at pp. 32-33, § 4.15.) Mr. Dror also represented that all of the cash and promissory notes received were used to satisfy Neslemur's debts, and no funds or assets were leftover.[59] Neslemur filed its last annual report with its home state of Delaware in 1988 and its corporate status was changed to "Void" in 1991 for failing to pay taxes and file annual reports. According to Mr. Dror, "[a]s a result of the sale of substantially all of Neslemur's assets to AII, Neslemur was unable to answer for any judgment against it."[60]

Neslemur was out of business and void for 33 years, but was revived under Delaware law in April 2020.[61] However, Neslemur is an "active" corporation in name only. It has no employees and its only director and officer's "last dealings with Neslemur as an active company took place 33 years ago." (Dkt. 225, at 9.) It appears that Neslemur's sole asset is insurance policies, though it is unclear that such policies would cover Plaintiff's claims. In fact, Neslemur's insurer has already indicated that Plaintiff's claims may not be covered.[62]

---

[59] Exhibit 5, Dror Decl. at ¶ 5.
[60] *Id.* at ¶16.
[61] Exhibit 14, Opening Brief in Support of Neslemur's Motion to Dismiss, filed in *AII v. Neslemur*, on June 8, 2020, at p.13.
[62] Exhibit 8, Fitzgerald Aff., at ¶ 10, and attached March 29, 2017 Letter at p. 4 ["Any Liability Nestle-Le Mur Assumed by Contract Is Not Covered by the Policies"].

18

This case does not present a situation where a predecessor sells off a product line but remains "viable" because it has other product lines in its inventory to sell. To the contrary, Neslemur went dark after it sold the Clubman product line and remained so for 33 years. Its recent "revival" and the existence of insurance policies in the name of Neslemur does not provide Plaintiff with a remedy, particularly where no assurance has been given that the carrier will not disclaim coverage. Absent such a pledge, there is no basis for this Court to conclude that there is no genuine issue of material fact as to whether Neslemur could satisfy any judgments that may be obtained by Plaintiff.

Furthermore, Neslemur's "revival" was nearly five years after Mrs. Bell's diagnosis, and nearly three years after her death. (Dkt. 39-2.) Any claim Plaintiff may have asserted against a newly revived Neslemur would have likely been barred by the statute of limitations. A technical right to proceed is virtually meaningless to Plaintiff given "formidable and possibly insuperable obstacles," and, as a result, it should be dismissed as a factor which could cause "complete denial of redress for a legitimate claim." *Kaminski*, 175 Cal. App. 3d at 459.

Plaintiff's evidence supports a finding that Neslemur is not a viable remedy for Plaintiff, and that his remedies against Neslemur were virtually destroyed by AII's acquisition of its assets.

## 2. *AII has the ability to assume Neslemur's risk-spreading role*

The second element of the *Ray* standard addresses the "successor's ability to assume the original manufacturer's risk-spreading role." *Ray,* 560 P.2d at 9. The purpose of product line successor liability is to ensure that the cost of injuries resulting from defective products is borne by the makers of the products, rather than by the injured persons who ordinarily are powerless to protect themselves. *Santor v. A.M. Karagheusian, Inc.,* 44 N.J. 52, 64-65 (1965).

This element is generally satisfied where the successor knew of the defect prior to acquiring the product line or, where, upon acquiring the assets, it has "essentially the same ability as the predecessor to assess the risks," which is generally the case if the successor acquires the "know-how available through the records of manufacturing designs, the continued employment of the factory personnel, and the consulting services of [the predecessor's] general manager." *Chaknova v. Wilbur-Ellis Co.*, 69 Cal. App. 4th 962, 972-73 (1999). Per the terms of the Purchase Agreement, Neslemur agreed to consult AII with respect to manufacturing, distribution and sales issues. (Dkt. 294-3, at p. 39, § 9.2.) In addition, prior to purchasing Neslemur, as part of its due diligence, AII specifically inquired into the hazards (if any) that the products may pose to human health.[63] AII has presented no evidence that it does not have essentially the same ability to assess the risks as Neslemur.

---

[63] Exhibit 2, Ryzman Dep., at 66:12-18.

Moreover, even if AII claims its Clubman no longer contained asbestos (which Plaintiff disputes), such a fact is immaterial. The product-line successor rule does not require the successor to have the same defect in the product line. "[T]he successor need not be 'morally' responsible for the defect to incur liability." *Rawlings,* 97 Cal.App.3d at 901. Even if AII had no knowledge that Clubman talc contained asbestos prior to the purchase agreement, it has not and cannot demonstrate – as it must – that it did not assume a similar position to spread the risks after acquiring the "general business" of Neslemur. *See Chaknova,* 69 Cal.App.4th at 972; *Rawlings*, 97 Cal.App.3d at 901. AII therefore has not met its burden with respect to the second element under *Ray*.

### 3. It is Fair to Require AII to Assume Responsibility for Neslemur's Defective Products

The third element of the *Ray* standard addresses the fairness of imposing liability on the successor. Where, as here, the successor is benefiting from the "goodwill" of the product line, the fairness element is met, as it is fair for "the one who takes the benefit [to] bear the burden." *Ray*, 560 P.2d at 10-11.

In this case, the 1987 Purchase Agreement expressly provides that AII paid $360,000 was for "Good Will." (Purchase Agreement, section 2.4, Allocation of Purchase Price, at 7, Exhibit F.) Indeed, AII structured the purchase of Clubman "to ensure that as far as the customer is concerned, there's a seamless transition, from ownership from Neslemur to AII."[64] Moreover, AII's marketing of Clubman explicitly drew upon the

---

[64] Exhibit 1, Loveless Dep., June 28, 2016, at 108:9-18.

goodwill, as demonstrated by its use of nearly identical packaging immediately after the acquisition, with "World Famous Since 1810" on the container. (Dkt. 194-3, at Exhibits 5 and 8.) Because AII "received the substantial benefits of the continuing manufacturing enterprise, [it] should also be made to bear the burden of the operating costs that other established business operations must ordinarily bear." *Ramirez,* 86 N.J. at 352-53.

Courts have found the assessment of liability against the successor to be fair since a company which continues to manufacture the product line of its predecessor relies on the good will which the predecessor accumulated through years of operation. *Ray*, 560 P.2d at 9. AII is "profiting from and exploiting all of the accumulated good will which the products have earned, both in its outward representations of continuity and in its internal adherence to the same line of equipment." *Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145, 1154 (1st Cir. 1974). Furthermore, when AII entered into the Purchase Agreement in 1987, the product-line exception to successor liability had been recognized by California courts. As a California entity, AII presumably factored any potential liability into the purchase price. *See Mettinger v. Globe Slicing Mach. Co., Inc*., 153 N.J. 371, 386 (1998). There is a triable issue as to whether it is fair to hold AII responsible for Neslemur's acts.

Because AII has failed to meet its burden that no genuine issue of material fact exists as to Plaintiff's claim of product line successor liability, AII's motion for summary judgment should be denied.

## III. AII CAN BE LIABLE FOR PUNITIVE DAMAGES.

AII incorrectly argues that it cannot be liable for punitive damages predicated upon the acts of omissions of its predecessor, Neslemur. AII can be liable for the malicious conduct of its predecessor. In *Moe v. Transamerica Title Ins. Co.*, 21 Cal. App. 3d 289 (1971), the Court of Appeal held that a successor is liable in punitive damages for the actions of its predecessor. *Id*. at 304-05. AII therefore cannot avoid liability for Neslemur's malicious conduct in selling a product known to contain asbestos.

Because AII does *not* argue that there is no genuine issue of material fact as to whether Neslemur's conduct prior to acquisition was willful, wanton or fraudulent, AII's motion for summary judgment should be denied.

## CONCLUSION

Based on the foregoing, Plaintiff requests the Court deny AII's motion for summary judgment in its entirety.

Dated: March 8, 2021

Respectfully submitted,

*/s/ Frank J. Wathen*
Frank J. Wathen (PHV)
Texas Bar No. 20920010
Attorney for Plaintiff
**SIMON GREENSTONE PANATIER, PC**
1201 Elm Street, Suite 3400
Dallas, TX 75270
214-276-7680
fwathen@sgptrial.com

23

*/s/ William Marc Graham*
William Marc Graham
NC State Bar 17972
**WALLACE AND GRAHAM, PA**
525 N. Main Street
Salisbury, North Carolina 28144
704-633-5244
bgraham@wallacegraham.com

*Local Civil Rule 83.1 Counsel*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 8, 2021, Plaintiff filed the foregoing Instrument via ECF filing which will serve all counsel of record in the above-referenced matter.

*/s/ Frank J. Wathen*
Frank J. Wathen


## WORD COUNT CERTIFICATION

This Reply complies with Local Rule 7.3(d) (1)'s word count limitation. The word count feature on Microsoft Word states the word count of the counted portions of this response is 6178 words, within the 6250 word limit.

*/s/ Frank J. Wathen*
Frank J. Wathen