## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## Greensboro Division

| | |
|---|---|
| Lloyd Bell, individually and as Executor of the Estate of Betty Whitley Bell, Deceased, <br><br> Plaintiff, <br><br> v. <br><br> American International Industries, Inc., et al., <br><br> Defendants. <br> _____ | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> No. 1:17-cv-111-WO-JEP <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

### DEFENDANT AMERICAN INTERNATIONAL INDUSTRIES' OPPOSITION TO NON-PARTY NORTHWELL HEALTH, INC.'S OBJECTIONS TO AND APPEAL FROM THE MAGISTRATE JUDGE'S FEBRUARY 25, 2021 ORDER <u>AND MOTION TO UNSEAL EVIDENCE</u>

Northwell sought to intervene in this case to shield one of its employees from cross-examination regarding factual misrepresentations she made--specifically about the *Bell* case--in a published article. That employee, Jackie Moline, MD, is also Plaintiff's expert in this case. The Magistrate Judge properly denied Northwell's motion on a variety of grounds including mootness, untimeliness, redundancy, and potential to mislead the fact finder. Northwell now asks this

Court to find that ruling "clearly erroneous" and shield Moline from any discovery regarding her mischaracterization of the *Bell* case in her article.

Two of Plaintiff's experts, Drs. Moline and Gordon, claim to have done a "ground-breaking" study linking cosmetic talc, supposedly contaminated with asbestos, to mesothelioma. ("*Mesothelioma Associated with the Use of Cosmetic Talc*" (2020).)[1] This article states that Moline consulted in 33 mesothelioma lawsuits where the plaintiffs' only exposure to asbestos was from cosmetic talc. She and other plaintiff's experts immediately started relying on the article for causation opinions in cosmetic talc cases.

Moline repeated her claim of finding 33 mesothelioma cases with only cosmetic talc exposure in sworn testimony to Congress, to the lay press, and in an affidavit submitted to this Court. She refuses to identify any of the 33 cases; effectively preventing cross-examination of her factual representations. Moline specifically directed Defendant American International Industries' ("AII") counsel to request such information from Northwell.

---

[1] Cited as "Moline Article" from here on out.

In response to subpoena, Northwell disclosed that Betty Bell (deceased wife of Plaintiff Lloyd Bell) was one of the 33 cases. The facts of *Bell*, however, contradict the central "no other asbestos exposure" premise of Moline's article as Mrs. Bell twice alleged occupational exposure to asbestos in workers' compensation cases.

Plaintiff first moved for a protective order--arguing Northwell should not have released the identifying information--and to seal any mention of Mrs. Bell being part of Moline's study. The Magistrate Judge denied Plaintiff's motion for a protective order, in part, ruling that information about the *Bell* case being included in the study had to be produced if Moline were to remain an expert for Plaintiff.

Northwell belatedly sought to intervene and extend the protective order to prohibit any mention of Mrs. Bell being part of Moline's study. In a well-reasoned nine page order, MJ Peake denied the motion to intervene. She also told Northwell that its motion to extend the protective order would be denied (even if it were allowed to intervene):

> Allowing Dr. Moline to testify as an
> expert for Plaintiff without

> disclosing or addressing plaintiff's
> inclusion in the research study that
> is part of the basis for Dr. Moline's
> expert opinion risks misleading the
> jury, the court would deny Northwell's
> motion on the merits even if the
> intervention were allowed.

(ECF 309 at 8.) The MJ allowed court records of Mrs. Bell's inclusion in Moline's study to continue to be sealed on a "temporary" basis. (*Id.* at 9.)

This Court should deny Northwell's appeal and vacate the Magistrate Judge's temporary sealing orders. To conceal that one of the "no asbestos exposure" subjects actually filed two workers' compensation cases for asbestos exposure would amount to a fraud on the medical community, the public, and this Court.

## STATEMENT OF FACTS

**I. Moline's Article and the Drive to Make Cosmetic Talc the "Next Asbestos."**

Moline claims to have done "the first large case series to identify cosmetic talcum powder contaminated with asbestos as the cause of malignant mesothelioma in cosmetic talc users." (ECF 274-1, Moline Article at 14.) The fundamental premise of her article is that none of the 33 subjects had any exposure to asbestos other than from allegedly-

4

contaminated talc. (*Id*. ("we present 33 cases, predominantly of women, who had no known exposure to asbestos other than prolonged use of talcum powder").) By refusing to identify the cases, Moline makes these assertions without fear of contradiction.

### a. There is no epidemiological evidence that cosmetic talc causes mesothelioma.

In contrast to asbestos, there is no epidemiology showing an increased incidence of mesothelioma in any cohort associated with cosmetic talc. (Exh. H,[2] Dr. Mundt Report, at 1-2 (studies done on talc workers--those who dug talc out of the ground and were exposed to levels of talc far higher than any barber or consumer would ever be--show no link between talc exposure and mesothelioma). Rather, Moline offers her case study as the first to ever prove cosmetic talc "causes" mesothelioma. (ECF 274-1, Moline Article at 11 ("In light of these gaps in the existing literature, we present 33 cases of individuals with malignant mesothelioma…".)

### b. Moline and Gordon are long-time asbestos plaintiffs' experts who, until recently, never opined that alleged trace asbestos-contamination of cosmetic talc causes mesothelioma.

[2] All exhibit citations are to the concurrently-filed Declaration of Robert E. Thackston.

Moline and Gordon wrote the 2020 article while serving as plaintiffs' experts in cosmetic talc litigation: "The cases were referred to author J.M. for medicolegal evaluation as part of tort litigation…" (<u>ECF 274-1</u>, Moline Article at 11.)[3] Both admit they "have served as expert witnesses in asbestos litigation, including talc litigation for plaintiffs." (*Id.*)

Moline began working as an expert witness for plaintiffs' lawyers in asbestos litigation as soon as she completed her medical training. She graduated from medical school in 1988, and immediately started working with Dr. Holstein at Mt. Sinai doing medical screening for plaintiffs' lawyers all over the country. She has continuously served in that role until today. (<u>Exh. A</u>, Moline dep. in *Crudge* at 14:5-13.)

Litigation work has consistently generated at least a third of Moline's income. (<u>Exh. B</u>, Moline in *Lashley* trial, 3/12/20 Vol. 1, at 19:6-10.) Since the 1990s, Moline and

---

[3] Moline's part of the article deals with asbestos exposure testimony. Gordon's part purports to address digestion of lung tissue to find asbestos fibers. Here, Plaintiff did not preserve or test any tissue from Mrs. Bell. Lung tissue digestion would have revealed whether she had occupational exposure to the type of asbestos at Fiber Industries, an allegation Plaintiff first made under oath and now claims Defendants cannot prove. Mrs. Bell's claim of asbestos exposure at Fiber Industries causing her mesothelioma is a party admission. AII intends to move for a spoliation instruction regarding tissue preservation at trial.

6

Gordon have been retained in hundreds of asbestos cases--all for plaintiffs' lawyers. (Exh. C, Gordon dep. in *Goldsmith* at 13:3-21, 15:20-22 (stating he's testified ~150-200 times, virtually always on behalf of plaintiffs); Exh. D, Moline in *Crudge* trial at 95:28-96:7.) Gordon's opinions have been excluded for doing exactly what he and Moline purport to do in this article: "…Dr. Gordon's findings are supported merely by his personal assurance he found asbestos fibers somewhere in the thousands of grid openings. This is exactly the sort of chicanery and *ipse dixit* the Court must exclude." *Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273, 1284 (S.D. Ga. 2018).

Moline has long testified on behalf of plaintiffs' lawyers as an expert on the causation of mesothelioma. She has consistently testified that there is no known cause of mesothelioma other than asbestos and that there is no safe level of exposure to asbestos. She has testified that dozens of asbestos-containing products were the cause of, or contributed to, a specific plaintiff's disease. Yet, until recently, she never mentioned cosmetic talc--or its alleged

trace contamination with asbestos--as a cause of mesothelioma.

To the contrary, as late as 2003, Moline offered a causation opinion in the case of a 50-year barber who used cosmetic talc every day. She did *not* include cosmetic talc as a cause of his mesothelioma. (Exh. E, Moline Report in *Polito* at 4; Exh. F, Moline in *Lashley* trial, 3/9/20 Vol. 1, at 193:7-196:3 (she did not concentrate on or consider talc in that case).)

### c. Plaintiffs' experts shifted focus to cosmetic talc due to numerous asbestos-containing product manufacturers declaring bankruptcy.

After decades of asbestos litigation, nearly all companies that had anything to do with asbestos products filed for bankruptcy. (*See, e.g.,* Behrens M., Esq., What's New in Asbestos Litigation, 28 *Rev. Litig.* 500, 502-503 (2009) (noting most manufacturers of asbestos-containing products went bankrupt leading the litigation to spread to other, more remote defendants).) For certain companies, bankruptcy trusts were created to pay claims to those allegedly injured from exposure to their asbestos-containing products. These claims

are confidential and trust rules make it difficult, if not impossible, to discover whether someone has filed a claim.

Courts have found that plaintiffs make bankruptcy claims in one forum but conceal those claims in civil lawsuits for the same injury. (*In re Garlock Sealing Techs*., LLC, 504 B.R. 71 (Bankr. W.D.N.C. 2014) (discovery revealed that Garlock was often sued in cases in which plaintiffs' lawyers made bankruptcy trust claims for the same injuries but never disclosed them to Garlock).) The plaintiffs' firm involved in the *Garlock* case also represents the Bells.

As more and more asbestos defendants filed bankruptcy, plaintiffs' lawyers who handle mesothelioma cases, and their experts, pivoted to purported trace asbestos contamination of cosmetic talc as an alleged cause of mesothelioma. But, the cosmetic talc theory lacked any epidemiological support. With asbestos, disease was seen in those who worked in mining and manufacturing of asbestos products, like textile mills, and then in occupations with heavy use of asbestos products like insulators and pipefitters.

Although Moline concedes that occupations at an increased risk for mesothelioma do *not* include barbers or hairdressers

(Exh. G, Moline in *Lashley* trial, 3/11/20 Vol. 1 at 194:23-195:2), she opines in this case that Mrs. Bell's mesothelioma was caused by her personal and professional use of cosmetic talc as a hairdresser. If permitted, she and Plaintiff's other experts will rely on her misleading article to buttress such testimony.

### d. Mrs. Bell made claims of occupational exposure to asbestos at her full-time industrial jobs.

Mrs. Bell is the only subject in Moline's article for which we have information. She (or her husband on her behalf) filed two workers' compensation claims alleging occupational exposure to asbestos at Fiber Industries/Celanese in Salisbury and at Cannon Mills in Kannapolis. Under North Carolina law, it is a crime to make a false statement to obtain a worker's compensation benefit. N.C.G.S Ann. § 97-88.2(a).

The first claim was signed by Mrs. Bell:

> Plaintiff was exposed to the hazards of asbestos-containing products while employed by this employer. Plaintiff will describe said exposure in detail in discovery with this defendant.

(ECF 322-2, Worker's Comp. Form rec'd 09/08/2015 at 3.) When questioned about the claim at deposition, her attorneys

promptly dismissed it. (Exh. I, B. Bell Dep. 6/21/16 at 536:11-537:6, B. Bell Dep. 6/22/16 at 45:24-46:1 and Exh. D3.) After Mrs. Bell died, however, her husband re-filed the claim, making the same representations. (ECF 322-5, Worker's Comp. Form signed 04/25/2019 at 3-4.) In both cases, the Bells were represented by Wallace & Graham, their counsel herein. (*Id.* at 2.)

Plaintiff has continued to stand by the workers' compensation claims. AII moved to compel the documents which serve as Plaintiff's good faith basis for the two claims and, in response, his counsel produced four "approved site lists" for asbestos bankruptcy trusts. (*See* Exh. J.) The sites match the plants where Mrs. Bell worked.[4]

## II. Northwell's Appeal Should Be Denied and the Sealing Orders Vacated.

Given the misrepresentations in the article, and the fact that Moline exclusively relied on publicly available litigation files as her research data, Northwell's appeal should be denied and the sealing orders vacated.

---

[4] Mrs. Bell's social security records indicate she held various industrial jobs from 1967-1968 (Fiber Industries/Celanese), 1972-1973 (Fiber Industries/Celanese), 1976-1995 (Cannon Mills), and 1996-2009 (Philip Morris). (ECF 104-4, B. Bell Social Security Records).

11

a. **Moline has repeatedly misrepresented the facts of the cases in her study--including to this Court, Congress, and the Media.**

Moline misrepresented the facts of the cases she purported to study in an affidavit to this Court submitted in support of the Northwell motion. She stated under oath: "The Article was based on our analysis of thirty-three individuals with malignant mesothelioma *who had no known asbestos exposure other than to cosmetic talcum powder.*" (ECF 265-1, Moline Affidavit at ¶8 (signed Dec. 2020).)

This is an issue of public interest partially because, in 2019, Moline provided oral and written testimony to the Subcommittee on Economic and Consumer Policy about consumer talcum powder and the results of her "study":

> I recently published an article on this topic in the Journal of Occupational and Environmental Medicine. As Wagner did in 1960, my colleagues and I reported on 33 individuals with no other identifiable source of exposure apart from cosmetic talc.

(Exh. K, Moline Written Testimony at 2; see also, ECF 187-5, Moline Oral Testimony at 8 (discussing Mrs. Bell under the pseudonym "Ms. D.").

12

In her Congressional testimony, Moline even used "Ms. D" as an example of one of her subjects who had no other exposure to asbestos. (ECF 187-5, Moline Oral Testimony at 8; see also, ECF 188 (comparing the facts of Mrs. Bell's case with the facts of "Ms. D's" case as Moline recited them to Congress). Beyond these public disclosures, Moline has given interviews to the media in which she repeated the same claims. (Exh. L, Time Magazine Article at 4 ("Moline emphasized the study's importance. 'This is the first time that anyone said, Let me look at all these cases, put it all together and identify the ones where [talc] is the sole exposure.'".)

Plaintiff's other experts have relied on Moline's article for additional publications. (ECF 276-6, Emory Article at 485 & n.9.) Drs. Emory, Compton, and Longo all rely on Moline's study for their analysis and conclusions in this case. (Exhs. M-O, Plaintiff's Experts' Reliance Lists.) This is important because it underscores the fact that merely striking Moline as an expert in *Bell* will not undo the prejudice to AII. Even if she does not testify, Plaintiff's other experts will undoubtedly rely on Moline's study in this and other cases.

**b. Despite knowledge of the falsity, Moline has continued to misrepresent the facts.**

Moline produced her initial expert report in *Bell* in 2016. Included on her reliance list was Mrs. Bell's original worker's compensation claim. (ECF 188-8, Moline Rpt. (5/5/16) at 3.) The claims were also discussed in Mrs. Bell's deposition (Exh. I), which is the type of material Moline claims to have reviewed for her article. (ECF 274-1, Moline Article at 11.) The worker's compensation claims were again brought to her attention in a trial in February 2020. (Exh. P, Moline in *Lashley* trial, Vol. 2 at 224:9-225:24.) Thus, despite having possession of and being confronted with contrary evidence, Moline continues to misrepresent that none of the 33 plaintiffs identified any other possible asbestos exposure.

**c. Northwell's requested relief is untimely.**

On August 24, 2020, AII served Northwell with a subpoena. (ECF 274-3, Service Return Aff.) About a month later, Northwell produced a document proving Mrs. Bell was a subject of Moline's article. It then waited five months before moving to intervene to preclude AII from questioning Moline about this disclosure.

14

A more complete procedural history can be found at ECF 274, so the facts will only be briefly summarized here:

- On September 11, 2020, counsel for Northwell asked for, and AII provided, a signed authorization for the release of Mrs. Bell's medical information. (ECF 188-7, 188-15.)

- In response to the subpoena, Northwell's prior counsel produced a spreadsheet proving that Mrs. Bell was one of the 33 plaintiffs in Moline's study. (Exh. Q, Northwell Spreadsheet.)

- A flurry of motions and briefing ensued.

- On September 25, 2020, MJ Peake heard Plaintiff's motion for protective order. Although Northwell did not attend, it was on notice of the dispute and briefing by the parties. (ECF 274-7, email dated 09/18/2020.)

- The Magistrate Judge ruled that AII was entitled to discovery into Mrs. Bell's inclusion in Moline's article. (ECF 274-8, Hr'g Tr. at 95:25-96:6.)

- Plaintiff offered Moline for deposition on October 5, 2020, but canceled the day before--claiming that Moline needed to confer with personal counsel. (ECF 274-5, Email from A. Rendon, ECF 274-6, Email from L. Kagan.)

15

- The parties filed a joint motion to extend the expert deadlines on December 4, 2020. (ECF 248-1.)

- A few days later, the Court ruled on the joint motion noting it had "previously extended the deadlines in this case by approximately 60 days to allow Plaintiff time to resolve these issues, but it appears that Plaintiff still has not made Moline available for deposition." (ECF 252 at 1-2.)

- Ultimately, the Magistrate Judge ordered Plaintiff to "make Dr. Moline available for deposition on or before January 7, 2021, or withdraw her as an expert witness." (ECF 252 at 2).

Plaintiff never offered Moline for deposition. Months later, Plaintiff's counsel broached the issue of seeking leave to present Moline for deposition. To date, they have not done so and the parties have proceeded under the assumption that Moline was withdrawn.

**d. The rules allowing sealing of sensitive material disclosed in discovery were not intended to protect experts from confrontation with material that contradicts their opinions.**

MJ Peake correctly ruled that Moline cannot rely on her article associating mesothelioma with 33 plaintiffs whose

16

"only asbestos exposure" was to cosmetic talc and then refuse to answer questions about the 33 cases. As we now know, the facts of *Bell* flatly contradict what Moline claims were the facts of the case study. If the assertion is false for one case, there is no reason to believe it is true for the others.

A methodology that amounts to no more than "because I said so" is no methodology at all. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (an expert's mere *ipse dixit* is insufficient). As the Magistrate Judge observed, questioning Moline about the facts of *Bell* "actually is necessary to avoid potential misleading of the fact finder here." (ECF 274-8, Hr'g Tr., 9/25/20, at 68.) Yet, on oral motion, Plaintiff's counsel asked that any mention of Mrs. Bell's inclusion in the study (in any pleading, transcript, or hearing) be sealed. The Magistrate Judge agreed--at least for purposes of discovery until the district judge had an opportunity to rule on the issue. (ECF 274-8, Hr'g Tr., 9/25/20, at 64:14-22 and 67:17-24). She ordered Moline be presented for deposition or withdrawn as a witness by a date certain. (ECF 252 at 2.)

17

Plaintiff failed to produce Moline by the court-imposed deadline, rendering questions about the scope of her deposition moot. Nevertheless, Northwell sought intervention to (i) impose additional limitations on the use of information already disclosed in this case, and (ii) preclude any questioning of Moline about Mrs. Bell's inclusion in the study (if she is ever deposed). MJ Peake denied Northwell's motion to intervene and extend the protective order because, although Northwell's arguments "provide a different perspective than the Parties," they are "largely the same contentions raised by Plaintiff in September. (*See* ECF 265; ECF 274 at 11-13 (table comparing Plaintiff's arguments with Northwell's arguments); ECF 309 at 5-6.)

Northwell now claims MJ Peake's ruling was "clearly erroneous." Further, should Plaintiff move for and receive leave to present Moline as an expert, Northwell asks this Court to prohibit any questions about whether Mrs. Bell was one of the subjects of Moline's article. (ECF 265 at 1 ("Plainly stated, Northwell moves this Court to prevent Defendants' counsels from questioning Moline about any linkage between Plaintiff and the Article.") That's right,

18

Northwell claims that, in the *Bell* case, Moline cannot be questioned about Mrs. Bell. Because the rules allowing sealing of sensitive material disclosed in discovery were not intended to protect experts from confrontation with material that contradicts their opinions, Northwell's appeal must be denied.

<u>**ARGUMENT**</u>

I. **Northwell's Appeal Should Be Denied.**

   a. **The Magistrate Judge correctly ruled that Northwell's motion to intervene was moot because Plaintiff was ordered to produce Moline for deposition by January 7 or lose her as an expert.**

As detailed above, Plaintiff was given every opportunity to produce Moline for deposition. Given the Magistrate Judge's final order (to make Moline available for deposition by January 7, 2021, or "withdraw her as an expert witness") and the fact that Plaintiff did not present Moline by the deadline, the Magistrate Judge correctly concluded that the witness was withdrawn and Northwell's motion was moot. (<u>ECF 252</u> at 2; <u>ECF 309</u> at 3.) There is nothing erroneous, let alone "clearly erroneous," about this decision. To hold otherwise would invite litigants to disregard court orders.

Northwell's posits that its motion is still live because Plaintiff "intends" to file a motion for leave to present Moline for deposition. (ECF 318 at 5.) To extend a deadline after it has passed, however, a party must file a motion and show excusable neglect. (*See* Fed.R.Civ.P. 6(b); L.R. 61.) The "intention" Northwell refers to was included in a status report filed on March 5, 2021, two months after the deadline had passed. (ECF 312 at 11.) Plaintiff still, to this day, has not moved to reinstate Moline.

By asking this Court to act as if Moline was still a viable expert, Northwell (i) presumes that Plaintiff's "intentions" govern the case and (ii) gives no credence to the Magistrate Judge's order. Whatever Plaintiff "intends," intentions are not a motion demonstrating "excusable neglect." For this reason, the Court should affirm the Magistrate Judge's denial of Northwell's motion to intervene as moot.

> **b. The Magistrate Judge's denial of Northwell's motion to intervene as untimely, duplicative, and prejudicial was correct.**

Whether a motion to intervene is timely involves three factors: "(1) how far the suit has progressed; (2) the

prejudice that delay might cause other parties; and (3) the reason for the tardiness in moving to intervene." *Students for Fair Admissions Inc. v. U. of N. Carolina*, 319 F.R.D. 490, 494 (M.D.N.C. 2017) (quoting *U.S. v. S. Bend Community Sch. Corp.*, 710 F.2d 394, 396 (7th Cir. 1983)).

Despite knowledge and involvement in the case, Northwell never tried to intervene from August until December 23, 2020. Northwell was on notice of the dispute from at least August 24, 2020, when AII served its subpoena. (ECF 274-3, Service Return Aff.) Counsel for AII was also in communication with Northwell in September about the subpoena. After the filing of various motions, the Court held a hearing on September 25, 2020. (ECF 274-8.) Northwell was aware of the hearing and chose not to participate.

MJ Peake ruled that AII was entitled to discovery into Mrs. Bell's inclusion in Moline's article. (ECF 274-8, Hr'g Tr. (9/25/20) at 95:25-96:6.) From August until December 23, 2020, Northwell did not seek to intervene or to challenge the Court's ruling in any way. That was:

- four months after Northwell was first put on notice of the issue;

- three months after the Court's first hearing on the issue;

- six weeks after the close of discovery; and

- two weeks after the court-imposed deadline for Moline's deposition. (*See* ECF 309 at 4.)

The Magistrate Judge correctly found no justification for this delay. "Northwell has not provided, and particularly given its awareness of the proceedings in September the Court does not see, any reason that would excuse the lateness. Therefore, even Northwell could have intervened months ago, when the issue was being litigated before the Court." (ECF 309 at 4.) There is nothing erroneous about this decision.

MJ Peake also correctly found that Northwell's motion to intervene would prejudice AII by delaying discovery to rehash issues already decided by the Court. Plaintiff previously argued that AII should be denied discovery into Mrs. Bell's inclusion in Moline's article for various reasons including federal regulations governing the protection of human subject research (45 C.F.R. Part 46), IRB standards of privacy, standards and norms related to privacy in medical research, and case law. (*See* ECF 274 at 11-13 (table comparing Plaintiff's arguments with Northwell's arguments). While

Northwell's arguments "provide a different perspective than the Parties," the Magistrate Judge explained that they were "largely the same contentions raised by Plaintiff in September." (ECF 309 at 5-6.) The Court accordingly ruled that intervention would be improper and prejudicial. (*See* ECF 309 at 4.) There is nothing "clearly erroneous" about this decision.

For these reasons, the Court should deny Northwell's Objections to Magistrate Judge Peake's ruling.

/ / /

**II. The Court Should Vacate the Temporary Sealing Orders Because (1) The Underlying Motions Are Subject to the Common Law Right of Access, (2) There Are No Countervailing Privacy Interests in Information Already Publicly Disclosed in Litigation, and (3) Plaintiff Filed a Document Identifying Mrs. Bell As a Subject of Moline's Article that Is Still Publicly Available.**

Having seen that both Plaintiff's and Northwell's requests for protective orders were sought for an improper purpose, the Court should vacate all prior sealing orders in this case. [All sealing orders relate to Mrs. Bell's inclusion in Moline's Article].

MJ Peake has indicated, on multiple occasions, an intention to revisit her sealing orders. (ECF 309 at 8-9 ("given the pre-trial nature of this matter related to

23

discovery issues, the Court will … *temporarily* file this Order under seal); *Id.* at 9 ("this Order will also be *temporarily* sealed, subject to further discussion with the Parties regarding the continued need for and appropriateness of sealing.") (emphasis added in both).) She initially granted a motion to seal based on representations that Moline's article involved medical research on human studies. As it has become increasingly clear that the article involved only expert opinions based on information disclosed in civil litigation, the Magistrate Judge stated that concealing this information "risks misleading fact finder." (<u>ECF 274-8</u>, Hr'g Tr. (9/25/20) at 68.)

Allowing Moline and Plaintiff's counsel to use what they claim is a study of 33 mesothelioma cases, not exposed to any asbestos other than cosmetic talc, while sealing information from the *Bell* case that contradicts that claim, would seriously mislead the medical community, the public, Congress, and the Courts. Northwell's appeal should be denied and the sealing orders vacated.

      **a.    The court records that have been sealed, and those Northwell now requests be sealed, are "judicial records" subject to the common law right of access.**

24

"The common law presumes a right to inspect and copy judicial records and documents." *BASF Agro B.V. v. Makhteshim Agan of N.A., Inc.*, 1:10CV276, 2013 WL 12178583, at *1 (M.D.N.C. Sept. 30, 2013)(J. Osteen). "[D]ocuments filed with the court are 'judicial records' if they play a role in the adjudicative process, or adjudicate substantive rights." *Id.* The question to be asked is: Were the "documents [] filed in connection with either a dispositive or non-dispositive motion" and "with the objective of obtaining judicial action" other than just a motion to seal. *Guessford v. Penn. Nat. Mutual Casualty INS. Co.*, No. 1:12CV260, 2014 WL 12594127 (M.D.N.C. Sept. 30, 2014) (J. Osteen). Judicial records include motions in limine, motions to compel, and more. *BASF Agro,* 2013 WL 12178583, at *3.

Once the presumption attaches, it can be rebutted only if "countervailing interests heavily outweigh the public interests in access." Factors to be considered include: whether the records "are sought for improper purposes," whether their release would "enhance the public's understanding of an important" event, and whether they are already publicly available. *BASF Agro* at *1.

Northwell's current motion, and virtually all other motions that have been sealed in this case, is subject to the common law right of access because it seeks to adjudicate substantive rights. For example, Northwell's motion to intervene seeks adjudication of the substantive right to intervention to preclude discovery on Moline. (ECF 318.) The same is true for many of the documents recently filed. (*See* ECF 265 (underlying brief in support of Northwell's motion to intervene).) Hence, they are subject to the common law presumption of access.

> **b.** **The public's and AII's interests in revealing the truth far outweigh the minimal interest the "public" might have in keeping confidential a study conducted by plaintiffs' experts, on plaintiffs, using litigation-generated material to support their litigation interests.**

Moline has made this a matter of public interest and importance. There are hundreds of currently-pending talc lawsuits, and some manufacturers have pulled decades-old products from the market due to rising litigation costs. Moline has publicly repeated her false claim to numerous organizations and institutions--including this Court and Congress. Hence, the matter is one of public importance, and AII's interest in setting the record straight is great.

Whatever interest there may be in protecting "human subject research" is immaterial to a study that amounts to nothing more than an expert's review of depositions and other litigation-generated materials to give opinions without considering any of the countervailing facts. None of the cases Northwell cites are remotely similar to a situation where the information reviewed was from litigation files, available to all the parties, and on which the experts produced reports with details of the plaintiffs' medical histories with no sealing order in place. (*See* ECF 181, 182, 197, 265, 274, 317, 318.) Northwell and Plaintiff are the ones seeking to use the Court's sealing procedure for an improper purpose.

One factor in determining whether to seal records is whether they are "sought for improper purposes, such as promoting public scandals or unfairly gaining a business advantage." *BASF Agro*, 2013 WL 12178583, at *1 (M.D.N.C. Sept. 30, 2013) (citations omitted). While framed from the perspective of the party seeking them, surely this factor is equally relevant if the party seeking to seal them is doing so for an improper purpose. Here, AII is not seeking to unseal evidence for any improper purpose. It is doing so to correct

27

the very public and repeated misrepresentation of Moline, and to protect its right to legitimate cross-examination. In contrast, while Northwell frames its arguments as a need to protect patient confidentiality, the real goal is to protect Moline from being confronted with her false statements. In essence, Plaintiff and Northwell seek to use Moline's article as a sword and shield to perpetuate a falsehood on fact finders and the public. They should not be permitted to do so.

**c. There are unsealed pleadings in this case, filed by Plaintiff, identifying Mrs. Bell as a subject of Moline's article.**

Another factor courts consider in weighing the common law right of access is whether information is otherwise publicly available. *BASF Agro*, 2013 WL 12178583, at *1 (M.D.N.C. Sept. 30, 2013) (quoting *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984) (citation omitted). Plaintiff first moved to seal evidence on September 15, 2020. (*See* ECF 179.) In that filing, Plaintiff redacted portions of the brief, but he failed to redact a part that directly identifies Mrs. Bell as a subject in Moline's article: "I. The Court Should Enter a Protective Order … Requiring All

Copies of Documents Identifying Betty Bell as a Subject Be Destroyed." (ECF 179 at 5.) That document has been public for nearly six months, and is still public today. *See Fleetwood Transp. Corp. v. Packaging Corp. of Am.,* No. 1:10MC58, 2011 WL 6217061, at *2 (M.D.N.C. Dec. 14, 2011) (party failed to show good cause to seal a document when the underlying agreement was publicly available on a court ECF system and had been for months).

Here, as in *Fleetwood*, ECF 179 explicitly identifies Mrs. Bell as one of Moline's study subjects. By Plaintiff's own doing, the fact of Mrs. Bell's inclusion in Moline's article is publicly available on the ECF system and has been for nearly six months. For this reason alone, the Court should unseal all other documents, transcripts, and filings identifying Mrs. Bell as one of Moline's 33 cases.

### d. IRB "confidentiality concerns" are inapplicable to Moline's article and, even if they applied, the Court is justified in unsealing the evidence.

Just as Plaintiff unsuccessfully argued, Northwell again asserts that Moline's article was done pursuant to the approval of Northwell's Internal Review Board ("IRB") and there implicates "confidentiality concerns." (*See, e.g.,* ECF

29

<u>264-1</u> at ¶¶16-18.) Whether IRB approval was required is a matter of legal interpretation within the competence of the Court. Based on the regulations, it appears IRB approval was not required, but, even if it were, (i) the rationale for confidentiality does not apply to Mrs. Bell's information because she was deceased at the time of the article, and (ii) any need for confidentiality was lost as to the plaintiffs in Moline's article when they filed their lawsuits. (*See Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 558 (7th Cir. 1984) ("Insofar as Squibb's subpoena requested records relating to plaintiffs and their mothers, however, the court ordered Dr. Herbst to disclose any records or other information which pertained solely to them because, in their cases, the need for confidentiality was lost when this litigation began.")

> **i. IRB approval was not required for Moline's article because it was "secondary research" using information that is otherwise "publicly available."**

The data Moline used for her article came from information she received in her work as a testifying expert witness. One exemption to the requirement for IRB approval is for "secondary research" when the information is otherwise

30

"publicly available." *See* 45 C.F.R. § 46.104(a) & (d)(4)(i)
(listing as exempt, "secondary research" that uses
identifiable private information when "the identifiable
private information … are publicly available"). The comments
explain that "secondary research" refers to "re-using
identifiable information and identifiable biospecimens that
are collected for some other 'primary' or 'initial'
activity." 82 FR 7149-01, at 7191.

In this case, Moline's use of litigation material was
"secondary research" involving information that is otherwise
publicly available. Moline initially obtained the
"identifiable information" used in her article for her
litigation work. (ECF 274-1, Moline Article at 11.) Hence,
the "primary" reason for collection of the material was not
research but litigation, and her subsequent use of the
information for her "study" was "secondary research."
Additionally, the information on the plaintiffs' diagnoses
and exposures became publicly available when they filed
lawsuits alleging mesothelioma because of use of talcum
powder. This is certainly true for Mrs. Bell.

Plaintiff's other experts agree. For example, just last year, Dr. Emory published a paper on 75 individuals with mesothelioma. All 75 "patients" were plaintiffs in litigation against talcum powder manufacturers. Dr. Emory recognized IRB approval was not required because, among other things, the cases came from her work as an expert witness in litigation:

> **ETHICS APPROVAL AND INFORMED CONSENT**
>
> As these cases were selected from medical-legal consultation practice and no identifying information was included, there was no formal institutional consent nor informed consent required.

(ECF 276-6, Emory Article at 489.)

Similarly, another Plaintiff's expert in this case, Dr. Longo, published a paper in 2020. He and his co-authors indicated their study did not require IRB approval "because this research was not experimental and was originally conducted pursuant to a lawsuit." (Exh. R, Longo Paper at e65-e66 ("The assessment did not meet the requirements to necessitate Institutional Review Board (IRB) approval.") See also, Exh. R at e76 n.85 (citing as support 45 C.F.R. 46.104, and linking to 45 C.F.R. section 46.104, which happens to be the section on research that is *exempt* from IRB approval) and

32

e76 n.85.)[5] Thus, according to Plaintiff's other experts, "research" done under similar circumstances (i.e., where the information comes from litigation files) does not require IRB approval.

### ii. Even if IRB approval were required, the underlying rationale for confidentiality would not apply to protecting Mrs. Bell's information because she was deceased at the time of the article and, hence, not a "human subject."

The requirement for IRB approval is dependent on several factors. The first is that the study involve "human subject research." A "human subject" is defined as "a *living individual* about whom an investigator (whether professional or student) conducting research … [obtains identifiable private information]." 45 C.F.R. at § 46.102(e)(1)(emphasis added). Hence, if the study involves deceased patients, it is not considered "human subject research" for the purpose of 45 C.F.R. 46.

This interpretation is consistent with Moline's representation in another of her recent papers. Therein, Moline wrote that informed consent and IRB approval was not

---

[5] Footnote 85 provides this link directing the reader to 45 C.F.R. § 46.104. https://www.ecfr.gov/cgi-bin/retrieveECFR?gp=&SID=83cd09e1c0f5c6937cd9d7513160fc3f&pitd=20180719&n=pt4 5.1.46&r=-PART&ty=HTML#se45.1.46_1104.

required for the study because "deceased individuals are not consider [*sic*] human research subjects subject to Institutional Review Board review."

> **ETHICS APPROVAL AND INFORMED CONSENT**
>
> Informed consent and Institutional Review Board review were not obtained in these cases, because deceased individuals are not consider human research subjects subject to Institutional Review Board review.

(ECF 300-1, Moline Dental Tape Article at 441.) As Mrs. Bell was deceased at the time of Moline's article, she is not considered a "human research subject" for purposes of IRB review.

<u>CONCLUSION</u>

Northwell's motion to intervene should be denied. All prior recommendations and orders sealing information regarding Betty Bell as one of Moline's 33 case studies should be vacated. The Court should hold further proceedings as to whether false information was submitted to the Court in connection with this or other motions. Costs for responding to this motion should be awarded to AII as well as such other and further relief to which it has shown itself entitled.

This 25th day of March, 2021.

34

/s/ Robert E. Thackston
Robert E. Thackston, NC Bar No. 36330
Kurt W. Greve, TX Bar No. 24007275
LATHROP GPM, LLP
2101 Cedar Springs Rd., Suite 1400
Dallas, TX 75201-2134
Telephone: (469) 983-6023
Facsimile: (469) 983-6101
Email: Robert.thackston@lathropgpm.com


/s/ Timothy Peck
Timothy Peck, NC Bar No. 9991
Richard A. Coughlin, NC Bar No. 19894
FOX ROTHSCHILD LLP
230 North Elm Street, Suite 1200
Greensboro, NC 27401
Telephone: (336) 378-5307
Fax: (336) 378-5400
E-mail: tpeck@foxrothschild.com
rcoughlin@foxrothschild.com

*Counsel for American International Industries*

## CERTIFICATE OF WORD COUNT

This brief complies with Local Rule 7.3(d)(1)'s word count limitation. The word count feature on Microsoft Word states that the word count of the counted portions of this brief is 6,132 words, within the 6,250 word limit.

/s/ Timothy Peck
Timothy Peck, NC Bar No. 9991
FOX ROTHSCHILD LLP

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that I electronically filed the foregoing document with the Clerk of the United States District Court for the Middle District of North Carolina using the CM/ECF system, which will send notification of this filing and an electronic copy of same to all counsel of record registered with the CM/ECF system, and I hereby certify that I have thereby electronically served the document upon all counsel in this action registered with the CM/ECF system.

This 25th day of March, 2021.

*/s/ Timothy Peck*
Timothy Peck, NC Bar No. 9991
FOX ROTHSCHILD LLP