IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Greensboro Division

| | | |
|---|---|---|
| Lloyd Bell, individually and as Executor of the Estate of Betty Whitney Bell, Deceased, | § § § § | |
| Plaintiff, | § § | Case No. 1:17-cv-111-WO-JEP |
| v. | § § | |
| American International Industries, | § § § | |
| Defendants. | § | |

**DEFENDANT AMERICAN INTERNATIONAL INDUSTRIES' BRIEF
IN SUPPORT OF MOTION TO VACATE PRELIMINARY
<u>PROTECTIVE ORDER OF SEPTEMBER 25, 2020</u>**

## I.    <u>INTRODUCTION</u>

Plaintiff's expert, Jacqueline Moline, M.D. ("Moline"), is representing to courts (including this one by declaration (ECF 265-1), fact finders, and even Congress that her published article proves cosmetic talc causes mesothelioma. (ECF No. 274-1, "Mesothelioma Associated with the Use of Cosmetic Talc" (2020) (hereinafter "Moline Article").)[1] She claims that in 33 litigation cases she reviewed, the **_only_** possible source of asbestos exposure was contamination

---

[1] The article obviously underwent no meaningful peer review as it contains glaring errors, like calling the Food & Drug Administration the "Federal Drug Administration." It claims several of the cases were hairdressers and cites an article that says if hairdressers were exposed to asbestos, it was most likely from hairdryers. (ECF No. 274-1, Moline Article at 16.)

of cosmetic talc. A single document produced by Moline's employer, Northwell Health, Inc. ("Northwell"), shows that Decedent Betty Bell ("Ms. Bell") was one of those cases.[2] Contrary to Moline's assertion of "no-other-exposure," Ms. Bell's lawyers filed two workers' compensation cases claiming she had occupational exposure to asbestos—having nothing to do with cosmetic talc. Plaintiff's counsel seeks to use this Court's September 25, 2020, Order to conceal that fact and shield Moline from cross-examination that would disprove the central premise of her article.

Moline has sought to create a national fervor by claiming that trace contamination of cosmetic talc with asbestos causes mesothelioma. She testified before a congressional committee about her supposed findings, specifically using Ms. Bell (as "Mrs. D") as an example. Accordingly, the Northwell document identifying Ms. Bell as one of 33 plaintiffs in Moline's article has far reaching implications. It is a "judicial document" subject to the public right of access because it has been filed with the Court and has been the subject of substantial briefing. (ECF Nos. 331 & 331-17.) It contains no confidential medical information.[3] Moline never treated Ms. Bell. Her only relationship with Ms. Bell was as her litigation expert.

---

[2] The information for the remaining 32 plaintiffs is redacted and AII does not seek to unredact that information at this time.

[3] Even if it did, that privilege was waived when Ms. Bell, and later her estate, filed a personal injury lawsuit.

Although the Northwell document is a judicial document subject to the common law right of access, Plaintiff's counsel wants to keep this contradictory information under protective order. They have sued cosmetic talc companies in mesothelioma cases across the country. The current protective order allows plaintiffs and their experts to continue to cite the Moline Article as "proof" that cosmetic talc causes mesothelioma—without fear of contradiction by the actual evidence showing that, at least in one case, it is false.

There is no countervailing interest that outweighs the public's right to access. The Northwell document is not entitled to protection because the Moline Article does not qualify as "Human Subject Research" under federal regulations or the common law. The Northwell document is not HIPAA protected, as the Court has already noted. Nor is it privileged because Moline never treated Ms. Bell, and, regardless, any claim of privilege was waived once Ms. Bell put her medical health at issue by filing a lawsuit. Moline's Article and the underlying information are nothing more than Moline's litigation opinion in cases in which she was hired as a paid expert. But, she refuses to disclose which cases were included because she knows the facts of the cases, like *Bell*, belie the representation that the only possible asbestos exposure was from contaminated cosmetic talc.

This Court's preliminary protective order was not intended to be a final order. If left in place, it will allow Moline and the firms that hire her to continue to represent that her study found mesothelioma in 33 cases with no other plausible asbestos exposures. There is no other way to conclusively prove that fact. As the order stands now, plaintiffs' counsel can use it to prevent defendants from cross-examining Moline about her misrepresentations on the most key issue in her supposed study. The Court should not permit such an injustice and should vacate the order.

## II.  **QUESTION PRESENTED**

1.  Should the preliminary protective order be vacated when:

    a.  It is being used to fraudulently conceal the fact that Ms. Bell was one of the participants and she had alternative exposures to asbestos in direct contradiction to the premise of the Article;

    b.  The Moline Article does not qualify as "human subject research";

    c.  The information sought is not HIPAA protected;

    d.  Moline made material misrepresentations and/or her research was seriously flawed when she claimed none of the 33 plaintiffs in the study had any alternative exposures to asbestos; and

    e.  Moline and Plaintiff's counsel represent to courts, fact finders, the public, and Congress that her study proves cosmetic talc causes mesothelioma—even though they know there were other alleged exposures in the underlying, undisclosed, cases.

4

## III. RELEVANT FACTS

### A. Moline misrepresents information in an article she claims is the first epidemiological study linking cosmetic talc to mesothelioma.

Plaintiffs in traditional asbestos cases have heavily relied on epidemiological studies. (*See* ECF No. 331 at 4-5) (providing background). Prior to the publication of Moline's Article, there was no epidemiology showing an increased incidence of mesothelioma in any cohort associated with cosmetic talc. (ECF No. 331-8, Dr. Mundt Report, at 1-2.) Moline's Article was explicitly intended to fill this gap. She and her coauthors proclaimed it to be "the first large case series to identify cosmetic talcum powder contaminated with asbestos as the *cause* of malignant mesothelioma in cosmetic talc users." (ECF 274-1, Moline Article at 14) (emphasis added). (*See also* ECF No. 331 at 4-5.) Her coauthors included a lawyer and a prolific expert whose work one federal court recently labeled "chicanery." *Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273, 1284 (S.D. Ga. 2018).

The Article is litigation-driven advocacy. Moline is the only physician author, yet none of the 33 cases were her actual "patients." Moline's only relationship with them was as their litigation expert. And the "data" she claims to have reviewed consisted mostly of deposition transcripts. (ECF 274-1, Moline Article at 11.) Although the Article suggests that someone other than

the authors interpreted the transcripts, it was Moline who did so. (*See id.* ("All cases were reviewed by an occupational physician with experience evaluating asbestos exposure in thousands of patients.") (ECF No. 197-1 at 14-20, Moline Trial Testimony in *Lashley* Vol. 1, 94:3-24 (admitting that physician was her).)

Moline can claim the facts of the cases support her conclusions without fear of contradiction because she refuses to identify the plaintiffs involved. She never treated the information received in the cases as confidential. She issued public expert reports with no protective order or even caveats about confidentiality. (*See* ECF No. 205-11, Moline Rpt. in *Bell* (5/5/16).) Moreover, Moline claims she did not ask Plaintiff, his lawyers, or family representatives for permission to include their litigation information in her Article. (*See* ECF 274-1, Moline Article at 14; *see also* ECF 274-8, Hr'g Tr. (9/25/20) at 57). Its principal purpose was to aid plaintiffs in their lawsuits.

Despite not treating the case information as confidential when she received it, Moline—and the law firm that hired her—now invoke a non-existent "researcher privilege" so no one can impeach Moline with materials from the cases. The single document produced by Northwell in this case, which shows that Ms. Bell was one of the subjects, contradicts the central premise of Moline's paper—that her subjects had no other possible exposures to asbestos.

In 2019, Moline provided oral and written Congressional testimony about her preliminary findings to the Subcommittee on Economic and Consumer Policy. (ECF 331-11, Moline Written Testimony at 2; *see also*, ECF 187-5, Moline Oral Testimony at 8 (discussing Ms. Bell under the pseudonym "Mrs. D"). In her Congressional testimony, Moline even used Ms. Bell (under the alias "Mrs. D") as an example of one of her subjects who had no other exposure to asbestos. (ECF 187-5, Moline Oral Testimony at 8; *see also*, ECF 188 (comparing the facts of Ms. Bell's case with the facts of "Mrs. D's" case as Moline recited them to Congress).[4]

Since its publication, Moline's paper has featured prominently in talc litigation. Before judgment was entered in this case, for example, four of Plaintiff's disclosed experts relied on Moline's Article in support of their opinions—one going so far as to affirmatively raise it at his deposition because he failed to include it in his report. *See* ECF 331-13 through 331-15 (Emory, Compton, Longo reliance lists) and ECF 187-14 (Brody deposition transcript).

**B.**    **AII suspected, and through discovery in this case confirmed, that the central factual claim of the Moline Article was false.**

---

[4] Beyond these public disclosures, Moline has given interviews to the media in which she repeated the same claims. (ECF No. 331-12, Time Magazine Article at 4.)

The central premise of Moline's Article is that none of the 33 plaintiffs had exposure to asbestos other than from what must have come from allegedly contaminated talc. (ECF 274-1, Moline Article at 14) ("[W]e present 33 cases, predominantly of women, who had no known exposure to asbestos other than prolonged use of talcum powder.") Based on the facts of Ms. Bell's case and Moline's description of "Mrs. D" in her congressional testimony, AII suspected that Ms. Bell was one of the 33 plaintiffs included in her study.[5] (ECF No. 188, at 6-10.)

This was critical because Ms. Bell (or her husband on her behalf) filed two workers' compensation claims alleging Ms. Bell was occupationally exposed to asbestos—facts that, if true, directly contradict the central claim of Moline's paper. (ECF 322-2, Worker's Comp. Form rec'd 09/08/2015 at 3; ECF 322-5, Worker's Comp. Form signed 04/25/2019 at 3-4.) To prove AII's suspicion, it repeatedly inquired about the identity of the participants during discovery, but Moline refused to answer. (*See* ECF No. 188-1.) Counsel for Plaintiff told AII if it wanted the information, it should subpoena Northwell. (ECF No. 188-1, Moline Dep. in *Johnson* (1/15/20) at 32:7-33:1.) AII did so.

---

[5] Based on other filings, AII believes there are other plaintiffs included in the study who had alternative exposures asbestos. (ECF 340-2, Motion to Compel, *Chenet v. Colgate-Palmolive Co.*, No. 2018-12536 (Civ. Dist. Ct. Parish of New Orleans, Louisiana Mar. 25, 2021).)

In response to AII's subpoena, Northwell produced a single, five-page document with all information redacted except Ms. Bell's name and some of her background information.[6] (ECF No. 331-17.) All entries for other study participants were redacted. But that document, in conjunction with the accompanying subpoena, provided proof that AII could use, for the first time, to confront Moline about her false claims.

This led to substantial motion practice (*see* ECF Nos. 168 & 188), and a hearing before Magistrate Judge Peake. (ECF No. 274-8.) Judge Peake ruled that defendants could question Moline about Ms. Bell because this was her case; recognizing that not allowing such would risk "misleading the fact finder." (ECF 274-8, Hr'g Tr. (9/25/20) at 68.)

Rather than produce Moline for deposition, and permit her to be cross-examined on these facts, Plaintiff withdrew her as an expert.[7] Thus, AII was deprived of its ability to cross-examine Moline about the false data in the Article.

---

[6] The only information visible on the document is Ms. Bell's name, the brands of talc she used, the name of the law firm representing her, her occupation, the date of her diagnosis, and her case number.

[7] ECF 309 at 3, Order on Northwell Motion to Intervene ("By order dated December 8, 2020, the Court directed Plaintiff to make Dr. Moline available for deposition by January 7, 2021 or withdraw her as an expert witness [Doc. #252]. That deadline has passed, and Plaintiff has neither made Dr. Moline available nor moved this Court for an extension of the deadline. Therefore, it appears that Plaintiff has elected to withdraw her from the case, in which case Northwell's Motion to Intervene is moot.")

### C. Moline and other plaintiffs' experts continue to use the article to argue that cosmetic talc causes mesothelioma.

The protective order allows Moline to continue to testify that the 33 cases of mesothelioma were persons with no exposure to asbestos other than cosmetic talc, without fear of cross-examination. AII now knows that Ms. Bell was one of those 33 study subjects. AII knows she had two workers' compensation cases alleging occupational exposure to asbestos. Plaintiff's only reason for seeking a protective order was to conceal these facts because they undermine Moline's conclusions and the case against cosmetic talc.

In April 2021, Moline testified as an expert in a mesothelioma case in Los Angeles. She told the court and jury that her study found that cosmetic talc causes mesothelioma. (*See* Moline Trial Tr. (*McNeal*) at pp. 1564-1570 (seven pages of testimony dedicated to her study), attached as **Ex. A**). Moline attempted to buttress her credentials by highlighting her congressional testimony. She and plaintiffs' counsel knew Moline was wrong about Ms. Bell's lack of other exposures to asbestos. (ECF No. 179) (Plaintiff's earliest motion on the issue was in September of 2020). Yet, she continues to tell courts and juries that her study involved 33 individuals with no possible exposures to asbestos other than cosmetic talc.

Plaintiff's counsel relies on and benefits from the misrepresentations in the Moline Article. The same plaintiff's counsel who requests that the *Bell*

information remain under seal argued to the jury in *McNeal* that the Moline Article proved that cosmetic talc causes mesothelioma. (*McNeal* Closing Argument at 3639:27-3640:2, attached as **Ex. B**) ("Gosh, does cosmetic talc really cause mesothelioma? Well, Dr. Moline, she published a paper on this…Dr. Moline testified to Congress on this issue.") *See also id. at* 3658:25-28 & 3659:18-20 (pointing out her Congressional testimony). At trial, Moline continued to affirm that the only known asbestos exposure the 33 plaintiffs had, including Ms. Bell, was from cosmetic talc. (**Ex. A**, Moline Direct in *McNeal* at 1567:26-1568:9.)

More recently, in a Pennsylvania case against AII, Moline and another plaintiff's expert issued reports relying on Moline's Article in support of their opinions. (Moline Expert Rpt. in *Fisher* at 19, attached as **Ex. C**; Finkelstein Expert Rpt. in *Fisher* at 152-154, attached as **Ex. D**.)

## IV. <u>LEGAL AUTHORITY AND ARGUMENT</u>

### A. **Jurisdiction**

This Court has the authority to vacate and/or modify the previously-entered protective order even post judgment and dismissal. *See Tucker v. Ohtsu Tire & Rubber Co.*, 191 F.R.D. 495, 499 (D. Md. 2000) (collecting cases); *see also Public Citizen v. Liggett Group*, 858 F.2d 775, 780–82 (1st Cir.1988); *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir.1990).

### B. Relevant legal standard

"The common law presumes a right to inspect and copy judicial records and documents." *BASF Agro B.V. v. Makhteshim Agan of N.A., Inc.*, 1:10CV276, 2013 WL 12178583, at *1 (M.D.N.C. Sept. 30, 2013)(J. Osteen). "[D]ocuments filed with the court are 'judicial records' if they play a role in the adjudicative process, or adjudicate substantive rights." *Id.* The question is: Were the "documents [] filed in connection with either a dispositive or non-dispositive motion" and "with the objective of obtaining judicial action" other than just a motion to seal. *Guessford v. Penn. Nat. Mutual Casualty Ins. Co.*, No. 1:12CV260, 2014 WL 12594127 (M.D.N.C. Sept. 30, 2014) (J. Osteen). Judicial records include motions in limine, motions to compel, and more. *BASF Agro,* 2013 WL 12178583, at *3.

It is undisputed that the Northwell document is a judicial record. It was attached to AII's Opposition to Northwell Health's Objections and Appeal. (ECF No. 331 & 331-17.) It has also been the subject of numerous motions. (*See e.g.,* ECF Nos. 168, 179, 188, 197, 265, 274, 275, 316, 330.) *Virginia Dept. of State Police v. Washington Post,* 386 F.3d 567, 572 (2004) ("Many of the documents produced by VDSP pursuant to the protective orders were later attached to or addressed in pleadings and other documents filed with the district court, and some were also discussed during district court hearings.")

Once the presumption attaches, it can be rebutted only if "countervailing interests heavily outweigh the public interests in access." *BASF Agro* at *1. Some of the factors to be weighed in the common law balancing test "include whether the records are sought for improper purposes, such as promoting public scandals or unfairly gaining a business advantage; whether release would enhance the public's understanding of an important historical event; and whether the public has already had access to the information contained in the records." *Virginia Dep't of State Police v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004) (quoting *In re Knight Publ. Co.*, 743 F.2d 231, 235 (4th Cir.1984)). Another factor is whether other interested parties have responded and sought disclosure of the information. (*See* ECF No. 360, at 1.)

## C. The Court should vacate its preliminary protective order to permit public access to data that undermines claims that plaintiffs' experts and counsel continue to present to courts and fact-finders.

Plaintiff cannot meet his burden of showing that countervailing interests "heavily outweigh the public interest in access."[8] All of the factors weigh in favor of vacating the protective order.

---

[8] AII has consistently opposed sealing of evidence in this case. Out of respect for the Court's ruling, AII has moved to seal prior filings consistent with the Court's instruction. However, in one filing, the Court noted: parties conferred and agreed to certain redactions. (ECF No. 353.) This may have been a mistake as AII opposed redactions in that instance.

13

### 1. AII does not seek disclosure of the documents for an improper purpose; rather, it seeks disclosure to rectify an injustice.

AII is not seeking disclosure of the documents to promote a public scandal or gain "an unfair business advantage." *Virginia Dep't of State Police v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004). It is trying to prevent Moline and others from misrepresenting to courts, juries, and the public the truth about a study supposedly showing that cosmetic talc causes mesothelioma. The conclusions in Moline's Article are based on her representation that none of the 33 patients had alternative exposures to asbestos—other than what must have come from cosmetic talc. We know that is false, at least in Ms. Bell's case, and probably others.

Ms. Bell had alternative exposures to asbestos at her job sites. The omission of this information could not have been an oversight. Moline had this evidence long before she testified to Congress or published her paper. Moline produced her initial expert report in *Bell* in 2016, which listed, among other materials reviewed, Ms. Bell's original workers' compensation claim. (ECF 188-8, Moline Rpt. (5/5/16) at 3.) Those same workers' compensation claims were also discussed in Ms. Bell's deposition (ECF No. 188-11), which is the type of material Moline claims to have reviewed for her Article. (ECF 274-1, Moline Article at 11.)

14

Despite the filing of numerous motions on this issue, Moline continues to misrepresent the facts of her study. Moline has never filed a correction to her public Article. In December 2020, Moline filed a declaration with this Court, making the very same factual misrepresentation. (ECF No. 265-1, Moline Declaration (12/23/20) at ¶8.) And, just this past April, Moline took the stand in a Los Angeles court testifying under oath that her study included 33 cases with no other possible exposures to asbestos. (**Ex. C**, Moline Rpt. in *Fisher* at 19.)

This Court has twice expressed concern about Moline's apparent misrepresentations. Magistrate Judge Peake, in ruling that Moline must answer questions about Ms. Bell's inclusion in the Article in this case, noted that to rule otherwise "risks misleading fact finder." (ECF 274-8, Hr'g Tr. (9/25/20) at 68.) More recently, the Court observed:

> [T]he facts presented about Dr. Moline's study cause this court concern. The contradiction between Mrs. Bell's history and the assertions contained in Dr. Moline's study are even more concerning if, in fact, other expert witnesses rely on Dr. Moline's study in their analysis of the present case." (See Doc. 331 at 13.) These issues need not be resolved at this time in light of this court's affirmance on a separate basis.

(ECF 350 at 7, n.2.)

In both instances, and others, the Court noted its decision to protect the information from disclosure was preliminary. (ECF 309 at 8-9 ("given the pre-

trial nature of this matter related to discovery issues, the Court will ... *temporarily* file this Order under seal); *id.* at 9 ("this Order will also be *temporarily* sealed, subject to further discussion with the Parties regarding the continued need for and appropriateness of sealing.") (emphasis added in both).) (ECF No. 360 at 3 (noting the confidentiality determinations were preliminary).)

Plaintiff's counsel and Moline are using the Court's order as a shield against cross-examination regarding Ms. Bell as one of the cases on which Moline's study was supposedly based. If the protective order is not vacated, it will permit Moline and Plaintiff's counsel to continue perpetuating the false narrative that the only plausible asbestos exposures in the 33 cases were from contaminated cosmetic talc. Defense counsel would not be allowed to ask Moline, and other experts relying on her Article, a significant question: "did you know Ms. Bell filed a workers' compensation case swearing she was occupationally exposed to asbestos in her work at Fiber Industries?" Thus, AII does not seek disclosure of the Northwell document for an improper purpose; rather, it seeks disclosure to reveal the truth.

## 2. Release would enhance the public understanding of an important issue.

The accuracy and reliability of Moline's claims are a matter of public interest. For every mesothelioma case in the U.S., it is now possible for

plaintiffs to file secret bankruptcy trust claims for exposure to asbestos and then file civil cases against makers of cosmetic talc. (ECF 131-3, June 19, 2020, Objection of US Trustee (noting the "troubling concern" in talc litigation around the secrecy with which many trust claims are submitted, allowed, and paid, making it "nearly impossible to detect when plaintiffs are seeking a recovery based on factual representations that are incompatible with other representations previously made in other litigation or before another trust" and **Ex. E**, Statement of Interest on Behalf of the United States of America Regarding Estimation of Asbestos Claims (12/28/20).)

Litigation and related costs have forced some cosmetics sellers, including AII, to withdraw talcum powder from the market. (See **Ex. F,** Deposition of C. Loveless in *Crudge* (4/19/19) at pp. 74:25-75:9.) Moline has widely publicized her study results to courts (including this one in a sworn affidavit), Congress, the media, and jurors. (ECF 188-5 (congressional hearing); ECF 331-11 (congressional written statement); ECF 331-12 (Time Magazine article); Moline Trial Tr. in *Lashley*, v.2 (3/11/20) at 211:13-25, attached as **Ex. G**.

AII and other defendants continue to be confronted with Moline's Article in litigation, and other plaintiffs' experts rely on it as support for their opinions. (ECF 276-6, Emory Article at 485 & n.9.) At trial, plaintiffs' lawyers are using it as a study that supposedly establishes that cosmetic talc causes

17

mesothelioma. (*McNeal* Closing Argument at 3639:27-3640:2 ("Gosh, does cosmetic talc really cause mesothelioma? Well, Dr. Moline, she published a paper on this…Dr. Moline testified to Congress on this issue."). Vacating the protective order and allowing AII to use the Northwell document will allow defendants to set the record straight.

> **3.** **No countervailing interests heavily outweigh the public interest because the Article is not "Human Subject Research"; the data is not HIPAA protected; and any general claim to privacy was waived once Ms. Bell put her medical health at issue.**

Plaintiff failed to meet his burden that "countervailing interests heavily outweigh the public interests in access." *BASF Agro* at *1. Plaintiff's law firm raised a host of baseless objections for concealing the Northwell document: among these are privilege, IRB approval, First Amendment protections, and HIPAA. For reasons stated in our prior briefing, these arguments are baseless. (*See, e.g.,* ECF No. 188, 197, 274.)

Neither the common law nor any explicit federal or state statute places a blanket protection on research data. Indeed, the Supreme Court has denied the existence of an "academic privilege." *See Univ. of Pa. v. EEOC*, 493 U.S. 182, 197–99 (1990) (explaining that the First Amendment right of "academic freedom" applied only where the government tried to control the content of

speech and declining to extend the privilege to protect confidential peer review materials from disclosure.)

One issue that seemed concerning to Magistrate Peake was the implications behind disclosure of data related to "human subject research." However, Plaintiff cannot cite any federal, state, or regulatory statute under which Moline's Article could be classified "Human Subject Research" that is afforded protection from disclosure. First, research involving deceased individuals—like Ms. Bell—is not human subject research and does not require IRB[9] oversight. *See* 45 C.F.R. § 46.102(e)("Human subject means a ***living*** individual...") (emphasis added). Second, Moline did not comply with the mandatory requisites of any human research statute by failing to obtain consent from Ms. Bell or an authorized representative. *See* 45 C.F.R. § 46.116 (no investigator may involve a human being as a subject in research covered by this policy unless the investigator has obtained the legally effective consent of the subject or of the subject's legally authorized representative").

Further, Moline's "research" was not conducted by, or on behalf of, the federal government or any state agency. Thus, it does not fall within any statute that protects research data from compelled disclosure. Nor does the research fall within state adopted protections that are specific to certain types

---

[9] Institutional Review Board.

of research involving potentially stigmatizing topics, such as mental health (Hawaii[10]), HIV/AIDS (California[11]), and genetics (Arkansas and Oklahoma[12]). Thus, the cases relied upon by Plaintiff, *Lampshire v. Procter & Gamble Co.,* 94 F.R.D. 58 (N.D. Ga. 1982) (case involving research conducted by the CDC) and *Doe v. Am. Red Cross Blood Servs., S.C. Region*, 125 F.R.D. 646 (D.S.C. 1989) do not apply here.

Plaintiff cited regulations by the Department of Health and Human Services and the Food and Drug Administration—both of which adhere to the definitions of "Human Subject Research" described above—to argue the agencies require that an institutional review board determine whether there are "adequate provisions to protect the privacy of subjects and to maintain the confidentiality of data." Oddly, Plaintiff's counsel then argues that, because his expert, Moline, failed to comply with her statutory and ethical requirements to ensure privacy or obtain consent for using the information, she should be rewarded by having the information sealed and protected (so that Moline can continue to testify about the information without any repercussions for her conduct).

---

[10] Hawaii Rev. Stat. § 324-13 (West).
[11] CAL. HEALTH & SAFETY CODE § 121075 (West 2012)..
[12] ARK. CODE. ANN. § 20–35–103 (LexisNexis 2005); OKLA. STAT. tit. 36, § 3614.4 (2011)

In addition, Plaintiff's arguments regarding general privacy interests do not apply here. Unlike human study subjects who have a reasonable expectation of privacy, Ms. Bell had no reasonable expectation of privacy when she placed her health at issue in litigation. Neutral study subjects who volunteer to be included in various studies have no stake in the outcome of the study. Ms. Bell and the other 32 subjects, however, are or were plaintiffs in litigation who placed their health at issue and whose information was then included in a study by their own expert to support their cases. Recognizing the absurdity in such an outcome, several statutes explicitly allow for disclosure of raw research data when the researcher is an expert in the litigation. *See e.g.,* Ga. Code Ann. § 24-12-2 (West)("Confidential raw research data may be disclosed in any judicial or administrative proceeding in which the researcher has either volunteered to testify or has been hired to testify as an expert by one of the parties to such proceeding.")

Further, as this Court already noted, and as was fully briefed in AII's prior filings, the Northwell document identifying Ms. Bell is not HIPAA protected information. (ECF 274-8, Hr'g Tr. (9/25/20) at 9:10-14) ("It does not look to me like a HIPAA authorization would be required, but to the extent Northwell had the information and believed it was required, it was not inappropriate for defense counsel to use the authorization that Ms. Bell had

Case 1:17-cv-00111-WO-JEP   Document 369   Filed 09/29/21   Page 21 of 28

agreed to in this case.") Thus, there is no legitimate countervailing interests that heavily outweigh the public interest in this matter.

### 4. Other parties have an interest in the information and are seeking public disclosure of the Northwell document.

Another relevant factor in considering whether material should be protected from disclosure is if others have an interest in, and seek disclosure of, the information. Magistrate Peake has noted on a few occasions that no other interested party had yet moved to unseal the information. (ECF No. 360, at 1) ("…the Court notes that the Motions to Seal have been on the public docket for several months, allowing any interested parties sufficient time to respond, and no such responses have been filed.")[13]

This factor has limited relevance in this case for at least two reasons. First, because of the protective order, AII cannot publicize that the Northwell document shows that Ms. Bell was one of the cases in the Moline Article and that Ms. Bell had other alleged asbestos exposure. If defendants in other cases knew of the Northwell document, they would undoubtedly want to use it to question the validity of Moline's study. Those who heard her testimony in Congress might want to know that the specific example she gave of a cosmetic-

---

[13] This is difficult given the facts of this case. The information is subject to protective order—AII cannot notify other non-parties or publicly disclose the information.

talc-exposure-only plaintiff was false. Second, unlike other cases where confidentiality orders have been at issue, this case was not subject to substantial media attention. *See, e.g., Virginia Dept. of State Police,* 386 F.3d 567. Thus, regulators, the public, the media, and others do not know that a study supposedly linking cosmetic talc to mesothelioma is deeply flawed, to put it charitably.[14] To the extent the Court means no other defendants in this case have filed a response, all of those defendants have resolved. There is no way of knowing whether agreeing not to challenge the preliminary protective order was a significant part of the settlement consideration.

If relief for this injustice is to be had, it must be in this case. Magistrate Judge Peake originally took the position that disclosure of the Northwell document was only appropriate in this case. Later, the Court decided to keep the information confidential because Plaintiff had withdrawn Moline as an expert in this case. (ECF No. 360 at 2) ("In addition, it now appears to the

---

[14] Another factor courts consider in weighing the common law right of access is whether information is otherwise publicly available. *BASF Agro,* 2013 WL 12178583, at *1 (M.D.N.C. Sept. 30, 2013) (quoting *In re Knight Publ'g Co.,* 743 F.2d 231, 235 (4th Cir. 1984) (citation omitted). *See also Virginia Dept. of State Police v. Washington Post,* 386 F.3d 567, 572 (4th Cir. 2004) (unsealing a potential criminal suspect's identity when that information was otherwise publicly available). Plaintiff first moved to seal evidence on September 15, 2020. (See ECF 179.) In that filing, Plaintiff redacted portions of the brief, but he failed to redact a part that directly identifies Ms. Bell as a subject in Moline's article. (Id. at 6). *See Fleetwood Transp. Corp. v. Packaging Corp. of Am.,* No. 1:10MC58, 2011 WL 6217061, at *2 (M.D.N.C. Dec. 14, 2011) (party failed to show good cause to seal a document when the underlying agreement was publicly available on a court ECF system and had been for months); *Virginia Dept. of State Police,* 386 F.3d at 573 ("Tinsley's identity has already been disclosed"). Additionally, Ms. Bell has been identified as a potential study subject in briefing in another court. (*See* ECF 340-2, Motion to Compel, *Chenet v. Colgate-Palmolive Co.,* No. 2018-12536 (Civ. Dist. Ct. Parish of New Orleans, Louisiana Mar. 25, 2021).)

23

Court that Plaintiff no longer intends to present Dr. Moline's testimony at trial, and the matter presently remains limited to pretrial discovery issues.") These justifications are fundamentally at odds with the realities of this litigation and the Court's prior observations. It is undisputed that Moline's Article has influence beyond just her testimony in this case. The Court was right that Plaintiff withdrew her in this case. (*Id.*) But, that does not mean the misrepresentation has been cured. As noted above, Moline continues to be disclosed as an expert for plaintiffs in talc litigation nationwide and other plaintiffs' experts continue to rely on her study in this ever-growing litigation.

AII will be prejudiced in other cases unless the protective order is lifted and defendants can use the evidence disclosed by Northwell to confront Moline and the numerous other experts who rely on her Article in other cases. Magistrate Judge Peake previously ruled that it would be improper for AII to have sought release of Ms. Bell's inclusion in Moline's Article in another case:

> Again, I think it would be very different if defense counsel had used Ms. Bell's authorization from this case to obtain the release of information in some other case. There are important confidentiality and privacy issues as to the other individuals in the study, so it would only be appropriate in this case to allow the release of the information as to Ms. Bell.

(ECF No. 220-2 at 8:15-21.) If it is inappropriate to request it in any other case, and Plaintiff withdrew Moline in this, an *appropriate case*, Plaintiff's counsel

is essentially given free rein to commit fraud—provided they never disclose Moline as an expert in any of the 32 remaining cases that were included in her study. How is that equitable?

## V. **CONCLUSION**

AII asks the Court to vacate the preliminary protective order in light of Moline's recent testimony relying on Ms. Bell's information in other cases. The single Northwell document shows that Ms. Bell was one of the cases Moline included in her Article. If that information continues to be protected by this Court's order, Moline and plaintiffs' counsel are free to mislead courts and fact finders across the nation with the false claim that none of the 33 cases involved alleged exposures to asbestos other than contaminated cosmetic talc. Facts of the *Bell* case clearly contradict that assertion. Moline should not be allowed to continue to testify and be shielded from anyone even mentioning the *Bell* case because of the preliminary protective order. No good purpose would be served by such an order, and it would allow perpetuation of a misrepresentation on future courts, fact finders, and the public.

Respectfully submitted this 29th day of September, 2021.

_/s/ Robert E. Thackston_
Robert E. Thackston, NC Bar No. 36330
Kurt W. Greve, TX Bar No. 24007275
LATHROP GPM, LLP
2101 Cedar Springs Rd., Suite 1400

Dallas, TX 75201-2134
Telephone: (469) 983-6023
Facsimile: (469) 983-6101
Email: robert.thackston@lathropgpm.com
kurt.greve@lathropgpm.com

*/s/ Timothy Peck*
Timothy Peck, NC Bar No. 9991
Richard A. Coughlin, NC Bar No. 19894
FOX ROTHSCHILD LLP
230 North Elm Street, Suite 1200
Greensboro, NC 27401
Telephone: (336) 378-5307
Fax: (336) 378-5400
E-mail: tpeck@foxrothschild.com
rcoughlin@foxrothschild.com

*Counsel for Defendant American International Industries*

## CERTIFICATE OF WORD COUNT

This brief complies with Local Rule 7.3(d)(1)'s word count limitation. The word count feature on Microsoft Word states that the word count of the entire brief is 6,091 words, within the 6,250 word limit.

*/s/ Timothy Peck*
Timothy Peck, NC Bar No. 9991
FOX ROTHSCHILD LLP

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that I electronically filed the foregoing document with the Clerk of the United States District Court for the Middle District of North Carolina using the CM/ECF system, which will send notification of this filing and an electronic copy of same to all counsel of record registered with the CM/ECF system, and I hereby certify that I have thereby electronically served the document upon all counsel in this action registered with the CM/ECF system.

This 29th day of September, 2021.

*/s/ Timothy Peck*
Timothy Peck, NC Bar No. 9991
FOX ROTHSCHILD LLP

Case 1:17-cv-00111-WO-JEP   Document 369   Filed 09/29/21   Page 28 of 28