IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Greensboro Division

| | | |
|---|---|---|
| Lloyd Bell, individually and as Executor of the Estate of Betty Whitney Bell, Deceased, | § § § § | |
| Plaintiff, | § | Case No. 1:17-cv-111-WO-JEP |
| v. | § § | |
| American International Industries, Inc., et al., | § § § § | |
| Defendants. | § | |

DEFENDANT AMERICAN INTERNATIONAL INDUSTRIES' REPLY IN SUPPORT OF MOTION TO VACATE PRELIMINARY PROTECTIVE ORDER OF SEPTEMBER 25, 2020

ARGUMENT

A. Plaintiff wrongly suggests that AII bears the burden of showing good cause to vacate the protective order.

The challenged protective order relates to documents in the Court's record. *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2nd Cir. 2004)("A district court that concludes … there is a public right of access to judicial documents thus acts within its jurisdiction when it modifies or vacates a protective order to allow that access…"). On September 25, 2020, Magistrate Peake entered a verbal protective order covering what Plaintiff represented to

be personal medical and privileged research information. In reality, it was one line in a five-page redacted document produced by Northwell Health ("Northwell document"). (ECF 274-8, Hr'g Tr. at 96:6-16.) On March 25, 2021, AII filed the Northwell document with its Opposition to Northwell's Objections and Appeal. (ECF 331 & 331-17). Over AII's objections, the Magistrate sealed the document based on the prior protective order, which was secured with representations that confidential medical and research information was at issue. (ECF 274-8, Hr'g Tr. at 70:17-25.)

There is no confidential medical information or research in the Northwell document. The protective order merely shielded information showing that Moline made misleading—if not patently false—statements in her Article. (ECF 274-1, "Mesothelioma Associated with the Use of Cosmetic Talc" (2020) ("Moline Article" or "Article".) Because shielding false statements in a published article is not a proper purpose of a protective order, the September 25th order should be dissolved.

**B.    Even if the standard advocated by Plaintiff applies, Plaintiff bears the burden of showing good cause to continue the protective order.**

"Rule 26(c) does not explain…whether the party seeking or opposing the modification bears the burden of showing good cause," *Factory Mut. Ins. Co. v. Insteel Indus., Inc.*, 212 F.R.D. 301, 303 (M.D.N.C. 2002), and there is no

2

controlling Fourth Circuit authority on the issue.[1] Even in jurisdictions requiring the party seeking modification to show good cause, they do so only in certain circumstances.

Whether the party seeking modification has the burden of showing good cause "depends on whether the parties were required to demonstrate good cause for the issuance of the order, whether the parties relied on the order, and whether the parties stipulated to the terms of the order." *Factory Mut. Ins. Co.* 212 F.R.D. at 303. These factors weigh in favor of placing the burden on Plaintiff to show good cause for maintaining the protective order on a single document that shows their expert published a misleading Article used to support a new chapter in toxic tort litigation against cosmetic talc companies.

*First*, the parties did not stipulate to a protective order. AII opposed protection and has consistently stated there is no reason to seal a record showing Plaintiff's expert used her litigation file on Ms. Bell in a supposed study of possible causes of mesothelioma. (ECF 197; ECF 274-8.)

---

[1] *In re Kolon Industries Inc.*, 479 Fed.Appx. 483 (4th Cir. 2012) (unpublished decision) (suggesting good cause is the standard); *United States v. (Under Seal),* 794 F.2d 920, 928 n.6 (4th Cir.1986) (discussing in dicta good cause as potentially the standard). Courts are split on the issue. *Omega Homes, Inc. v. Citicorp Acceptance Co.*, 656 F. Supp. 393 (WD Vir. 1987) ("In considering motions to modify protective orders, courts are split as to whether the burden of showing good cause for continued protection lies with the protected party or with the party seeking modification.") *SmithKline Beecham Corp. v. Synthon Pharms., Ltd.*, 210 F.R.D. 163, 166–67 (M.D.N.C. 2002) (requiring good cause to modify protective order but citing no cases from the Court of Appeals for the Fourth Circuit); *Factory Mut. Ins. Co.,* 212 F.R.D. at 303 (same).

3

*Second*, although the Magistrate may have conditionally accepted Plaintiff's argument that the Northwell document contained confidential medical and research information, more than once she reminded the parties that the protective order was tentative and subject to reconsideration. (ECF 274-8 at 96:12-16)(applying very deferential standard in granting the motion and stating it could be revisited for "any reason".)

*Third*, Plaintiff has not relied on the protective order in any manner that would justify its continued enforcement. Plaintiff did not enter into a protective order prior to a document production to "facilitate discovery." *Factory Mut. Ins. Co.* 212 F.R.D. at 305. Nor did he produce the document—even though the Court ruled it should have been produced as part of Rule 26 disclosures. The Magistrate clearly contemplated that Moline would be confronted with the document when deposed. But rather than allowing Moline to answer questions about whether her Article included Ms. Bell and how the facts of Ms. Bell's case contradict the Article, Plaintiff never tendered Moline for deposition (despite repeatedly claiming they were about to).[2]

---

[2] Plaintiff now claims he withdrew Moline as an expert because she would have had to sit "for deposition while Northwell's motion was pending," and because "Plaintiff determined that he could prove his case with the remaining experts." (ECF 377 at 8.) Plaintiff previously and strenuously claimed he had not withdrawn Moline. ((ECF 274-8, Hr'g Tr. (9/25/20) at 115:17-19)(stating they were going to offer her); ECF 312, Joint Rpt. (3/5/21) at 11 (affirming they were going to offer her); ECF 318, Northwell Obj. to and Appeal from 2/25/21 Order at 6.)

4

Consequently, because (i) AII did not agree to the protective order, and (ii) Plaintiff did not rely on it, Plaintiff has the burden to show good cause for maintaining the protective order and continuing to seal information that is in the public interest to disclose.

C.  **Even if AII bears the burden, there is good cause to vacate the protective order and unseal the single document showing Ms. Bell's litigation information was used in Moline's Article.**

The Court should not allow use of a protective order to shield information of public importance. Moline published an Article claiming to find a novel link between cosmetic talc and mesothelioma. Moline's conclusions are based on the claim that she reviewed 33 litigation cases with no possible asbestos exposure other than cosmetic talc. The Northwell document shows that *Bell* was one of the 33 cases, and the evidence available to Moline in *Bell* certainly included claims of alternative exposure to asbestos (i.e., her two workers' compensation claims). (*See* ECF 369, at 15-16.) In essence, Plaintiff asks this Court to facilitate Moline's ability to continue testifying in ways that are flatly contradicted by the cases she claims to rely on. That is not a proper purpose of a protective order.

The impact that cosmetic talc litigation is having on businesses is a matter of public interest. Litigation costs have forced numerous talc

manufacturers to withdraw products.[3] (ECF 369 at 17.) Most recently, Johnson & Johnson[4] entered into bankruptcy as a result of liabilities associated with talc litigation. In its Informational Brief filed on October 14, 2021, J&J specifically mentioned misrepresentations in the scientific literature as a factor forcing it into bankruptcy. It identified the Moline Article and its litigation-driven claims as part of the false pseudo-scientific information propping up talc litigation:

> The [Moline] article itself presents facts skewed to favor the plaintiffs' litigation positions. One key contention in the article is that, for every subject in the study, cosmetic talc was the only potential source of asbestos exposure. This is inaccurate… Through those plaintiffs' disclosures and other information obtained in litigation, counsel has identified clear evidence of their other asbestos exposures.

(*See* Informational Brief of LTL Management LLC at 94-95, attached as **Exhibit A**.)

J&J's Brief, filed after AII's motion, identified *yet another plaintiff* in Moline's study that had alternate exposures to asbestos. (*Id.* at 98 n.378, identifying Case 6). This brings the total number of plaintiffs in Moline's

---

[3] Plaintiff claims the statement that Defendants have been forced to withdrawn cosmetic talc due to rising litigation is disingenuous because it "impl[ies] that AII was forced to switch to cornstarch because of the Moline Study and her alleged misrepresentation regarding one of her 33 subjects." AII never said that. AII said that rising litigation has caused companies to stop selling long-standing products. J&J is the latest example.

[4] LTL Management LLC was the debtor and indirect subsidiary of J&J. (*See* **Ex. A**, at 1.) AII will refer to it as "J&J's Brief" for simplicity.

Article that AII or other defendants have identified as potentially misrepresented to five. (ECF 340-2, *Chenet v. Colgate-Palmolive Co.*, No. 2018-12536 (Civ. Dist. Ct. Parish of New Orleans, Louisiana Mar. 25, 2021) (citing cases 3, 4, 17, & also 9, which is Ms. Bell).) Yet, Plaintiff asks this Court to allow Moline to continue hiding that fact, so she can testify about her "study" without fear of contradiction.

While J&J suspects that the facts of the 33 cases on which Moline claims to rely do not support her conclusions, those involved in this case know for certain they do not (because *Bell* is one of them). This is information that should not be concealed from the public, much less the litigants outside *Bell*. The Northwell document is a judicial record subject to the common law right of access. Because it relates to ongoing litigation of public concern, the protective order should be vacated and the document unsealed.

**D.   Plaintiff claims that Ms. Bell's two workers' compensation claims are irrelevant to Moline's conclusion that the only possible asbestos exposures were from cosmetic talc.**

Plaintiff, in effect, asks the Court to conclude that his counsel had no good faith basis to file not one, but two, workers' compensation cases alleging Ms. Bell was occupationally exposed to asbestos at her industrial worksites and those exposures caused her mesothelioma. No such fact-finding is necessary here. All that matters is whether the Northwell document deserves

7

to be protected. Keeping the protective order in place means Moline never has to answer questions about her inclusion of Ms. Bell in her Article, per order of the *Bell* court. Judge Peake did not intend to forever shield an expert from logical cross-examination about scientific opinions. In fact, she ruled to the contrary—stating that, if Moline wanted to express opinions about her study, she must discuss whether Ms. Bell was one of the participants.

Plaintiff's workers' compensation claims are relevant evidence. Evidence is relevant if "(a)…it has *any tendency* to make a fact *more or less probable* than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 402 (a) & (b) (emphasis added). *Sentis Grp., Inc. v. Shell Oil Co.*, 763 F.3d 919, 926 (8th Cir. 2014) ("…Plaintiffs cannot, by their sole insistence, declare evidence undiscoverable and irrelevant merely because it does not fit into their own theory of the case.")

Plaintiff's counsel routinely discloses Moline as an expert in cases across the country, and she and other plaintiffs' experts rely on her Article to "prove" that cosmetic talc causes mesothelioma. (ECF 369 at 11.) Ms. Bell and her husband (on her behalf) both filed claims, subject to criminal penalty,[5] alleging exposure to asbestos at her industrial jobsites. This is, by definition, "relevant evidence" because it "has a tendency to make" the factual claim that none of

---

[5] N.C.G.S. Ann. § 97-88.2(a)(making false statements to obtain benefits is a crime).

Moline's participants had alternative exposures "less probable than it would be without the evidence." Fed. R. Evid. 402. Such evidence goes to the reliability of Moline's methodology and the credibility of her assessment of the plaintiffs' alternative exposures. That Plaintiff, his counsel, and his expert now attempt to back away from those statements does not make them any less relevant. Nor does it mean there is "no actual evidence" that Ms. Bell was exposed to asbestos at her jobsites.[6]

On this point, Plaintiff claims that Ms. Bell chose to later contradict herself (kind of).[7] (ECF 377 at 4.) At deposition, Ms. Bell testified to filing the workers' compensation claims but then stated she did not know if she was actually exposed at Cannon Mills (Pillowtex) or Celanese as asbestos was not discussed. (ECF 333-12, Betty Bell Dep., v.3 (6/21/16)) at 514:16-515:1, 527:24-528:8, & 530:11-532:5.) A more plausible inference is that Ms. Bell "contradicted" herself when she realized, or was instructed on, the potential implications of the compensation claims on her civil case against the cosmetic talc manufacturers. Regardless, her later "contradiction" does not make her

---

[6] Plaintiff's counsel, Wallace & Graham, previously filed briefing claiming that one of those companies should be subject to punitive damages for hiding information about workers' asbestos exposure. *Schenk v. HNA Holdings, Inc.*, 613 S.E.2d 503 (N.C. App. 2005).

[7] Mr. Bell later re-filed a worker's compensation claim on Ms. Bell's behalf. (ECF 188-10, Lloyd Bell's Form 18B.)

9

earlier statement any less relevant. It simply renders her testimony subject to impeachment by inconsistent statement.

Plaintiff also argues that, because Ms. Bell filed two workers' compensation claims against two different employers, there is uncertainty about her exposure at either plant. (ECF 377 at 15-16.) This makes no sense.[8] Plaintiff's experts, including Moline, have routinely and repeatedly stated that every exposure to asbestos contributes to disease, which, in this case, would include Ms. Bell's exposure at both jobsites. (Moline Trial Tr. in *Lashley* (3/9/20) v.1 at 144:24-145:5 and 156:22-157:1, attached as **Exhibit B** (affirming any exposure above background contributes to disease); Brody Dep. in *Hanson* (6/15/17) at 20:21-22, attached as **Exhibit C** (any exposure contributes).) Indeed, that's precisely why Moline's claim that none of the 33 plaintiffs in her Article had alternative exposures is so critical to her ultimate conclusion.

To prevent a preliminary decision from shutting off necessary future cross-examination of Moline, her Article, and all the plaintiffs' experts who rely thereon, the protective order should be vacated.

---

[8] Plaintiff also suggests that, because the North Carolina Worker's Compensation Act permits only the employer of the "last injurious[]" exposure to be held liable, this somehow undermines the importance of Ms. Bell's admissions. That conclusion is simply an operational aspect of the Act, not a scientific determination of causation.

10

### E. AII will be prejudiced if the Protective Order is maintained because it cannot effectively cross-examine Moline.

Plaintiff argues that Moline's recent cross-examination in *McNeal* shows that AII will not be prejudiced if the protective order is maintained. (ECF 377 at 16-17.) Plaintiff's example, however, demonstrates the opposite. Rather than cross with actual evidence, counsel in *McNeal* was relegated to asking ineffective hypotheticals that Moline could easily deny without fear of impeachment:

> Q Okay. And after you published the paper and testified in Congress about the paper, did you come to learn that some of the information regarding one or more of the people in your study was incorrect as published?
>
> A There was a question about one particular individual that I was presented with information about, but I -- based on the information that I had, there was -- **it wasn't determined that they had the — any additional exposure**. I'm not sure of any others.

(ECF 377 at 16-17.)

If the protective order was not in place, AII could: (i) confirm Ms. Bell was a study subject, (ii) cross Moline with the two workers' compensation claims Ms. Bell filed, under oath, claiming occupational exposure, and (iii) demonstrate that Moline had these documents before her Congressional testimony and paper were published. Moline could then explain to a jury how

11

she disregarded Ms. Bell's own sworn statements of exposure to come to a conclusion directly contradictory to them.

**F.     Moline's study is not dispassionate research by a neutral scientist—it's litigation advocacy that should be subject to discovery like any other expert opinion.**

Plaintiff implies that Moline's study is comparable to dispassionate scientific research. (ECF 377 at 18.) This is misleading in that Moline's study was performed by a litigation expert, on plaintiffs with filed lawsuits, and using litigation files as the basis for her opinions. The proper description of that is "expert litigation opinion." Merely publishing it and subjecting it to (minimal) peer-review does not magically convert it to something else. Nor does it transform otherwise public information into something "confidential."

To hold otherwise opens the door for litigation experts to launder their opinions through peer-reviewed journals (many of which have very low standards), thereby simultaneously cloaking them with an air of reliability yet insulating them from discovery. It is for this very reason that *Daubert* treats "research independent of litigation" differently from litigation-driven research. *In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*, 424 F. Supp. 3d 781, 790 (N.D. Cal. 2020) ("Consideration should also be given to whether the expert's testimony springs from research independent of the

12

litigation.")(Citations omitted). Litigation-driven research, like Moline's, is discoverable.[9]

## G. The Court should not entertain Plaintiff's efforts to misleads courts and fact finders.

Even the attorney-client privilege, the bedrock of our judicial system, exempts from its ambit of protection, communications in furtherance of a fraud. *In re Grand Jury Subpoena*, 884 F.2d 124, 127 (4th Cir. 1989). Similarly, attorneys, as officers of the court, are not permitted to sit back and allow clients to knowingly testify falsely under oath. *See* Model R. Prof. Conduct 3.3 (lawyer must take remedial action upon learning witness called by lawyer made materially false statement). In her order, the Magistrate recognized a roadmap exists—which Plaintiff seized upon—for the perpetuation of Moline's misrepresentations: Simply don't offer Moline as an expert in any of the 33 cases included in her Article. (ECF 274-8, Hr'g Tr. (9/25/20) at 56:24-57:2)("If Dr. Moline is not going to be an expert in this case, we can exclude Dr. Moline as an expert, and then that can stay confidential, and we'll require them to destroy all of that information"). With plaintiffs' prolific use of Moline as an

---

[9] Plaintiff points to the testimony of two "defense" experts to buttress Plaintiff's contention that the information should be privileged. (ECF 377 at 14-15.) While both physicians may be respected in their fields, they are not the arbiters or interpreters of the law.

13

expert and her Article as the basis of this burgeoning litigation, that cannot be the rule of law. Nor was it the intention of the Court.

## CONCLUSION

Whether framed as vacating the oral, preliminary protective order or unsealing the Northwell document, or both, the bottom line is that the Court should rescind its protective order precluding defendants from using a document the contents of which Plaintiff himself has disclosed in public filings. Maintaining the protective order shields all of plaintiffs' experts from healthy cross-examination into the reliability of Moline's Article and prevents AII and other cosmetic talc defendants from challenging the "science and data" behind plaintiffs' theory that cosmetic talc is capable of causing mesothelioma.

Respectfully submitted this 3rd day of November, 2021.

/s/ Robert E. Thackston
Robert E. Thackston, NC Bar No. 36330
Kurt W. Greve, TX Bar No. 24007275
LATHROP GPM, LLP
2101 Cedar Springs Rd., Suite 1400
Dallas, TX 75201-2134
Telephone: (469) 983-6023
Facsimile: (469) 983-6101
Email: Robert.thackston@lathropgpm.com
Kurt.greve@lathropgpm.com

/s/ Timothy Peck
Timothy Peck, NC Bar No. 9991
Richard A. Coughlin, NC Bar No. 19894
FOX ROTHSCHILD LLP

14

230 North Elm Street, Suite 1200
Greensboro, NC 27401
Telephone: (336) 378-5307
Fax: (336) 378-5400
E-mail: tpeck@foxrothschild.com
rcoughlin@foxrothschild.com

*Counsel for Defendant American International Industries*

## **CERTIFICATE OF WORD COUNT**

This brief complies with Local Rule 7.3(d)(1)'s word count limitation. The word count feature on Microsoft Word states that the word count of the counted portions of this brief is 3,120 words, within the 3,125 word limit.

*/s/ Timothy Peck*
Timothy Peck, NC Bar No. 9991
FOX ROTHSCHILD LLP

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that I electronically filed the foregoing document with the Clerk of the United States District Court for the Middle District of North Carolina using the CM/ECF system, which will send notification of this filing and an electronic copy of same to all counsel of record registered with the CM/ECF system, and I hereby certify that I have thereby electronically served the document upon all counsel in this action registered with the CM/ECF system.

This 3rd day of November, 2021.

*/s/ Timothy Peck*
Timothy Peck, NC Bar No. 9991
FOX ROTHSCHILD LLP